**THE LIBERTY VIEW BUILDING**
**SUITE 420**
**457 HADDONFIELD ROAD**
**CHERRY HILL, NJ 08002**
————————

Wesley Fenza                                                                                Direct Dial (856)406-4339
Member of PA and NJ Bars                          (856) 662-1018                     E-mail:  wfenza@weirpartners.com
                                                  (856) 662-1592 FAX


July 31, 2014


Hon. Noel L. Hillman, U.S.D.C.J.
United States District Court for the
     District of New Jersey
Mitchell H. Cohen U.S. Courthouse, Room 6020
1 John F. Gerry Plaza
P.O. Box 2706
Camden, New Jersey 08101

         **Re:      Fraternal Order of Police, Lodge 1, et al v. City of Camden, et al**
                  **Civil Action No. 10-1502 (NLH)(AMD)**

Dear Judge Hillman:

         This firm represents the City of Camden in the above captioned matter.  Defendant City of Camden's Motion for Summary Judgment was filed yesterday as Document 144.  However, we are refilling the supporting Memorandum of Law because of a formatting error in the printing of same. There is no change in the substance of the Memorandum of Law

         I thank the Court for its attention and courtesies


                                       Respectfully,


                                       WEIR & PARTNERS LLP



                                       /s/ Wesley Fenza, Esq._____
                                       WESLEY FENZA, ESQ.



WF/mb
Encl.
cc: Gregg L. Zeff, Esq.  (via ECF)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| FRATERNAL ORDER OF POLICE, LODGE 1, JOHN WILLIAMSON, ANTHONY GALIAZZI, and CHARLES J. HOLLAND, Plaintiffs,<br><br>v.<br><br>CITY OF CAMDEN, SCOTT THOMSON, ORLANDO CUEVAS, and LIEUTENANT JOSEPH WYSOCKI, Defendants. | CIVIL NO. 10-1502 (NLH)(AMD)<br><br><br>**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

## TABLE OF CONTENTS

Table of Contents .................................................................................................................i

Table of Authorities ...........................................................................................................iii

Statement of Undisputed Facts ............................................................................................1

    I.    A. The Directed Patrol Program...................................................................................1

    II.    Holland and Galiazzi Were Identified as Low Performers.......................................3

    III.    Galiazzi and Holland Transferred ............................................................................7

    IV.    Williamson's Disciplinary Violations.......................................................................9

    V.    Sgt. Wysocki's Role................................................................................................11

    VI.    Orders Issued by Commanders ...............................................................................12

    VII.    The Disbanding of the City of Camden Police Department .............................14

Legal Argument .................................................................................................................15

    I.    Summary Judgment Should be Granted on Count I Because the Camden City Police Department Did Not Have a Quota System .......................................................................16

    II.    Summary Judgment Should be Granted on Count I Because N.J.S.A. 40A:14-181.2 Provides No Private Cause of Action....................................................................................18

    III.    Summary Judgment Should be Granted on Count II Because the Undisputed Facts Show that A CEPA Claim Cannot be Supported ..........................................................20

i

A.    It was unreasonable for plaintiffs to believe that the City's actions were illegal or in violation of public policy and therefore a CEPA claim cannot be established. ...................... 22

B.    Plaintiffs cannot prove a causal connection between an adverse employment action and a whistleblowing activity. ............................................................................................ 28

IV.    Summary Judgment Should be Granted on Counts III and V Because Plaintiffs Have Failed to Establish Facts to Support Their Due Process Claims .................................................. 32

V.    Summary Judgment Should be Granted on Count IV Because Plaintiffs Cannot Prove a Violation of the First Amendment. ...................................................................................... 33

A.    Galiazzi's and Holland's Statements Were Not Made As Citizens Expressing on a Public Concern. ....................................................................................................................... 33

B.    Plaintiffs' speech was made in their official capacity, not in their capacity as citizens. 34

VI.    Summary Judgment Should be Granted on Count VI Because Plaintiffs Cannot Prove that the City Instituted an Illegal Policy, Custom, or Practice Related to Quotas. ..................... 37

VII.    Summary Judgment Should be Granted on Counts VII and VII Because There Are No Facts in Dispute That Could Establish a Violation of the Federal Family Medical Leave Act or the New Jersey Family Leave Act. ........................................................................................ 37

VIII.    Summary Judgment Should be Granted on All Counts to Sgt. Joseph Wysocki Because there is No Evidence that He Committed Any Violation Against Any Plaintiff ....................... 39

IX.    Individual Defendants Police Chief John Scott Thompson, Inspector Orlando Cuevas, and Sgt. Joseph Wysocki are Entitled to Qualified Immunity ....................................................... 40

X.    Plaintiffs Have Not Met the Threshold for a Punitive Damages Claim ............................. 42

XI.    Plaintiffs' Requests for Declaratory Judgment and Injunctive Relief are Moot ............. 42

XII.    Plaintiffs' Requests for Front Pay Must be Stricken ........................................................ 44

Conclusion .................................................................................................................................... 46

# TABLE OF AUTHORITIES

## Cases

Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405 (1994) .........................................21

Advance Elec. Co., Inc. v. Montgomery Tp. Bd. of Educ., 351 N.J. Super. 160 (App. Div. 2002) .46

Alexander v. Sandoval, 532 U.S. 275 (2001) ..................................................................19

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ......................................................15

Battaglia v. United Parcel Service, 214 N.J. 518 (2013) ....................................................24

Blackburn v. UPS, 3 F. Supp. 2d 504 (U.S.D.C. 1998) ................................................22, 24

Borough of Tinton Falls Police Dept., 98 F.3d 107 (3rd. Cir. 1996) ......................................16

Bunting v. Mellen, 541 U.S. 1019 (2004) ......................................................................46

Carswell v. Borough of Homestead, 381 N.J. 235 (App. Div. 2004) ......................................42

Carswell v. Borough of Homestead, 381 F.3d 235 (3d Cir. 2004) ..........................................44

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ................................................................15

Coleman v. Kaye, 87 F.3d 1491 (3rd Cir. 1986) ..............................................................45

Connick v. Myers, 461 U.S. 138 (1983) ........................................................................35

Crescent Park Tenants Ass'n v. Realy Equities Corp. of N.Y., 58 N.J. 98 (1971) ......................45

Delaware v. Prouse, 440 U.S. 648 (1979) ......................................................................27

Desvi, Inc. v. Continental Ins. Co., 968 F.2d 307 (3rd Cir. 1992) .........................................16

DiBiase v. SmithKline Beecham Corp. 48 F.3d 719 (3d Cir.) ...............................................16

Digital Equipment Corp. v. Desktop Direct, Inc., 511 U.S. 863 (1994) ..................................43

Estate of Roach v. TRW, Inc., 164 N.J. 598 (2000) ..........................................................30

Garcetti v. Ceballos, 547 U.S. 410 (2006) ...............................................................36, 38

Green v. Phila. Housing Auth., 105 F.3d 882 (3d Cir. 1997) ...............................................35

Harlow v. Fitzgerald, 457 U.S. 800 (1982) ....................................................................42

Hersh v. Allen Products Co., 789 F.2d 230 (3rd Cir. 1986) .................................................15

In re City of Plainfield's Park-Madison Site, 372 N.J. Super. 544 (App. Div. 2004) ..................46

Linan-Faye Costr. Co. v. Housing Auth., 49 F.3d 915 (3rd Cir. 1995)...................................16

Marrero v. Camden County Board of Social Services, 164 F.Supp.2d 455 (D.N.J. 2001) ..............40

Matsushita Elec. Indus. Col, Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) ..................16

Matter of Advisory Committee on Professional Ethics Opinion 621, 128 N.J. 577 (1992) ............47

Matter of Ass'n of Trial Lawyers of America, 228 N.J.Super. 180 (App. Div. 1988).....................46

Maw v. Advanced Clinical Communications, 179 N.J. 439 (2004) ...................................28, 30

Mehlman v. Mobil Oil Corp., 153 N.J. 163 (1998) ..........................................................29

Mitchell v. Forsyth, 472 U.S. 511 (1985) ................................................................42, 43

Monell v. Dep't of Social Services of City of New York, 436 U.S. 658 (1978) .........................39

Orsatti v. New Jersey State Police, 71 F.3d 480 (3rd Cir. 1995).........................................16

Pearson v. Callahan, 555 U.S. 223 (2009)................................................................42, 43

Philbin v. Trans Union Corp., 101 F.3d 957 (3d Cir.1996) .................................................31

Pickering v. Board of Education, 391 U.S. 563 (1968).......................................................35

Quinlan v. Curtiss-Wright Corp., 425 N.J.Super. 335 (App. Div. 2012) ...........................47, 48

R.J. Gaydos Ins. Agency, Inc. v. National Consumer Ins. Co., 168 N.J. 255 (2001) .............19, 20

Romano v. Brown & Williamson Tobacco Corp., 284 N.J. Super. 543 (App. Div.1995)................30

Rosko v. Pagano, 466 F.Supp. 1364 (D.N.J. 1979) .........................................................38

Saucier v. Katz, 533 U.S. 194 (2002) ..........................................................................43

Smith v. Wade, 461 U.S. 30 (1983)..............................................................................45

State v. Abreu, 257 N.J. Super. 549 (App.Div.1992) ............................................................ 27
State v. Dangerfield, 339 N.J. Super. 229 (App.Div.2001) .................................................. 27
State v. Harbatuk, 95 N.J.Super. 54 (App. Div. 1967) ........................................................ 18
State v. Sheffield, 62 N.J. 441 (1973) ................................................................................. 27
State v. Sirianni, 347 N.J. Super. 382 (App. Div. 2002) ..................................................... 27
State v. State Troopers Fraternal Ass'n., 134 N.J. 393 (1993) ........................................... 38
State v. Stovall, 170 N.J. 346 (2002) ................................................................................. 27
Sterling v. Borough of Minersville, 232 F.3 190 (3d Cir. 2000) ........................................ 44
Synnex Corp. v. ADT Sec. Services, Inc., 394 N.J.Super. 577 (App. Div. 2007) .............. 19
Williams v. Pharmacia, Inc., 137 F.3d 944 (7th Cir. 1998) ............................................... 48
Young v. Schering Corp., 141 N.J. 16 (1995) .................................................................... 21

## Statutes

29 U.S.C.A. 2612 ............................................................................................................... 38
42 U.S.C.A. § 1983 ........................................................................................................... 33
N.J.S.A. 10:5-13 ................................................................................................................ 19
N.J.S.A. 34:11B ................................................................................................................. 38
N.J.S.A. 34:19-3 ................................................................................................................ 21
N.J.S.A. 34:21-6 ................................................................................................................ 19
N.J.S.A. 39:5F-4 ................................................................................................................ 17
N.J.S.A. 40A:14-150 .......................................................................................................... 20
N.J.S.A. 40A:14-181.1 ....................................................................................................... 17
N.J.S.A. 40A:14-181.2 ................................................................................... 16, 17, 18, 20, 24
N.J.S.A. 56:8-159 .............................................................................................................. 19

## Rules

F.R.C.P. 56(c) .................................................................................................................... 15
F.R.C.P. 801 ...................................................................................................................... 29

<u>**STATEMENT OF UNDISPUTED FACTS**</u>

**I.      A. The Directed Patrol Program**

1.    In 2008, the City of Camden Police Department evaluated the capacity and flexibility of the daily operation of the department and created a violence reduction initiative. Exhibit A (Deposition of Chief Thompson) at 42:2, 49:19; Exhibit B (Violence Reduction Initiative) at 1.

2.    The purpose of the violence reduction initiative was to ensure that the maximum amount of resources was allocated to a proactive crime prevention strategy and better balance police response to community-generated calls. Ex. B at 1.

3.    Part of the violence reduction initiative was the introduction of a directed patrol program. During an officer's non-obligated time, the officer was to be given a structured 15-20 minute deployment into a targeted area to accomplish a specific patrol or crime reduction function. Unless extenuating circumstances existed, directed patrols were meant to last only 15-20 minutes. Ex. B at 9.

4.    Directed patrols had always existed in the department; the difference in the new system was that directed patrols would be tracked and recorded. Ex. A at 33:12-20.

5.    Under the new violence reduction initiative, directed Patrols were to be logged by the CAD system under code 10-43. For additional accountability, supervisors were expected to visit officers on directed patrol assignments to provide guidance and ensure that issues were being properly addressed. Ex. B at 10.

6.    While on directed patrols, officers were expected to patrol the area, address criminal conditions, and talk to people in the community about crime conditions in the neighborhood. Ex. A at 61:13-24.

7.    If an officer did not see any criminal activity on a directed patrol, the officer was then expected to approach community members present and inquire about criminal activity or

1

quality of life issues. Exhibit C (Deposition of Anthony Galiazzi) at 16:3-7; Exhibit D (Deposition of Charles Holland) at 73:9-11.

8.  Directed patrols were not expected to necessarily result in an arrest, citation, or search of any individual. Ex. C at 36:22-37:8; Ex. D at 98:19-99:24.

9.  When an officer engaged with a citizen, that officer was to fill out a field contact card containing demographic and identifying information about the individual contacted. Ex. C at 16:3-20. Exhibit E (field contact card).

10.  Officers were never instructed to use any type of force or restraint in order to obtain information for field contact cards. Ex. C at 19:20-23.

11.  Field contact cards were not permitted to be turned it with fields left blank, but any field that requested information that was not available could be marked "unknown" and the card would be accepted. Exhibit FF (Deposition of Scott Shaw) at 48:1-23.

12.  Officers were not expected to produce any certain number of field contact cards, but officers were expected to maintain a satisfactory engagement rate with citizens in their patrol area. Exhibit K (Deposition of Michael Lynch) at 25:10-18. Exhibit L (Deposition of Orlando Cuevas) at 57:6-20. A field contact card was a way of reporting an engagement with a citizen. Ex. K at 24:5-12.

13.  An "engagement" was any interaction between a police officer and a citizen. Ex. K at 24:24 - 25:1.

14.  An officer's engagement rate was a separate measurement from the number of directed patrols performed. Ex. K at 29:9-17.

15.  Officers on Special Operations were expected to perform at least 27 directed patrols per unit per shift. Officers on Patrol Operations were expected to perform at least 18 directed patrols per unit per shift. The commanders were informed that assignment may detract from

2

the standard, but that any deviations should be explained on each commander's daily report. Exhibit F (9/26/2008 Email from Orlando Cuevas); Ex. L at 60:21 – 61:3.

16.  When patrol officers were informed of the goal number for directed patrols, several officers mistakenly believed that a quota system was being put in place. When such allegations were made by patrol officers, their supervisors would explain that the goal was not absolute, and could be affected by other assignments. Ex. I (10/16/08 memorandum from Orlando Cuevas).

17.  When officers failed to meet their goal number of directed patrols, sergeants and lieutenants were told to provide an explanation as to why the goal was not met, and any corrective action taken. Ex. G (10/3/08 email from Orlando Cuevas); Ex. J (10/27/08) email from Orlando Cuevas.

## II.    Holland and Galiazzi Were Identified as Low Performers

18.  In August of 2008, Plaintiff Anthony Galiazzi was assigned to the supplemental patrol special operations squad, where he received an 11% shift differential. Ex. C at 13:17 – 14:5.

19.  A shift differential is additional pay over an officer's normal salary.  A higher shift differential results in higher pay. Ex. D at 45:22 – 46:7.

20.  Galiazzi interpreted the directed patrol policy to mean that he was required to complete 28 directed patrols per shift regardless of other calls. Ex. C at 33:9-13.

21.  Initially, when on a directed patrol, Galiazzi refused to question any citizens not suspected of a crime, despite his orders to engage any community members present. Ex. C at 19:5-23.

22.  In late September of 2008, Inspector Cuevas, who was overseeing the directed patrol program, became concerned that the CAD system was not accurately capturing all directed patrols performed. Ex. F. There was some disagreement about whether the fault was with

3

officers for failing to report the directed patrols or with dispatchers for failing to record them. Ex. H (10/6/08 memorandum from Harry Leon).

23. In January of 2009, Inspector Cuevas informed each lieutenant that that he or she was to submit a list of the 3 lowest performing officers from his or her command for the month of December. Lieutenants were told to give a detailed explanation for why each officer was selected, and not to base the selection on a single factor such as leave time. Exhibit O (1/30/09 email from Orlando Cuevas).

24. In identifying low performers, Lieutenants were not given any specific criteria, but were told to use their judgment and do an overall assessment of each officer. Ex. A at 134:16-136:15.

25. On Special Operations, low performers were chosen because of excessive unaccounted time and low numbers of engagements or directed patrols. Officers that did not meet their goals with regard to statistical measures were not designated as low performers if they had a reasonable explanation as to why those numbers were not met. Ex. FF at 65:22 – 68:4.

26. On January 27, 2009, Galiazzi was given a verbal counseling regarding his poor attendance. Exhibit N (2/16/2010 memo from Michael Lynch).

27. In January or February of 2009, Holland was informed by his supervisors that he was being placed on the low performer list based on his statistics from December and January. Ex. D at 102:7 – 103:22.

28. Another officer named McCausland was on the low performer list with Galiazzi and Holland. Ex. D at 104:20-23.

29. On January 27, 2009, Holland, Galiazzi, and McCausland were all told that their work performance for the month of December was low. Exhibit O (Certification of Galiazzi) at ¶ 4; Exhibit Q (2/2/2009 Memoradum from Frank Cook).

4

30.  At the meeting, the officers were shown a sheet containing their monthly statistics. Officer McCausland had the lowest statistics of the three. Ex. C at 46:12-47:2; Ex. D at 195:1-8.

31.  The assessment of Holland's, Galiazzi's, and McCausland's performance was based on statistical categories of directed patrols, pedestrian/vehicle stops, moving violations, and quality of life enforcement. Ex. Q.

32.  Galiazzi is unaware of what statistics were used to rank the officers. Ex. C at 127:6 – 128:17.

33.  Lt. Cook, the supervisor of Holland, Galiazzi, and McCausland informed Inspector Cuevas on February 2, 2009 that the three officers were the lowest performers in his squad for the month of December. Ex. Q.

34.  Galiazzi, Holland, and McCausland were given written counseling/warning forms regarding their low performance. Each counseling form stated that a warning was being issued for failure to properly patrol post or zone, and that statistics for the months of December and January were not comparable to other officers in the unit. Exhibit R (Galiazzi counseling form); Exhibit S (Holland counseling form); Exhibit T (McCausland warning form).

35.  Galiazzi believed that the true reason that he was being counseled was a failure to conduct a required number of pedestrian and motor vehicle stops. Ex. C at 39:12-23.

36.  Galiazzi wrote on his counseling form "Quotas are illegal!" Ex. R.

37.  Holland wrote on his counseling form "I have not been provided with any type of baseline to gauge what my numbers should be. I have not been trained or provided any training on the proper amount of statistics that an officer is supposed to provide/generate. I have been a police officer for 14yrs and have never been told that my statistics were below par. I am have not been advised of or trained in what statistics are used to measure productivity. For the

5

months of Dec 2008 + Jan 2009 out of a possible 35 days that could have been worked, I worked 19.5 days. Aprrox. 55% of the days." Ex. S.

38.  On February 6, 2009, Inspector Cuevas emailed Lt. Cook stressing the importance of finding out why Galiazzi believed that a quota was being instituted and making sure that Galiazzi's orders were being given clearly. Ex. W (2/6/09 email from Orlando Cuevas)

39.  Galiazzi was ordered to write an information report explaining his statement that quotas are illegal. In his information report, dated February 2, 2009, Galiazzi indicated that he was not provided with a baseline to gauge what his numbers should be or provided training on the proper amount of statistics he should produce in a shift. Galiazzi also stated "I have been a police officer for 2 ½ years and never had a problem with my statistics before, this is why I said quotas are illegal. It is my opinion that my comment on my counseling form is just that my opinion, and needs no further explaining." Exhibit U (Galiazzi information report).

40.  Holland was also ordered to write an information report about his response to the counseling form. On Febrary 9, 2009, Holland completed an information report stating that his response required no further explanation. Ex. X (Holland information report).

41.  On February 10, 2009, Chief Thompson issued an order stating that every supervisor was responsible for directing all available units to conduct directed patrols in crime hot spot locations, and that units should not be permitted to remain unobligated. The order also stated that officers must engage all persons violated any law or ordinance in the area. Exhibit Y (2/10/09 email from John Thompson).

42.  On the evening of February 13, 2009, Inspector Cuevas conducted a review of directed patrols, and found that only one unit per hour was being produced during certain hours, which, given the goals set by the department, was unacceptable. Exhibit Z (2/14/09 email from Orlando Cuevas).

6

### III.    Galiazzi and Holland Transferred

43.  On February 16, 2009, Lt. Cook recommended to Inspector Cuevas that Holland, Galiazzi, and McCausland be transferred out of the unit. Ex. V (2/16/09 Memorandum from Frank Cook).

44.  On February 20, 2009, Galiazzi was transferred from Special Operations Platoon 4 to Patrol Operations Platoon 4. Ex. O at ¶ 8. His new work hours were from 9:30pm to 7:30am. Ex. C at 45:3-5.

45.  On patrol operations, Galiazzi's shift differential was 10%. Ex. O at ¶ 9.

46.  Galiazzi was aware of the process to appeal a transfer, but did not do so. Ex. C at 45:12-21.

47.  Around the same time, Holland was transferred to patrol operations. Ex. D at 117:23 – 118:14.

48.  Holland's shift differential on patrol operations was 8.5%. Ex. D at 119:4-6.

49.  Holland filed a grievance challenging his and Galiazzi's transfers and requesting that both officers be put back on supplemental patrol. Exhibit AA (grievance form).

50.  In March of 2009, Galiazzi's son broke his arm. Ex. C at 49:1-4.

51.  Galiazzi took 3 weeks of leave time to care for his son. Ex. C at 49:24 – 50:1.

52.  At some point, Galiazzi was told that he would be put on the "abuse of sick time" list, which is a list of people who the administrator believes are using too much sick time. Ex. C at 52:2-9.

53.  Galiazzi had previously been put on the abuse of sick time list for taking excessive time off to care for his son. Ex. C at 52:10-17.

54.  Galiazzi is unaware of who placed his name on the abuse of sick time list. Ex. C at 54:4-5.

55.  In March of 2009, Galiazzi was transferred to a different squad. There was no difference between the squads in terms of hours or compensation. Ex. C at 57:4-14.

56.  On May 22, 2009, Holland was granted leave pursuant to the Family Medical Leave Act to care for his mother for the period of one year. Ex. D at 127:10-13.

57.  Holland used the family leave time intermittently and on no predetermined schedule; he would call the department on the day he was using his family leave time and report that he was going to be out on family leave time that day. Ex. D. at 136:22 – 137:22.

58.  On May 27, 2009, Holland received a memo (that also went to several other members of the police force) regarding the general number of missed days in the department. Ex. D at 130:25 – 132:4.

59.  The memo was addressed to all personnel of Platoon 3 and 6, and stated "[t]his is a verbal warning informing you that the possibility of you receiving a Counseling Form is close…. Check with your immediate supervisor for the exact days…. this is only a verbal warning." Exhibit BB (5/27/09 memo from Captain Grimes).

60.  On June 17, 2009, Holland received notice that he was going to be placed in the chronic sick category. Ex. D at 133:2-7.

61.  In response, Holland spoke to his Lieutenant, who requested documentation of his FMLA approval. Several days later, Holland submitted the requested documentation. Ex. D at 133:2 – 134:8.

62.  On June 18, 2009 and June 24, 2009, Galiazzi was given written reprimands for his chronic absenteeism. Ex. N.

63.  At some point, Galiazzi believed that he was being followed by internal affairs. Ex. C at 68:16 – 70:2.

8

64.  In August of 2009, Galiazzi had a vacation planned to Lake George, NY, which was approved by his supervisors. Ex. C at 61:4-16. The vacation was cancelled but Galiazzi's supervisors due to manpower, but Galiazzi did not report to work. Instead, he called in sick every morning. Ex. C at 62:3 – 65:10.

65.  Galiazzi did not file a grievance related to his cancelled vacation. Ex. C at 63:11-12.

66.  Immediately following his vacation, Galiazzi went out on stress leave and never returned to work. Ex. C at 66:22 – 67:24.

67.  In August of 2009, Holland claims that he was told that he may be marked away without leave from a shooting where he had been present, though he was never charged by internal affairs. Ex. D at 142:14 – 146:21.

68.  On October 21, 2009, Holland was visited at home by one of his supervisors, as a way of checking to make sure he was not abusing sick leave. Holland explained that he was on FMLA, and his supervisor left. Ex. D at 136:5-21.

69.  In November of 2009, Holland was served with a preliminary notice of disciplinary action alleging that he failed to report to a certain location as ordered on September 30, 2009. Exhibit GG (Notice of Preliminary Disciplinary Action).

70.  In December of 2009, Holland transferred to a different police department. Ex. D at 149:9-11.

71.  Holland's disciplinary charges were never resolved due to his transfer. Ex. D at 147:3-15.

## IV.    Williamson's Disciplinary Violations

72.  In November of 2003, Plaintiff Williamson became the President of the Fraternal Order of Police, a police union. Exhibit M (Deposition of John Williamson, Vol. I) at 14:11-13.

9

73.  In January and February of 2009, Plaintiff Williamson, in his capacity as FOP president, filed a number of grievances on behalf of officers who were placed on the low performer list. Ex. M at 43:10-14.

74.  In March 2009, Williamson led the FOP in a rally protesting against the directed patrol program, forced overtime, and other departmental practices. Ex. HH at 42:16-25.

75.  On August 28, 2009, Williamson was charged with disciplinary violations related to an incident at Virtua West Jersey Hosptial. According to the preliminary notice, Williamson "did create a disturbance by belligerently accosting members of the medical staff of Virtua West Jersey Hospital Camden, as they were attempting to provide necessary medical care to a Camden City police officer." Exhibit II (8/28/09 Preliminary Notice of Disciplinary Action).

76.  The disciplinary issue stemmed from a phone call received by Chief Thompson from the President of Virtua Hospital, reporting that Williamson had gotten into a verbal altercation with hospital staff while they were trying to care for an officer. Thompson gave the matter to the Internal Affairs department, who filed charges. Ex. A at 340:3-341:4; Ex. II.

77.  The Virtua incident resulted in Williamson receiving a written reprimand. Williamson did not appeal. Ex. M at 45:21 – 47:14.

78.  At some point, Williamson was investigated regarding a fight that occurred outside of a union meeting that he attended on October 6, 2009. The Complaint filed in this matter indicates that Williamson was reprimanded, but at his deposition, Williamson stated that he believed that was incorrect, and that no discipline was imposed. Ex. M at 50:19 – 51:12.

79.  Williamson was investigated by Internal Affairs for an infraction alleged by Officer Leon Reed on October 21, 2009. Reed alleged that Williamson sent out a letter regarding an upcoming FOP election, and that it contained inaccuracies. Exhibit KK (10/21/09 Internal Affairs

Complaint). Williamson was not formally charged or disciplined for this incident. Ex. M at 50:13-15.

80.  On November 18, 2009, Williamson was charged with disciplinary violations for allegedly failing to report the existence of a flash drive containing confidential internal affairs files which he viewed at the Law Offices of Attorney Tim Quinlan. Exhibit JJ (11/18/09 Preliminary Notice of Disciplinary Action).

81.  The disciplinary charges stemmed from an incident whereby a USB flash drive and some confidential documents were delivered to the office of Williamson's attorney, and Williamson viewed them. The charges were ultimately dismissed by Chief Thompson. Ex. M at 47:18 – 49:20.

## V.    Sgt. Wysocki's Role

82.  Defendant Sgt. Wysocki supervised the internal affairs investigator who investigated the complaints against John Williamson but he had no direct involvement in the investigations. Exhibit LL (Deposition of Joseph Wysocki) at 7:10-13.

83.  Defendant Sgt. Wysocki supervised the neglect of duty internal affairs investigation against Holland but he did not personally initiate it.  Ex. LL at 48:16 - 50:2.

84.  At the time Holland was investigated for the neglect of duty case, internal affairs was using surveillance to observe how officers were responding to dispatch calls.  Ex. LL at 48:25 - 49:15; 51:12-24).

85.  The policy of surveilling officers was in effect before Wysocki was assigned to internal affairs. Ex. LL at 52:4-7.

86.  Plaintiff Holland was not targeted for the neglect of duty internal affairs investigation; he happened to be the officer who responded to a crime condition that was called in by internal affairs.  Ex. LL at 56:11-57:2.

11

87. Defendant Sgt. Wysocki supervised the internal affairs investigator who investigated the complaints against John Williamson but he had no direct involvement in the investigations.   Ex. LL at 78:12 - 79:2; 82:13-18).

88. Plaintiff Galiazzi's only allegation against Defendant Sgt. Joseph Wysocki is that Sgt. Wysocki was the head of internal affairs when Galiazzi was being followed on patrol by internal affairs. Ex. C at 104:1-10.

89. Plaintiff Holland's allegations against Defendant Sgt. Joseph Wysocki are that Sgt. Wysocki was the head of internal affairs while there were investigations against him and Sgt. Wysocki followed the allegedly retaliatory orders of Inspector Cuevas and Chief Thomson.  Ex. D at 169:18 - 170:7.

90. 73.  Plaintiff Williamson's claim against Sgt. Wysocki is based on the fact that Wysocki was in charge of internal affairs at the time Williamson was the subject of internal affairs investigations.  Ex. HH at 23:23 - 24:3.

## VI.    Orders Issued by Commanders

91. On April 3, 2009, Chief Thompson issued a general order clarifying the directed patrol program. The order stated that it was the policy of the department "to fully utilize its unobligated time in a Directed Patrol manner at places, times, and on days where carefully analyzed criminal trend and pattern information, field officer observations and experience, and community stakeholders indicate that crime is occurring or likely to occur." Exhibit CC (General Order 09-02).

92. The general order also stated:

During Directed Patrol assignments, officers are expected to employ a variety of

effective and legal tactics that are specifically design and proven to reduce crimes and

12

other public safety problems. Specifically, in a matter consistent with constitutional law and with principles of professional and respectful policing, units shall be responsible for dealing with:

- Those individuals or conditions responsible for contributing to the diminishment of the neighborhood's quality of life.
- Elements identified as being related to or contributing to crime.
- Infractions of State Law and Municipal Ordinances.

Police Officers are also expected to interact with members of the community to receive their feedback about:

- their neighborhood concerns or issues,
- quality of police service

Supervisors shall ensure that the actions taken by police officers while on directed patrols are consistent with, and reflective of, the problem that they are intending to attenuate, and acting lawful and professional at all times. Ex. CC.

93. On May 28, 2009, Chief Thompson issues a general order "[t]o enhance the effectiveness of field operations by establishing guidelines for investigative detentions." Exhibit DD (General Order 2009-011).

94. The order reiterated the difference between a field inquiry and an investigative detention.

> Field Inquiry: a voluntary and consensual police-citizen encounter supported by no particular level of suspicion or belief, wherein a member poses questions to a suspect who is not compelled to respond or even stop and listen to the questions. Ex. DD at I.A.

95. The order also contained the requirement that whenever a member conducted a field inquiry or received any information about illegal activity, the member was required to complete a community intelligence card. Ex. DD at VII.B.

13

96.  On June 18, 2009, Anthony Carmichael sent an email clarifying that an officer on a directed patrol where there was no one to engage was to clear the first directed patrol and begin another at a different location. Ex. EE (6/18/09 email from Anthony Carmichael).

97.  Deputy Chief Michael Lynch personally instructed all commanders that the directed patrol program "was not a number game," and that they were not to instruct their officers that a certain number of directed patrols were required per shift. Ex. K at 34:15-19. Low performers were to be designated based on the totality of the circumstances. Ex. K at 37:10-20.

**VII.    The Disbanding of the City of Camden Police Department**

98.  The City of Camden no longer has a police force. On May 1, 2013, the City of Camden dissolved its police force. Law enforcement services for the City are now provided by the Metro Division of the Camden County Police Department. Exhibit MM (Police Services Agreement).

99.  As a result, the employment of all Camden City police officers was terminated as of May 1, 2013. Ex. MM.

100.   The staffing and administration of the Metro Division of the Camden County Police Department (hereinafter "Metro Division") was conducted pursuant to a Police Service Agreement (hereinafter "Agreement"). Ex.MM.

101.   By the terms of the Agreement, the County provides all police services to the City on a 24-hour, 7-days-per-week basis, and only the County is responsible for "all facets" of law enforcement activities. Ex. MM at ¶ 2(A).

102.   The County is responsible for creating and enforcing performance standards for the Metro Division. Ex. MM at ¶ 5.

103.   While the County is required to keep the Mayor of the City informed regarding police activities (Ex. MM at ¶ 7), nothing in the agreement gives the City any supervisory authority or control over the Metro Division.

14

104.   Staffing of the Metro Division is fully within the control of the County, and the County is the "sole hiring authority." Ex. MM at ¶ 3(A).

105.   The Agreement provides:

>   It is specifically understood that this agreement is not a merger of the County and City Police Department. There are no expectations and/or promises of employment to any employee (sworn or non-sworn personnel) of the City of Camden.

Ex. MM at ¶ 3(D).

106.   The staffing of the Metro Division was fully under the control of the County, and free from any City Control. Ex. MM at ¶ 3(D)

107.   The County considered applications from any police officers who wished to apply. Exhibit NN (Civil Service Commission Order establishing pilot program) at 2.


## **LEGAL ARGUMENT**

The court must enter summary judgment if the pleadings, depositions, or answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. F.R.C.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Hersh v. Allen Products Co.*, 789 F.2d 230, 232 (3rd Cir. 1986). A fact is material if a dispute over that fact might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine only if there is sufficient reason for a reasonable jury to return a verdict for the non-moving party. Id. at 248. The court must view all facts and make all reasonable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Col, Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A court may not weigh evidence, determine the truth of the case or otherwise resolve factual disputes, but may only determine whether there is a factual dispute to be resolved by a jury. *Linan-Faye Costr. Co. v. Housing Auth.*, 49 F.3d 915, 926-27 (3rd Cir. 1995); *Desvi, Inc. v. Continental Ins. Co.*, 968 F.2d 307, 308 (3rd Cir. 1992). The existence of a factual dispute between the parties will not defeat a summary judgment motion unless it involves material facts which may affect the outcome of the case. *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3rd Cir. 1995); *Borough of Tinton Falls Police Dept.*, 98 F.3d 107, 112 (3rd. Cir. 1996). Summary judgment is appropriate where the resolution of the motion depends wholly upon the interpretation of the applicable law. *DiBiase v. SmithKline Beecham Corp.* 48 F.3d 719, 724 (3d Cir.), *cert. den.*, 516 U.S. 916, (1995). As argued below, the defendants are entitled to summary judgment on all of plaintiff's claims.

## I.    Summary Judgment Should be Granted on Count I Because the Camden City Police Department Did Not Have a Quota System

Under New Jersey law, it is illegal for a police department to establish a system whereby a quota is established for arrests or citations:

> a. A State, county or municipal police department or force engaged in the enforcement of Title 39 of the Revised Statutes or any local ordinance adopted pursuant to this title shall not establish any quota for **arrests or citations.** The department or force may, however, collect, analyze and apply information concerning the number of arrests and citations in order to ensure that a particular officer or group of officers does not violate any applicable legal obligation.

> b. The department or force shall not use the number of **arrests or citations issued** by a law enforcement officer as the sole criterion for promotion, demotion, dismissal, or the earning of any benefit provided by the department or force. Any such arrests or citations, and their ultimate dispositions, may be considered in evaluating the overall performance of a law enforcement officer.

N.J.S.A. 40A:14-181.2 (emphasis added). A "quota" is defined as

16

> any requirement, in writing or otherwise, regarding the number of arrests made or the number of citations issued within a defined period of time by a law enforcement officer, or regarding the proportion of the arrests made and citations issued by the law enforcement officer relative to the arrests made and citations issued by another law enforcement officer or group of officers.

N.J.S.A. 40A:14-181.1. Though there is no caselaw interpreting this statute, the plain language speaks for itself. The statute self-evidently bans only quotas for arrests and citations. "Arrest" is not defined in the statute, but "citation" is defined as "any summons, ticket, or other official document issued by a police officer for a traffic violation, containing an order which requires the motorist to respond." *Id.*, N.J.S.A. 39:5F-4.

Black's Law Dictionary defines an "arrest" as "1. A seizure or forcible restraint. 2. The taking or keeping of a person in custody by legal authority, esp. in response to a criminal charge; specif., the apprehension of someone for the purpose of securing the administration of the law, esp. of bringing that person before a court." (9th Ed. 2009), arrest. New Jersey courts define "arrest" as "'(T)he taking of a person into the custody of the law in order that he may be held to answer for a criminal offense or be prevented from committing one." *State v. Harbatuk*, 95 N.J.Super. 54, 59 (App. Div. 1967).

It is undisputed that the alleged "quota" for directed patrols had no requirement for any arrests or citations to be issued. Galiazzi and Holland both admitted that a directed patrol did not require an arrest, citation, or search of any individual. Ex. C at 36:22-37:8; Ex. D at 98:19-99:24. The only numerical standard referenced in any of the evidentiary documents was a requirement for 18-27 directed patrols. This was the standard referenced when Galiazzi and Holland protested about "quotas" in February of 2009. As it is admitted that directed patrols are not arrests or citations, there is clearly no violation of N.J.S.A. 40A:14-181.2.

17

Further, there is no evidence that the number of directed patrols was being used as "the sole criterion for promotion, demotion, dismissal, or the earning of any benefit provided by the department or force." All directives from the command staff contained explicit instructions that all "low performer" designations be made on a comprehensive basis, taking into account all performance measurements. Further, Plaintiffs base much of the CEPA claim on the fact that Officer McCausland had lower directed patrol statistics than Galiazzi or Holland, but he was not transferred or otherwise punished. The fact that McCausland suffered no effect on his "promotion, demotion, dismissal, or the earning of any benefit provided by the department or force" conclusively shows that directed patrols (or other statistics) were the **sole** measurement used to determine the earning of any benefits.

An officer who was determined to not have enough directed patrols was considered to not be effectively using his available time. There is nothing illegal about the police department evaluating an officer's performance by how productively he uses his time. On the contrary, the use of statistics is critical to a police administration's efforts to evaluate the efficacy of its activities and its officers. In the absence of any evidence that the defendants established a quota of arrests or citations, the defendants are entitled to summary judgment as a matter of law on Count One of plaintiffs' Complaint.

## II.    Summary Judgment Should be Granted on Count I Because N.J.S.A. 40A:14-181.2 Provides No Private Cause of Action

No private cause of action is contained within N.J.S.A. 40A:14-181.2. "New Jersey courts have been reluctant to infer a statutory private right of action where the Legislature has not expressly provided for such action." *R.J. Gaydos Ins. Agency, Inc. v. National Consumer Ins. Co.*, 168 N.J. 255, 279-80 (2001). Where the plaintiffs are members of a class which is not the intended

18

beneficiary of the statute, no private cause of action will be recognized. *Ibid. See also Synnex Corp. v. ADT Sec. Services, Inc.*, 394 N.J.Super. 577, 590 n.2 (App. Div. 2007) (holding that alarm company licensing statute did not confer private right of action). "Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.' " *Alexander v. Sandoval,* 532 U.S. 275, 289 (2001) (quoting *California v. Sierra Club,* 451 U.S. 287, 294 (1981)).

When determining if a statute confers a private cause of action, New Jersey courts consider three factors: whether

> (1) plaintiff is a member of the class for whose special benefit the statute was enacted;
> (2) there is any evidence that the Legislature intended to create a private right of action under the statute; and
> (3) it is consistent with the underlying purposes of the legislative scheme to infer the existence of such a remedy.

*Gaydos, supra* at 272. In such an examination, the goal is to determine the intent of the legislature. *Id.* at 272-73.

Like *Synnex*, the statute in this matter focuses on the entity regulated (the police force), rather than any protected individuals, and thus create no implication of an intent to confer rights on any class of persons. Furthermore, if the statute was meant to confer rights on a class of person, it would obviously be members of the public who were ticketed due to a quota system. Nothing in the statute suggests the counterintuitive result that the statute is meant to protect individual police officers. The Plaintiffs in this matter are clearly not members of the class for whose benefit the statute was enacted.

Nor is there any evidence that the Legislature intended to create a private right of action. The Legislature often explicitly allows for a private right of action in its statutes (*see, e.g.* N.J.S.A. 10:5-13 (Law Against Discrimination); N.J.S.A. 56:8-159 (Junk Fax Act); N.J.S.A. 34:21-6 (Plant

19

Loss Job Notification Act)). Where police officers are concerned, the Legislature has demonstrated its ability to explicitly grant a private cause of action where appropriate. *See* N.J.S.A. 40A:14-150 (granting cause of action for review of disciplinary proceedings). The lack of an explicit cause of action granted pursuant to N.J.S.A. 40A:14-181.2 shows the legislature's intent that no private cause of action be created.

The general legislative scheme under Title 40A:14 is focused on the regulation of municipal police and fire services for the benefit of the general public. Remedies granted to individual officers for disciplinary disputes are clearly spelled out by N.J.S.A. 40A:14-150 (or Title 11A in civil service municipalities). Allowing police officers to sue under N.J.S.A. 40A:14-181.2 would subvert the intentions of the Legislature for the procedures in § 14-150 to be the preferred method of review for any disciplinary action taken against police officers.

Reviewing the factors above, it is evident that the Legislature did not intend to create a private right of action under N.J.S.A. 40A:14-181.2. Therefore, Count I of Plaintiffs' complaint should be dismissed.

## III.    Summary Judgment Should be Granted on Count II Because the Undisputed Facts Show that A CEPA Claim Cannot be Supported

The Conscientious Employee Protection Act [hereinafter "CEPA"] was enacted in to protect from retaliation employees who "blow the whistle" on employers engaged in illegal or harmful activity. *Young v. Schering Corp.*, 141 N.J. 16, 23, (1995), citing *Abbamont v. Piscataway Twp. Bd. of Educ.*, 138 N.J. 405, 417-18, (1994). The Act states:

> An employer shall not take any retaliatory action against an employee because the employee does any of the following:
> a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or another employer, with whom there is a business relationship, that the employee **reasonably** believes:
> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law, …; or

20

> ….
> c. Objects to, or refuses to participate in any activity, policy or practice which the employee **reasonably** believes:
> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law, …;
> …
> (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

N.J.S.A. 34:19-3 (emphasis added). To maintain a cause of action under subsections (a)(1) or (c)(1) of CEPA, a plaintiff must prove the following: (i) that he reasonably believed at the time he articulated his concerns that his employer's conduct was violating either a law or a rule or regulation promulgated pursuant to law; (ii) that he performed a "whistleblowing" activity described in N.J.S.A. 34:19-3(a) or (c)(1); (iii) that he was subjected to an adverse employment action; and (iv) there was a causal connection between his whistleblowing activity and the adverse employment action. *Blackburn v. UPS*, 3 F. Supp. 2d 504 (U.S.D.C. 1998) (citing *Falco v. Community Medical Center*, 296 N.J. Super. 298, 314, (App.Div.1997) (quoting *Mehlman v. Mobil Oil Corp.*, 291 N.J. Super. 98, 123, (App.Div.1996), *aff'd*, 153 N.J. 163, (1998)); *Young v. Schering Corp.*, 275 N.J. Super. 221, 233, *aff'd* 141 N.J. 16 (1995)).

At Count II of their Complaint, plaintiffs allege that they objected to the statistical method being used to rate officers' performance because they believed the method was illegal or in violation of public policy. They further allege that as a result of their objections, the defendants took adverse employment actions against them. Galiazzi's alleged whistleblowing activity consisted of the following:

- written statements he made on his February 4, 2009 counseling form stating that quotas are illegal; and

- his February 9, 2009 special report in which he stated that he had not been provided with a baseline to gauge what his numbers should be.

21

Plaintiff Holland's alleged whistleblowing activity consisted of:

- his statements on his February 4, 2009 counseling form; and

- his February 29, 2009 grievance.

There is no evidence that individual plaintiffs Galiazzi and Holland expressed to the administration any criticism of the directed patrol policy. The alleged whistleblowing activity alleged in Count II of the complaint, and in the discovered facts, consisted only of criticism of the Department's method of evaluating officers by using statistics. Plaintiff Williamson's alleged whistleblowing activity consisted of:

- grievances that were filed by the FOP while he was president in January and February 2009 complaining about various actions including officers being counseled for being on the low performer list; and

- a March 2009 rally complaining about the directed patrol policy, among other things.

For purposes of this motion, it is conceded that these are actions that could be found to fit the statute's definition of whistleblowing activity because they are expressed objections to the police department's policy. It is also conceded that all three officers experienced what a jury could determine to be adverse employment actions after their objections. However, for the reasons set forth below, the defense argues that the remaining requirements of the CEPA statute have not been met by the plaintiffs and this count must therefore fail.

> A. It was unreasonable for plaintiffs to believe that the City's actions were illegal or in violation of public policy and therefore a CEPA claim cannot be established.

CEPA does not merely require that the employee subjectively believe that certain activities have taken or are about to take place. In order for an employee's belief to be considered "reasonable," that belief must be such that "a reasonable lay person would conclude that *illegal activity was going on*" or, at the very least, is imminent.

22

*Blackburn v. United Parcel Service, Inc.*, 3 F.Supp.2d 504, 515 (D.N.J. 1998) (emphasis in original), *aff'd* 179 F.3d 81 (3d Cir. 1999). Even a sincere belief cannot support a CEPA claim unless such belief is objectively reasonable. *Id.* at 516. To survive summary judgment, the record must contain sufficient factual evidence that the acts complained of could support the a finding that the employee's belief was reasonable. *Battaglia v. United Parcel Service*, 214 N.J. 518, 558 (2013). "That is, the statute does not protect employees whose complaints are directed to minor or trivial matters." *Ibid.*

In *Blackburn, supra*, the plaintiff UPS employee sued over adverse employment actions taken allegedly as a result of his complaint about UPS's pricing system, which may have, at some point, resulted in customers receiving improper discounts. *Id.* at 514. The District Court held that the plaintiff's CEPA claim could not stand:

> Even giving plaintiff the benefit of some limited knowledge of antitrust law, an objective trier of fact could not possibly find that he reasonably believed that the conduct he disclosed was unlawful, as required under the first element….
>
> Moreover, despite plaintiff's allegation that he has now unearthed certain violations that might reasonably be considered unlawful, plaintiff did not say so in any of his memos to and conversations with UPS. As discussed above, **plaintiff merely conveyed his concerns, through various memos and conversations, that a law might at some point in the future be violated if certain precautions were not taken** or changes not made in the pricing system then being developed. He also questioned, disagreed with, and expressed his level of discomfort about his employer's practices. **Plaintiff never conveyed a reasonable belief, however, that the activities about which he complained were unlawful such that "a reasonable lay person" could "conclude that illegal activity was going on.**

*Blackburn, supra* at 516 (emphasis added) (internal citations omitted). The District Court concluded that CEPA:

> is still a "Whistleblower Act," not a "Chronic Complainer Act." This is so even if the purported reason for the employee's termination… was pretextual. Indeed, although the court does not so find, a reasonably

23

> objective trier of fact presumably could find that plaintiff's termination had nothing to do with [his proffered reason], and that plaintiff was fired for, as he puts it, being a "squeaky wheel" and a "pain in the ass." "Squeaky wheels" and "pains in the ass," however, are not protected classes under the Whistleblower Act.

*Id.* at 517.

### i.    *The City's Method of Evaluating Officers was Completely Legal*

Even if we assume for the purposes of this motion that the defendants used the number of directed patrols as the sole criterion for evaluation of officers' performance, that would not have been a violation of any law or public policy. As discussed above, N.J.S.A. 40A:14-181.2 prohibits the use of arrests and/or citations as the sole criterion for evaluation, and there is no dispute that a directed patrol does not necessarily result in an arrest or a citation.

It was not illegal for the defendants to use statistics to evaluate officers' performance, so long as those statistics were not solely the number of arrests and citations. The plaintiffs do not allege in this case that the defendants used solely the number of arrests and citations as the sole method of performance analysis. They contended that it was illegal for the administration to require a minimum number of directed patrols, and/or that it was illegal that they were not made aware of what specific statistics the administration was analyzing in its performance analysis. Neither of these actions on behalf of the administration was illegal and it was not reasonable for the plaintiffs to believe that these actions were illegal. Plaintiffs Galiazzi and Holland were simply determined to be among the lowest performers as compared to the other officers in their platoon, and were held accountable for it. This may have been a change that the chief brought with his administration that they were not happy about, but it was not illegal and no reasonable jury could find that the plaintiffs reasonably believed that it was illegal at the time they objected to it.

24

Even if a jury were to find that Galiazzi and Holland did object to the directed patrol program itself, a proposition which the defendants vigorously oppose, as shown below in subheading iii, there is nothing illegal about the directed patrol program, and there is no reasonable basis to believe otherwise.

ii.    *Plaintiffs cannot demonstrate that they reasonably believed that the method of evaluating officers violated a clear mandate of public policy.*

As law enforcement officers, it was not reasonable for plaintiffs to believe that the method used by the defendants to evaluate their performance was illegal or against public policy. There is no evidence in this case that officers were required to perform a minimum number of arrests or citations. Officers were required to interact with the public and fight crime in designated hot-spots and were given a number that was required unless there was an acceptable reason why they could not reach that goal.

What the policy did was make the officers more accountable for their time, and those that were not being productive with their time were evaluated accordingly. The officer evaluation policy was based on the officers' use of the time they had available to fight crime. This is the essence of being a police officer, a reasonable expectation not in conflict with public policy, and therefore cannot be the basis of a CEPA claim for any plaintiff. As *Blackburn* stated, voicing concerns "that a law might at some point in the future be violated if certain precautions were not taken" is not protected under CEPA.

iii.    *It was not reasonable for Plaintiff FOP or Williamson to believe that the directed patrol policy was illegal.*

It is not unconstitutional for police officers to approach citizens on the street to inquire about crime conditions or citizens' personal information. "'It is well-settled that the police may arrest only if they have probable cause; may stop for brief investigatory questioning if they have

25

an articulable, reasonable basis for suspicion; and they may make an inquiry without any grounds or suspicion.' " *State v. Sirianni*, 347 N.J. Super. 382 (App. Div. 2002) (quoting *State v. Rodriguez*, 336 N.J. Super. 550, 558–59, (App. Div. 2001), *rev'd*, 172 N.J. 117, (2002)), *certif. denied*, 172 N.J. 178, (2002). Mere inquiries require no constitutional justification. *Id.; State v. Stovall,* 170 N.J. 346, 356, (2002); *State v. Dangerfield*, 339 N.J. Super. 229, 236, (App.Div.2001), *aff'd as modified*, 171 N.J. 446, (2002). On-the-spot questioning involves neither detention nor seizure in the constitutional sense. *State v. Sheffield*, 62 N.J. 441, 447 (1973), *cert. denied*, 414 U.S. 876, (1973); *State v. Abreu*, 257 N.J. Super. 549, 554–55, (App.Div.1992). Brief, non-intrusive encounters with individuals on the street or in parked cars implicate none of the privacy or security concerns engendered by discretionary police spot checks of moving vehicles. See *Delaware v. Prouse* 440 U.S. 648, (1979).

Nothing in any of the written documents evidencing the directed patrol policy demonstrates any requirement that the officers use force or intimidation of any citizen to obtain information from citizens. On the contrary, officers are trained yearly on the law of arrest, search and seizure, and the chief's general order dated May 28, 2009 specifically reinforced the legal requirements for field inquiries, investigative detentions, pat down frisks, and reasonable suspicion. (Exhibit DD). The fact that these officers felt that *maybe* other officer would disobey order and use force to keep up with the level of expectations set forth by the police department is exactly the kind of speculation that *Blackburn* held was unprotected by CEPA. None of the Plaintiffs identified any current legal violations as a result of the directed patrol policy, and none of the Plaintiffs could show that any legal violation was imminent. Even if they sincerely believed that other officers would, lacking the plaintiffs' moral fortitude, disobey orders and disobey the law, such a belief was not reasonable under the circumstances, and is not protected by CEPA.

26

    *iv.    It was not reasonable for Williamson or the FOP to believe that the directed patrol policy*

    *violated a clear mandate of public policy.*

The reference in Section 3c(3) to a "clear mandate of public policy" conveys a legislative

preference for a readily discernable course of action that is recognized to be in the public

interest.

> A "clear mandate" of public policy suggests an analog to a constitutional provision, statute, and rule or regulation promulgated pursuant to law such that, under Section 3c(3), there should be a high degree of public certitude in respect of acceptable versus unacceptable conduct.
> ...
> The legislative approach vis-à-vis a "clear" mandate of public policy bespeaks a desire not to have CEPA actions devolve into arguments between employees and employers over what is, and is not, correct public policy. Such an approach also fits with the legislative requirement of a "mandate" as opposed to a less rigorous standard for the type of public policy that is implicated.

*Maw v. Advanced Clinical Communications*, 179 N.J. 439, 444-45 (2004). The determination of

whether the plaintiff adequately has established the existence of a clear mandate of public

policy is a question of law to be determined by the court. *Mehlman v. Mobil Oil Corp.*, 153 N.J.

163, 187 (1998). It is ironic that the FOP or any Camden police officer would argue that a policy

that by its very definition sought to increase public safety, is against public policy. The only

way the policy would be illegal or against public policy is if the officers disobeyed order and

disobeyed the law. Plaintiffs allege that they were so pressured to attain a minimum number of

engagements, that there was a risk that some other, unspecified officers (not them, of course)

would be pressured to disregard their orders and the law in order to meet expectations.

    However, no reasonable jury could find that the administration required an

unreasonable mandatory minimum number of directed patrols or engagements. The

administration did set a standard of a minimum of 18 or 27 directed patrols per shift, depending

27

on the type of platoon they were on, but also made it clear that it was possible that other assignments made that goal not possible:

> Special Operations is expected to perform at least 27 directed patrols per unit per shift, while Patrol Operations is expected to perform at least 18 per unit per shift. **Obviously, there will be assignments that will detract from this standard**.

Ex. F (emphasis added). Rather than mechanically apply the standard, the Police Department routinely stressed the need for supervisors to explain any failure to reach the goal.

There was also a possibility that citizens could be subjected to being approached by more than one officer in a day because every officer had a duty to engage citizens. However, there is no evidence that this happened or is occurring with any frequency, or that there have been any citizen complaints about this activity. There is likewise no clear public policy against having police officers engage with citizens. On the contrary, the public policy of the City was that the police should be regularly engaging with the public. Ex. M at 26-27. The plaintiffs may have disagreed with this policy, but a CEPA action is not meant to "devolve into arguments between employees and employers over what is, and is not, correct public policy." *Maw, supra* at 444.

Plaintiffs have not demonstrated a clear mandate of public policy that the directed patrol policy violated to the extent that the court may find, as mandated by *Maw* "a high degree of public certitude in respect of acceptable versus unacceptable conduct" that it involved. Accordingly, plaintiffs cannot prove that they reasonably believed that the directed patrol policy that they complained of violated a clear mandate of public policy, and therefore their actions cannot be the basis of a CEPA claim.

> B. <u>Plaintiffs cannot prove a causal connection between an adverse employment action and a whistleblowing activity.</u>

28

The requirement that an employee who brings a CEPA claim must show a causal connection between the whistle-blowing activity and the adverse employment action can be satisfied by inferences that the trier of fact may reasonably draw based on circumstances surrounding the employment action. *Estate of Roach v. TRW, Inc.*, 164 N.J. 598, 612, (2000). The temporal proximity of employee conduct protected by CEPA and an adverse employment action is one circumstance that may support an inference of a causal connection. *Romano v. Brown & Williamson Tobacco Corp.*, 284 N.J. Super. 543, 550, (App. Div.1995). Plaintiffs generally they rely on inferences and in some instances temporal proximity to substantiate their claims.

All direct evidence offered by the plaintiffs is hearsay, and thus is not admissible for summary judgment purposes. See *Philbin v. Trans Union Corp.*, 101 F.3d 957, 961 n. 1 (3d Cir.1996) (noting that a hearsay statement that is not capable of being admissible at trial should not be considered on a summary judgment motion). Several Plaintiff mention in their depositions that they heard rumors or innuendo that they were retaliated against due to their complaints, but such statements, to the extent that they are offered for their truth, consist of hearsay. F.R.C.P. 801.

Rule 801 has an exception for a statement of a party-opponent. F.R.C.P. 801(d)(2). However, the statement of an employee or agent is only admissible if such person was authorized to make a statement on the subject or the statement was on a matter within the scope of the employee relationship. *Id*. Statements by officers, sergeants, or lieutenants regarding the motivations of commanders are not statements within the scope of the employee relationship, nor are such officers authorized to make such statements. Such statement are merely speculation by coworkers about their bosses, and as such, are inadmissible hearsay.

29

Proofs of a causal relationship under CEPA are subject to the same burden-shifting analysis used in Title VII discrimination cases. *Blackburn,* 179 F.3d at 92. The plaintiff must meet its *prima facie* burden, then the burden of production shifts to the defendant to articulate a legitimate reason for the adverse employment action. *Ibid.* Upon doing so, the burden shifts back to the plaintiff who must show "both that the reason [given by the employer] was false, and that [retaliation] was the real reason." *Ibid.* (*quoting Woodson v. Scott Paper Co.,* 109 F.3d 913, 920 n. 2 (3d Cir. 1997)).

       i.     *Anthony Galiazzi and Charles Holland*

Plaintiff Galiazzi contends that as a result of his statement that "quota's are illegal" on his February 4, 2009 counseling form and his February 9, 2009 special report, he was retaliated against by being transferred to a different platoon on February 20, 2009, followed by internal affairs officers, transferred from one midnight shift to another, and his August 2009 vacation was cancelled.

Plaintiff Holland alleges that as a result of his statements on his February 4, 2009 counseling form (that he was not given any baseline to gauge what his numbers should be, had not been trained in the proper amount of statistics, and was not advised of what statistics were used to measure his productivity), he was transferred to a different platoon on February 20, 2009, was the subject of an internal affairs investigation in August 2009, he was placed on an abuse of sick time list, and he was the subject of an internal affairs investigation in November 2009.

The proffered explanation for Galiazzi's and Holland's transfers were simply that they were low-performing officers and their superior didn't want them to remain on that shift. This is evidenced by the superior Lt. Cook's memo to Inspector Cuevas specifically asking Cuevas to transfer Galiazzi and Holland out of the unit due to "less than favorable effort" (Ex. N). A

30

change in work assignments due to low performance is not illegal. The plaintiffs' only evidence of pretext comes from the fact that one other low-performing officer was not transferred. However, that fact alone does not create an inference of retaliation. There could be dozens of reasons why Ofc. McCausland was permitted to stay in his assignment, and there is no evidence that this decision was made for any reason other than ensuring the best police work possible.

There is no dispute that officers were randomly followed by internal affairs officers during this time period, but there is nothing illegal about the department's internal affairs department policing its officers. It was an integral part of the directed patrol program that officers were to be monitored to ensure that they were performing their duties. In any case, being monitored is not an "adverse employment action."

When Galiazzi's August 2009 vacation was cancelled it was six months after his alleged whistleblowing activity, the proffered reason was that he was needed because the department was low on manpower at that time. Galiazzi has produced no evidence of pretext. No reasonable jury could find that these actions constituted retaliation for a statement he wrote on a counseling form in February 2009.

Likewise, Holland has produced no evidence to suggest that being placed on the abuse of sick time list was retaliatory. Admittedly, he was using a large amount of sick time. Therefore, he was placed on the list. When he explained to his supervisor that he was in a somewhat-unique situation, no further action was taken against him. This is not an adverse employment action, nor is there any evidence that it was done for retaliatory reasons.

     ii.     *John Williamson*

Plaintiff Williamson contends that as a result of grievances and rallies he promoted on behalf of the FOP against the directed patrol policy and the performance evaluation policy, he was the

31

subject of internal affairs investigations. However, it is undisputed that those investigations were not initiated by any of the defendants, but were initiated by people outside of the police department and/or persons not in the police or city administration. The hospital grievance was initiated by the vice president of the hospital, the flash drive incident was transferred to the City from the prosecutor's office, and the FOP grievance was initiated by a fellow FOP member. There is no evidence that any of these investigations were initiated in response to any of Williamson's FOP activities that were critical of the administration. The internal affairs department was required by the attorney general's guidelines to investigate these complaints of wrongdoing against Officer Williamson, just as it was required to do so against any other officer.

> Every law enforcement agency shall establish a policy providing that all citizen complaints are readily accepted and fully and promptly investigated
> …
> All complaints of officer misconduct shall be accepted from all persons who wish to file a complaint.

Internal Affairs Policy & Procedures, State of New Jersey, www.nj.gov/oag/dcj/agguide/ internalaffairs2000v1_2.pdf at 14. Williamson's attempt to causally link the investigations to his criticisms of the directed patrol policy has no evidentiary basis in the record and therefore his CEPA claim must fail.


IV.    **Summary Judgment Should be Granted on Counts III and V Because Plaintiffs Have Failed to Establish Facts to Support Their Due Process Claims**

Plaintiffs allege at Count III of their Complaint that the defendants violated their due process rights when they were "transferred, written up, suspended, forced to resign, and subjected to other adverse employment actions without due process of law". (Exhibit at ¶119).

32

However, they fail to establish what process they contend they were entitled to. There was no agreement between the FOP and the administration about the number of transfers that could occur and there is no allegation that plaintiffs were entitled to any process before being transferred. In addition, there is no evidence that written counselings required any hearing, notice or other process. In the absence of any evidence that some due process was required, plaintiffs cannot prove the allegations in Count III and V of their Complaint and defendants are entitled to judgment as a matter of law.

### V.    Summary Judgment Should be Granted on Count IV Because Plaintiffs Cannot Prove a Violation of the First Amendment.

42 U.S.C.A. § 1983 states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

A public employee's speech is protected by the First Amendment if it implicates matters of public concern. *Pickering v. Board of Education*, 391 U.S. 563, 571–72, (1968). A public employee's speech involves a matter of public concern if it can "be [of] political, social, or other concern to the community." *Green v. Phila. Housing Auth.*, 105 F.3d 882, 885 (3d Cir. 1997). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers,* 461 U.S. 138, 147–48 (1983).

### A.    Galiazzi's and Holland's Statements Were Not Made As Citizens Expressing on a Public Concern.

33

Galliazzi's statements were written on an internal counseling form and on his internal special report. His objections were to the method of his performance evaluation. There is no evidence that he expressed a public concern.

Holland's statements were written on his internal counseling form and his February 26, 2009 grievance addressed to the chief of police. His objections were to the method of his performance evaluation, what he contended was a retaliatory transfer, and other violations of the collective bargaining agreement. Nothing in any of these writings expressed a public concern, but rather addressed his employment conditions. Absent speech involving a public concern, there can be no violation of these plaintiffs' First Amendment rights.

B. Plaintiffs' speech was made in their official capacity, not in their capacity as citizens.

It is conceded that any statements critical of the department's directed patrol policy could be found to be a matter of public concern because they alleged that the policy had an unconstitutional impact on the city's residents. It is disputed that the statements were made by the plaintiffs in their capacity as citizens rather than pursuant to their official duties. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).

In *Garcetti*, the plaintiff was a deputy district attorney who, in the course of his employment, wrote a memo to his supervisors that criticized aspects of a criminal investigation handled by his office. *Id*. at 414-15. After his criticism he was transferred to another position within the office, transferred to another location, and denied a promotion. *Id*. at 415. He sued his supervisor and his county employer, alleging violation of 42 U.S.C. § 1983 by the employer's violation of his First and Fourteenth Amendment rights and retaliation. *Id*.

34

The Supreme Court in *Garcetti* considered that precedent has "sought both to promote the individual and societal interests that are served when employees speak as citizens on matters of public concern and to respect the needs of government employers attempting to perform their important public functions." *Id*. at 420, *citing Rankin v. McPherson*, 483 U.S. 378, 384, (1987) (recognizing "the dual role of the public employer as a provider of public services and as a government entity operating under the constraints of the First Amendment"). The Court explained that "[u]nderlying [the Court's] cases has been the premise that while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'" *Garcetti* at 420, *citing Connick v. Myers*, 461 U.S. 138, 154 (1983). The Court held that the controlling factor in the plaintiff's case was that his expressions were made pursuant to his duties as a calendar deputy. *Id*. at 421.

> That consideration—the fact that Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case—distinguishes Ceballos' case from those in which the First Amendment provides protection against discipline. We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.

*Ibid*. The court reasoned that the holding was

> supported by the emphasis of [the Court's] precedents on affording government employers sufficient discretion to manage their operations. Employers have heightened interests in controlling speech made by an employee in his or her professional capacity. Official communications have official consequences, creating a need for substantive consistency and clarity. Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission.

*Id*. at 422-23. To hold otherwise, the court explained

> would commit state and federal courts to a new, permanent, and intrusive role, mandating judicial oversight of communications between and among government employees and their superiors in the course of

official business. This displacement of managerial discretion by judicial supervision finds no support in our precedents. When an employee speaks as a citizen addressing a matter of public concern, the First Amendment requires a delicate balancing of the competing interests surrounding the speech and its consequences. When, however, the employee is simply performing his or her job duties, there is no warrant for a similar degree of scrutiny. To hold otherwise would be to demand permanent judicial intervention in the conduct of governmental operations to a degree inconsistent with sound principles of federalism and the separation of powers.

*Id.* at 423.

In the present case, all plaintiffs were acting in their official capacities as police officers at the Camden Police Department at the time they made the speech in question. Plaintiffs Galiazzi and Holland wrote statements on internal counseling forms and Holland wrote a grievance to the administration. Plaintiff Williamson spoke at all times as a representative of the police union to the administration. There is no evidence that any of the plaintiffs were disciplined, counseled, transferred, or given any other adverse action for any speech outside of their official duties.

A police department is a military-type organization where discipline must be enforced. *Rosko v. Pagano*, 466 F.Supp. 1364, 1369 (D.N.J. 1979); *State v. State Troopers Fraternal Ass'n.*, 134 N.J. 393, 415–17, (1993); *City of Newark v. Massey*, 93 N.J. Super. 317, 323, (App. Div. 1967). To permit plaintiffs' claim to go forward in this case would ignore the Supreme Court's proscription against judicial oversight of communication between employees and their superiors within the employment setting. *Garcetti, supra,* at 423. Because there is no dispute that the speech was made in plaintiffs' official capacities, this court must grant summary judgment to the defense on Count IV of plaintiffs' Complaint.

36

**VI.    Summary Judgment Should be Granted on Count VI Because Plaintiffs Cannot Prove that the City Instituted an Illegal Policy, Custom, or Practice Related to Quotas.**

Plaintiffs contend at Count VI of their Complaint that the defendants "maintain[ed] policies, customs and practices related to quotas" in violation of their federal due process rights, that defendants received notice that their policies, customs and practices violated federal and state rights and laws, and that defendants failed to train its management on constitutionally protected methods of stopping citizens and the illegal practice of quotas.

Local governing bodies may be sued directly under § 1983 for monetary, declaratory, or injunctive relief where the action that is alleged to be unconstitutional implements or executes a **policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers**. *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658, 690 (1978) (emphasis added).

As argued above, there is no evidence that there was a policy of illegal quotas in the department. There is also no evidence that the directed patrol policy at issue in this count of plaintiffs' Complaint is illegal, as argued above. Accordingly, the defendants request summary judgment on Count VI of plaintiffs' Complaint.

Further, many of the plaintiffs' allegations rely on allegations that the directed patrol policy was not practiced according to the policies set by the commanders. These allegations are particularly inappropriate to the *Monell* claim. All communications from commanders stressed the fact that there was no quota, that all statistical requirements were meant to be flexible, and that any failure to produce the required amount of statistics should be explained before any punishment was considered.

**VII.    Summary Judgment Should be Granted on Counts VII and VII Because There Are No Facts in Dispute That Could Establish a Violation of the Federal Family Medical Leave Act or the New Jersey Family Leave Act.**

37

The Federal Family Medical Leave Act entitled Plaintiff Holland to twelve weeks of leave during a 12-month period to care for his sick mother. 29 U.S.C.A. 2612(a)(1)(C). The leave could be taken intermittently. 29 U.S.C.A. 2612(b). The City Case was permitted by statute to require Holland to first exhaust his accrued vacation and sick time during the 12-week period. 29 U.S.C.A. 2612(d)(2)(B). The FMLA prohibits an employer from interfering, restraining, or denying the exercising or the attempt to exercise rights under the statute. 29 U.S.C. § 2615.

The New Jersey Family Leave Act (NJFLA) contains a near identical provision. N.J.S.A. 34:11B-9. The NJFLA entitled Holland to 12 weeks of intermittent leave within a 12-month period. N.J.S.A. 34:11B-4(a). This leave could be paid or unpaid or a combination of both. N.J.S.A. 34:11B-4(d). It is unlawful for any employer to "interfere with, restrain or deny the exercise of, or the attempt to exercise, the rights provided under this act or to withhold the benefits provided for under this act." N.J.S.A. 34:11B-9(a).

To prevail on a retaliation claim, a plaintiff must show that a retaliatory action was "materially adverse" in that it "well might have dissuaded a reasonable worker from exercising a right under the FMLA." *Id*. at 501. Harassment, to be actionable, must be sufficient to deter a person of ordinary firmness from exercising a right under the statute. *Marrero v. Camden County Board of Social Services*, 164 F.Supp.2d 455 (D.N.J. 2001)

There is no dispute that Holland was able to use the time he was entitled to pursuant to the Act(s) to care for his mother. His allegation is that he was told by his superiors in the police department that he was being included in a list of people who were abusing sick time and who were chronically sick and that he was subjected to a sick visit by a superior while on leave. When he responded to his superior that he was not sick, but using his sick time towards his family leave time, he was simply asked to provide the department with the documentation that he provided to the City. This demonstrates a lack of communication between the City and the

38

individual layers of the police administration, but no intentional interference with Holland's use of the leave he was entitled to. He was never prevented from using leave to care for his mother. The one time he was visited to verify that he was sick does not come anywhere near the level of harassment that would be required to deter a person of ordinary firmness from exercising his rights.

In the absence of evidence that the defendants interfered with, restrained, or denied the exercise of or the attempt to exercise Holland's family leave, Counts VII and VIII of plaintiffs' Complaint must be dismissed.

## VIII.    Summary Judgment Should be Granted on All Counts to Sgt. Joseph Wysocki Because there is No Evidence that He Committed Any Violation Against Any Plaintiff

Plaintiffs' allegations against Defendant Sgt. Joseph Wysocki are based solely on the fact that Sgt. Wysocki was in the position of commander of internal affairs at the time they were the subject of internal affairs investigations. There is no evidence that he performed any retaliatory acts or made any decisions that could support an inference of retaliation.

Defendant Sgt. Joseph Wysocki became commander of internal affairs in May 2009. This was three months after Plaintiffs Galiazzi and Holland were transferred to different platoons, allegedly in retaliation for their statements against the directed patrol policy. There is no evidence that he had any involvement in the creation of the directed patrol policy or its implementation. There is evidence that Defendant Sgt. Wysocki supervised the investigations of Holland and Williamson because he was the commander of the division, but he did not personally initiate them.

The policy of surveilling officers was in effect before Wysocki was assigned to internal affairs. In addition, the evidence demonstrates that Plaintiff Holland was not targeted ahead of time for the neglect of duty internal affairs investigation; he happened to be the officer who

39

responded to a crime condition that was called in by internal affairs. Aside from Holland's unsupported assumption that he was targeted, there is no fact upon which a jury could base a finding that Sgt. Wysocki instructed any internal affairs investigator to target any of the plaintiffs.

In the absence of any evidence that Defendant Wysocki had any involvement in the planning, implementation or supervision of any officer who performed directed patrols, or that he performed any act that could be determined to be an act of retaliation, there is no basis for any claim against him and he must be dismissed as a defendant in this case.

### IX.    Individual Defendants Police Chief John Scott Thompson, Inspector Orlando Cuevas, and Sgt. Joseph Wysocki are Entitled to Qualified Immunity.

Qualified immunity is a question of law to be decided by the court. *Carswell v. Borough of Homestead,* 381 F.3d 235, 242 (App. Div. 2004). Qualified immunity entitles a defendant not to stand trial or face the other burdens of litigation.  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Such immunity would be "effectively lost" if a case were permitted to go to trial erroneously. *Mitchell, supra* at 526.

> [R]equiring an official with a colorable immunity claim to defend a suit for damages would be peculiarly disruptive of effective government, and would work the very distraction from duty, inhibition of discretionary action, and deterrence of able people from public service that qualified immunity was meant to avoid.

*Digital Equipment Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 871 (1994) (internal quotations omitted). A Defendant is entitled to summary judgment if the Plaintiff fails to produce evidence

40

sufficient to create a genuine issue that Defendants' conduct violated a clearly established statutory or constitutional right. *Mitchell, supra* at 526.

To overcome a claim of qualified immunity, the Court must conduct an inquiry into two prongs: (1) whether facts have been established to demonstrate the violation of a Constitutional right; and (2) whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201, (2002). Although *Saucier* mandated that the first prong must be considered first, the current rule is that the Court may exercise its discretion in deciding which prong to address first. *Pearson v. Callahan*, 555 U.S. 223, 235 (2009). However, *Pearson* did not modify the fact that each prong must be examined and decided by the Court. *Id.*

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for a police officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An office might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to qualified immunity.

*Id.* at 205

If it is determined that the officer did violate a clearly established constitutional right, the court must then decide whether the officer made a reasonable mistake as to what the law required. *Carswell v. Borough of Homstead*, 381 F.3d 235, 242 (3d Cir. 2004). The determinations of whether the right was clearly established and whether the official's conduct was reasonable are questions of law. *Sterling v. Borough of Minersville*, 232 F.3 190, 193 (3d Cir. 2000).

In the present case, Chief Thomson and Inspector Cuevas instituted and implemented the department's directed patrol policy and the policy of evaluating individual police officers.

41

Even if there is a determination that one of the policies is illegal, there is no dispute that these defendants acted in their official capacity and attempted to establish and enforce policies that were legal and in the best interests of the citizens of the City of Camden. There was nothing about the policies that was clearly unconstitutional or that a reasonable officer would identify as illegal. As argued above, Defendant Wysocki was merely the commander of the internal affairs division, and did not establish either of the policies in question. There is no evidence that he knowingly violated any law. Accordingly, the individual defendants are entitled to qualified immunity.

## X.    Plaintiffs Have Not Met the Threshold for a Punitive Damages Claim

Punitive damages are recoverable for claims under 42 U.S.C. 1983 "when the defendants' conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30 (1983); *Coleman v. Kaye*, 87 F.3d 1491, 1509 (3rd Cir. 1986). In this case, there is no dispute that all of the individual defendants were acting in their official capacities at the time of the alleged retaliation. There is no evidence of any evil motive or intent and no evidence of any act that rises to the level that would justify punitive damages. Accordingly, the defendants ask that all claims for punitive damages be dismissed and denied.

## XI.    Plaintiffs' Requests for Declaratory Judgment and Injunctive Relief are Moot

In their Complaint, Plaintiffs included eight (8) separate counts, requesting a variety of relief, including compensatory damages for pain and suffering, past economic loss, and future economic loss, punitive damages, attorney's fees, declaratory judgment, and injunctive relief. Several of the requests for declaratory and injunctive relief are nonspecific, though several counts request "an order declaring the policies, practices and/or customs of the CPD described herein, violate Federal and State law." Plaintiffs do not specify the form of the injunction that

they request. For purposes of this motion, it is assumed that Plaintiffs are requesting an injunction preventing the City of Camden from operating its directed patrol policy.

As the Court is aware, the City of Camden no longer has a police force. On May 1, 2013, the City of Camden dissolved its police force. Law enforcement services for the City are now provided by the Metro Division of the Camden County Police Department. As a result, the employment of all Camden City police officers was terminated as of May 1, 2013. Staffing of the Metro Division is fully within the control of the County, and the County is the "sole hiring authority."

New Jersey Courts will not issue advisory opinions in the absence of a genuine controversy. *Crescent Park Tenants Ass'n v. Realy Equities Corp. of N.Y.*, 58 N.J. 98, 107 (1971). The "doctrines of standing, ripeness and mootness that have evolved over the years are incidents of the 'primary conception that ... judicial power is to be exercised to strike down legislation ... only at the instance of one who is himself immediately harmed, or immediately threatened with harm, by the challenged action.'" *Id.* at 185 (*quoting State v. Jones,* 198 N.J. Super. 553, 559-60 (App. Div. 1985)). A cause of action is moot if the issues are hypothetical, the judgment cannot grant effective relief, or there is no concrete adversity between the parties. *See Advance Elec. Co., Inc. v. Montgomery Tp. Bd. of Educ.*, 351 N.J. Super. 160, 166 (App. Div. 2002).

To be entitled to declaratory judgment, a party must have a genuine stake in the outcome. *See Matter of Ass'n of Trial Lawyers of America*, 228 N.J.Super. 180, 184-85 (App. Div. 1988).*See also In re City of Plainfield's Park-Madison Site,* 372 N.J. Super. 544, 550 (App. Div. 2004) ("Issues that have been rendered moot by subsequent developments render legal issues abstract and outside the proper realm of courts."). When an issue is purely hypothetical, declaratory judgment is inappropriate. *Plainfield, supra* at 550.

43

Likewise, a request for an injunction will be deemed moot of subsequent developments have made the relief requested unavailable. *See Bunting v. Mellen,* 541 U.S. 1019, 1019 (2004) (denying certiorari to school prayer case because plaintiffs no longer attended institution, rendering claims for declaratory and injunctive relief moot). Where a plaintiff requests declaratory judgment related to employment, but is not actually employed at the time of the decision, the matter is moot. *See Matter of Advisory Committee on Professional Ethics Opinion 621*, 128 N.J. 577, 605 (1992). In *Ethics Opinion*, the attorney who had been offered a position as a part-time legislative aide sought declaratory relief regarding an ethics rule restricting his ability to represent private parties. *Id.* The matter was decided on the merits due to a number of governmental entities joining the matter (*Id.* at 584-85), but the matter as to the original plaintiff was dismissed as moot because he declined the legislative aide position. *Id.* at 605.

All claims for injunctive and declaratory relief against the City are moot. The City has no authority over the Metro Division, and certainly has no control over the Metro Division's directed patrol policy, if any. Any injunction or declaratory relief issued against the City regarding the directed patrol policy is moot – the City no longer has a directed patrol policy.

Additionally, none of the plaintiffs are employed by the City. The matter is analogous to *Ethics Opinion* in that the plaintiffs are not employed by the defendant, and thus have no actual stake in declaratory or injunctive relief. Camden County, the entity responsible for policing the City, is not a party to this action. Therefore, the injunctive and declaratory claims must be dismissed.

## XII.    Plaintiffs' Requests for Front Pay Must be Stricken

Front pay "is a concept that attempts to project and measure the ongoing economic harm, continuing after the final day of trial, that may be experienced by a plaintiff who has been wrongfully discharged in violation of anti-discrimination laws." *Quinlan v. Curtiss-Wright Corp.,*

44

425 N.J.Super. 335, 350 (App. Div. 2012). Front pay "generally compensates for the immediate loss of the position until the position would have ended or the employee would have left the company." *Ibid. See also Williams v. Pharmacia, Inc.*, 137 F.3d 944, 953-54 (7th Cir. 1998) ("The front pay award approximated the benefit [Plaintiff] would have received had she been able to return to her old job").

Where there are circumstances which show that the plaintiff would have been terminated prior to trial, an award of front pay is inappropriate. *Quinlan, supra* at 352. Relevant factors include:

> (1) the employee's future in the position from which she was terminated; (2) her work and life expectancy; (3) her obligation to mitigate her damages; (4) the availability of comparable employment opportunities and the time reasonably required to find substitute employment; (5) the discount tables to determine the present value of future damages; and (6) 'other factors that are pertinent in prospective damage awards.'

*Ibid.* (*quoting Suggs v. ServiceMaster Educ. Food Mgmt.*, 72 F.3d 1228, 1234 (6th Cir. 1996).

Plaintiffs request an award of front pay in every count of their complaint. Plaintiff Holland is the only party claimed to have been discharged in any manner, making him the only party arguably entitled to front pay. However, Plaintiff Holland's employment would have ended on May 1, 2013 regardless of any action taken by the City. The Metro Division had no guarantees of employment for City officers, and the City had no influence over the staffing of the Metro Division. Therefore, an award of front pay would have no basis. Even if Plaintiff Holland were constructively terminated (which Defendants vigorously deny), his employment could only have continued until May 1, 2013. All front pay claims must be stricken.

45

## <u>CONCLUSION</u>

For all the reasons stated above, summary judgment should be granted to the

defendants on all counts, and the plaintiffs' pleadings should be dismissed.

WEIR & PARTNERS LLP

Dated: July 30, 2014                by:     /s/Wesley Fenza
                                            Wesley Fenza, Esquire, ID # 025012010
                                            Weir & Partners, LLP
                                            *A Pennsylvania Limited Liability Partnership*

46