## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| FRATERNAL ORDER OF POLICE, LODGE 1, et al. | : CIVIL ACTION |
| | : |
| | : |
| *Plaintiffs,* | : No. 1:10-CV-1502 |
| | : |
| v. | : |
| | : |
| CITY OF CAMDEN, et al. | : |
| | : |
| *Defendants.* | : |
| | : |

### ORDER

A now this_____day of_____, 2014, upon consideration of the Defendants' Motion for Summary Judgment and the Plaintiffs' Response thereto, it is hereby ORDERED and DECREED that the Defendants' Motion is DENIED.

_____
J.

ZEFF LAW FIRM LLC
Gregg L. Zeff, Esquire
Jennifer L. Prior, Esquire
100 Century Parkway, Suite
305 Mt. Laurel, NJ  08054
(t) (856) 778-9700
(f) (856) 702-6640

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| FRATERNAL ORDER OF POLICE, LODGE 1, et al. | :   CIVIL ACTION |
| *Plaintiffs,* | :   No. 1:10-CV-1502 |
| v. | : |
| CITY OF CAMDEN, et al. | : |
| *Defendants.* | : |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT

On January 31, 2014 this court held a hearing on Defendants then Motion for Summary Judgment.   As a result of the hearing, the court ordering re-briefing and discovery on the issues surrounding the disbanding of the City of Camden police force.  Following discovery motion practice, Defendants re-filed the instant Motion for Summary Judgment.  It appears that the instant Motion repeats the initial Motion with no substantive changes other than section VI of the facts and the sections dealing with the City of Camden Defendant.  This brief, follows suit, but also includes section II, Private Cause of Action under N.J.S.A. 40A:14-181.2. The Plaintiffs in the above referenced matter, John Williamson, Chad Holland, Anthony Galiazzi and the Camden

Fraternal Order of Police ("Plaintiffs") by and through their attorneys, the Zeff Law Firm, LLC, hereby file the following Response in Opposition to Defendants' Motion for Summary Judgment. The Plaintiffs attach the following Statement of Facts and Memorandum of Law in support of their Response.

As noted above, the vast majority of this briefing was previously filed with the court. The exhibits referenced in this document have been previously filed at docket number 124. They have not been refilled here and will not be unless the court so requests. The only additional exhibit to this Response is "HH" which is attached.

Respectfully submitted,

/s/ Gregg L. Zeff, Esquire
Gregg L. Zeff, Esquire
Jennifer L. Prior, Esquire
*Attorneys for Plaintiffs*

Dated: October 7, 2014

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on the 7th day of October, 2014, the within Response to

Defendant's Motion for Summary Judgment was forwarded to the below-listed counsel

via ECF:


John Eastlack, Esquire
Weir & Partners, LLP
457 Haddonfield Road, Suite 420
Cherry Hill, NJ 08002


_/s/ Gregg L. Zeff_____
Gregg L. Zeff Esquire

ZEFF LAW FIRM LLC
Gregg L. Zeff, Esquire
Jennifer L. Prior, Esquire
100 Century Parkway, Suite 305
Mt. Laurel, NJ 08054
(t) (856) 778-9700
(f) (856) 702-6640

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| FRATERNAL ORDER OF POLICE, LODGE 1, et al. | : | CIVIL ACTION |
| | : | |
| | : | |
| | : | |
| *Plaintiffs,* | : | No. 1:10-CV-1502 |
| | : | |
| v. | : | |
| | : | |
| CITY OF CAMDEN, et al. | : | |
| | : | |
| *Defendants.* | : | |
| | : | |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS

### I.    The Directed Patrol Program

1.    Admitted.

2.    Admitted.

3.    Denied. Officers in the Camden Police Department ("CPD") were told that they were to conduct directed patrols by going to crime "hotspots" that were identified using "crime mapping and crime analysis." (See attached as Exhibit "A" excerpts of deposition of Chad Holland, Feb. 10, 2011, 60:14-22.) The directed patrols consisted of going to these hotspots and collecting information from

1

individuals in the area and putting that information on a field contact card. The information included each person's name, date of birth, driver's license information, social security number, height, weight, and address. (See attached as Exhibit "B" experts of deposition of Anthony Galiazzi, Feb. 11, 2011, 22:20-23:1.) Officers were required to conduct 27 directed patrols if they were on the supplemental units and 18 directed patrols if they were on a regular patrol unit. (Holland Dep., 62:5-19.) If officers did not fill out the information on the field contact card the directed patrol would not count toward the minimum requirement. (Galiazzi Dep., 30:22-31:1.) If officers did not get the required directed patrols during a shift they were told they would be disciplined. (Holland Dep., 63:4-19); (Galiazzi Dep., 23:14-17; 39:12-23.)

4.      Denied. Officers were initially told about the directed patrol policy around August 2008, but nothing was put in writing until approximately nine months later. (Holland Dep., 57:15-24.)

5.      Denied. Officers in the CPD were told that they were to conduct directed patrols by going to crime "hotspots" that were identified using "crime mapping and crime analysis." (Holland Dep., 60:14-22.) The directed patrols consisted of going to these hotspots and  collecting information from individuals in the area and putting that information on a field contact card. The information included each person's name, date of birth, driver's license information, social security number, height, weight, and address. (Galiazzi Dep., 22:20-23:1.) Officers were required to conduct 27 directed patrols if they were on the supplemental units and 18 directed patrols if they were on a regular patrol unit. (Holland Dep., 62:5-19.) If officers did not fill out the information on the field contact card the directed patrol

2

would not count toward the   minimum requirement. (Galiazzi Dep., 30:22-31:1.) If officers did not get the required directed patrols during a shift they were told they would be disciplined. (Holland Dep., 63:4-19);  (Galiazzi Dep., 23:14-17; 39:12-23.)

      6.    Admitted.

      7.    Denied. The directed patrols consisted of going to these hotspots and collecting information from individuals in the area and putting that information on a field contact card. The information included each person's name, date of birth, driver's license information, social security number, height, weight, and address. (Galiazzi Dep., 22:20-23:1.) Officers were required to conduct 27 directed patrols if they were on the supplemental units and 18 directed patrols if they were on a regular patrol unit. (Holland Dep., 62:5-19.) If officers did not fill out the information on the field contact card the directed patrol would not count toward the minimum requirement. (Galiazzi Dep., 30:22-31:1.) If officers did not get the required directed patrols during a shift they were told they would be disciplined. (Holland Dep., 63:4-19); (Galiazzi Dep., 23:14-17; 39:12-23.)

      8.    Admitted. Admitted that every directed patrol did not result in an arrest, citation, or search. However, there were instances where officers were told that every time they conducted a directed patrol they must issue a citation. (See attached as Exhibit "C" Deposition of John Williamson, 33:19-34:1; 35:1-4.)

      9.    Admitted.

      10.    Denied. Galiazzi believed the policy required officers to use force if necessary to obtain information or be disciplined. (Galiazzi Dep., 23:18-21.) Holland was told that if someone was in the area he had to stop the individual and get their

information. (Holland Dep., 72:13- 73:15; 77:19-25.)

11.    Denied. Officers were required to conduct 27 directed patrols if they were on the supplemental units and 18 directed patrols if they were on a regular patrol unit. (Holland Dep., 62:5-19.) If officers did not fill out the information on the field contact card the directed patrol would not count toward the minimum requirement. (Galiazzi Dep., 30:22-31:1.) If officers did not get the required directed patrols during a shift they were told they would be disciplined. (Holland Dep., 63:4-19); (Galiazzi Dep., 23:14-17; 39:12-23.)

12.    Denied. Officers were required to conduct 27 directed patrols if they were on the supplemental units and 18 directed patrols if they were on a regular patrol unit. (Holland Dep., 62:5-19.) If officers did not fill out the information on the field contact card the directed patrol would not count toward the minimum requirement. (Galiazzi Dep., 30:22-31:1.) If officers did not get the required directed patrols during a shift they were told they would be disciplined. (Holland Dep., 63:4-19); (Galiazzi Dep., 23:14-17; 39:12-23.)

13.    Denied. Officers were required to conduct 27 directed patrols if they were on the supplemental units and 18 directed patrols if they were on a regular patrol unit. (Holland Dep., 62:5-19.) If officers did not fill out the information on the field contact card the directed patrol would not count toward the minimum requirement. (Galiazzi Dep., 30:22-31:1.) If officers did not get the required directed patrols during a shift they were told they would be disciplined. (Holland Dep., 63:4-19); (Galiazzi Dep., 23:14-17; 39:12-23.)

14.    Denied. Officers were required to conduct 27 directed patrols if they

were on the supplemental units and 18 directed patrols if they were on a regular patrol unit. (Holland Dep., 62:5-19.) If officers did not fill out the information on the field contact card the directed patrol would not count toward the minimum requirement. (Galiazzi Dep., 30:22-31:1.) If officers did not get the required directed patrols during a shift they were told they would be disciplined. (Holland Dep., 63:4-19); (Galiazzi Dep., 23:14-17; 39:12-23.)

15.    Admitted that Officers were required to conduct 27 directed patrols if they were on the supplemental units and 18 directed patrols if they were on a regular patrol unit. (Holland Dep., 62:5-19.) Denied in part.  If officers did not fill out the information on the field contact card the directed patrol would not count toward the minimum requirement. (Galiazzi Dep., 30:22-31:1.) If officers did not get the required directed patrols during a shift they were told they would be disciplined. (Holland Dep., 63:4-19); (Galiazzi Dep., 23:14-17; 39:12-23.)

16.    Denied. Officers were required to conduct 27 directed patrols if they were on the supplemental units and 18 directed patrols if they were on a regular patrol unit. (Holland Dep., 62:5-19.) If officers did not fill out the information on the field contact card the directed patrol would not count toward the minimum requirement. (Galiazzi Dep., 30:22-31:1.) If officers did not get the required directed patrols during a shift they were told they would be disciplined. (Holland Dep., 63:4-19); (Galiazzi Dep., 23:14-17; 39:12-23.)

17.    Denied. Galiazzi believed the policy required officers to use force if necessary to obtain information or be disciplined. (Galiazzi Dep., 23:18-21.) Holland was told that if someone was in the area he had to stop the individual and get their

information. (Holland Dep., 72:13- 73:15; 77:19-25.)

## II.  Holland and Galiazzi Were Identified as Low Performers

18.    Admitted.

19.    Admitted.

20.    Admitted.

21.    Admitted.

22.    Admitted.

23.    Denied. Holland was told by his superiors that the low performer list could have been based on directed patrols, but they did not know. (Id. at 105:23-25.) When Holland asked one of his superiors, Sergeant Frett, what the low performer list was based on, Sgt. Frett responded, "who the fuck knows." (Id. at 105:6-17.)

24.    Denied. Holland was told by his superiors that the low performer list could have been based on directed patrols, but they did not know. (Id. at 105:23-25.) When Holland asked one of his superiors, Sergeant Frett, what the low performer list was based on, Sgt. Frett responded, "who the fuck knows." (Id. at 105:6-17.)

25.    Denied. Holland was told by his superiors that the low performer list could have been based on directed patrols, but they did not know. (Id. at 105:23-25.) When Holland asked one of his superiors, Sergeant Frett, what the low performer list was based on, Sgt. Frett responded, "who the fuck knows." (Id. at 105:6-17.) In or around January 28, 2009, Galiazzi was brought into a meeting with his superiors and told he would be placed on a low-performer list. (Galiazzi Dep., 33:14-34:11.) Around the same time, Holland was told by Sergeants Moffa and Frett, and

6

Lieutenant Cook that he was being placed on a low-performer list possibly because his amount of directed patrols, but they were not sure the reason. (Holland Dep., 103:2-104:7; 105:6-25.)

26.    Admitted.

27.    Denied. Holland was told by his superiors that the low performer list could have been based on directed patrols, but they did not know. (Id. at 105:23-25.) When Holland asked one of his superiors, Sergeant Frett, what the low performer list was based on, Sgt. Frett responded, "who the fuck knows." (Id. at 105:6-17.)

28.    Admitted.

29.    Denied. In or around January 28, 2009, Galiazzi was brought into a meeting with his superiors and told he would be placed on a low-performer list. (Galiazzi Dep., 33:14-34:11.) Around the same time, Holland was told by Sergeants Moffa and Frett, and Lieutenant Cook that he was being placed on a low-performer list possibly because his amount of directed patrols, but they were not sure the reason. (Holland Dep., 103:2-104:7; 105:6-25.)

30.    Admitted.

31.    Denied. In or around January 28, 2009, Galiazzi was brought into a meeting with his superiors and told he would be placed on a low-performer list. (Galiazzi Dep., 33:14-34:11.) Around the same time, Holland was told by Sergeants Moffa and Frett, and Lieutenant Cook that he was being placed on a low-performer list possibly because his amount of directed patrols, but they were not sure the reason. (Holland Dep., 103:2-104:7; 105:6-25.)

32.    Admitted.

7

33.     Denied. In or around January 28, 2009, Galiazzi was brought into a meeting with his superiors and told he would be placed on a low-performer list. (Galiazzi Dep., 33:14-34:11.) Around the same time, Holland was told by Sergeants Moffa and Frett, and Lieutenant Cook that he was being placed on a low-performer list possibly because his amount of directed patrols, but they were not sure the reason. (Holland Dep., 103:2-104:7; 105:6-25.)

34.     Admitted.

35.     Admitted

36.     Admitted.

37.     Admitted.

38.     Admitted.

39.     Denied. Galiazzi's Information Report stated the following:

> I do not understand why I have to write this special. I have not been provided with any type of baseline to gauge what my numbers should be. I also have not been provided with any training on the proper amount of statistics an officer is supposed to produce in a shift. I have been a police officer for 2 ½ years and never had a problem with my statistics before, this is why I said quotas are illegal. It is my opinion that my comment on my counseling form is just that my opinion, and needs no further explaining.

(See attached as Exhibit "D" Galiazzi Information Report, Feb. 9, 2009.)

40.     Admitted.

41.     Admitted.

42.     Admitted.

**III.    Galiazzi and Holland Transferred**

43.     Denied. Cook told Holland that he was told by Cuevas he had to transfer Galiazzi and Holland. (Holland Dep., 196:2-11.) Cook also said to Holland that although McCausland had a lower score than both Holland and Galiazzi, he was not transferred. (Id. at 197:8-14.) Cook reiterated that only Galiazzi and Holland complained on their initial counseling form. (Id.)

44.     Admitted.

45.     Admitted.

46.     Admitted

47.     Admitted.

48.     Admitted.

49.     Admitted.

50.     Admitted.

51.     Admitted.

52.     Denied. Galiazzi was told that he was placed on the "abuse of sick time" list. (Galiazzi Dep., 52:2-9.)

53.     Denied. Galiazzi was only warned previously.

> I think I was warned about how many sick days I used a year before, and I wrote—I think I wrot a special on it or told my sergeant what the reason was, my son was ill and in the hospital the year prior and had surgery prior to that the year before.

(Id. 52:10-17.)

54.     Admitted.

55.     Admitted.

56.    Admitted.

57.    Admitted

58.    Admitted.

59.    Admitted.

60.    Admitted.

61.    Denied. When Holland received a second abuse of sick leave notice from Lieutenant Leusner, he informed Lt. Leusner that he had been approved for intermittent FMLA to care for his mother, and Lt. Leusner told him Cuevas did not "give a shit" that he was approved for FMLA. (Hoffman Dep., 133:2-19.) Lt. Leusner further told Holland that Cuevas did not care that he was on FMLA, that he would continue to be placed in the chronic sick category, and he would eventually receive progressive discipline because of it. (Id. at 134:22-135:2.)

62.    Denied. Galiazzi was told that he was being followed by Internal Affairs ("IA") and the department was looking to fire him "because of this and because of the lawsuit." By "this" Galiazzi was referring to his complaints about the department enforcing illegal quotas. ( Galiazzi Dep., 68:2-19.)

63.    Denied. In February 2009, Galiazzi put in for and was approved for eight days of vacation in August 2009. (Id. at 60:18-62:10.)  Two days into his vacation, Galiazzi was called by Lieutenant Maddox and told that his vacation had been revoked and if he did not report to work immediately he would be marked AWOL and ultimately fired. (Id. at 62:11-24; 70:17-20.)  Galiazzi, his wife, and son never went to the vacation spot because Galiazzi was told his vacation was revoked. (Id. at 65:14-17.)  After being told his vacation was revoked in the middle of the

10

vacation, Galiazzi went out on leave due to work-related stress. (Id. at 63:14-23; 66:22-67:3.)

      64.    Admitted.

      65.    Denied. In February 2009, Galiazzi put in for and was approved for eight days of vacation in August 2009. (Id. at 60:18-62:10.) Two days into his vacation, Galiazzi was called by Lieutenant Maddox and told that his vacation had been revoked and if he did not report to work immediately he would be marked AWOL and ultimately fired. (Id. at 62:11-24; 70:17-20.) Galiazzi, his wife, and son never went to the vacation spot because Galiazzi was told his vacation was revoked. (Id. at 65:14-17.) After being told his vacation was revoked in the middle of the vacation, Galiazzi went out on leave due to work-related stress. (Id. at 63:14-23; 66:22-67:3.) From August 2009 to April 2010 Galiazzi was out on stress leave due to the retaliation of the Police Department. (Id. at 84:6-11.) Galiazzi was sent back to work by Dr. Kelly in April 2010. (Id. at 83:13-22.) On his sixth day back from work, Galiazzi had a panic attack and was rushed to the hospital. (Id. at 81:16-82:13.) After the panic attached Galiazzi once again went out on stress leave, and never returned to work. (Id. at 87:8-11.) In August 2010, Galiazzi was placed on unpaid medical leave, and he was laid off in January 2011. (Id. at 31:12-17; 90:15-91:10.)

      66.    Denied. Although Holland was on administrative leave, he went to the hospital after the shooting. Despite the fact that Holland was on administrative leave, and that he went to the hospital, he was later informed that he was going to be marked absent without leave ("AWOL") for that day. (Id. at 142:24-143:5.) When Holland asked his supervisor Sergeant Jefferson why he was being marked AWOL,

when he was on administrative leave and had been at the hospital, Jefferson said, "you know why they're fucking going to be coming after your head so you do what you got to do or whatever." (Id. at 144:24-146:12.)

67.      Admitted.

68.      Admitted

69.      Admitted.

70.      Admitted.

71.      Admitted.

**IV.     Williamson's Disciplinary Violations**

72.      Denied. In March 2009 the CPD Fraternal Oder of Police ("FOP") held an organized march to City Hall in Camden. The march culminated with Williamson making a speech to city counsel about officers being subjected to unfair directed patrols and being required to illegally force people on the street to give them information without any probable cause. (Williamson Dep., 42:16-43:3.)

73.      Admitted.

74.      Admitted.

75.      Admitted.

76.      Admitted.

77.      Admitted.

78.      Admitted.

79.      Admitted. (See attached as Exhibit "G" Reed Complaint, Dec. 21, 2009.)

80.     Admitted that Williamson was charged with neglect of duty, failure to take police action, and lack of loyalty to the department on November 18, 2009. (See Exhibit "F" Williamson Notice of Discipline, Nov. 18, 2009.)

81.     Admitted.

**V.     Sgt. Wysocki's Role**

82.     Admitted.

83.     Denied. Sergeant Joseph Wysocki made the made the decision to bring IA charges against Holland. (Holland Dep., 172:20-23.)

84.     Denied. At the time the incident was recorded, according to Wysocki, there was an issue with crime conditions being checked in the CPD, so IA would conduct video surveillance of certain officers' responses to a crime condition. (See attached as Exhibit "H" Excerpts of Joseph Wysocki Deposition, Jan. 16, 2012, 51:15-24.)[1]

85.     Admitted. The Plaintiffs object because this allegation is not supported by evidence that would be admissible at trial. Wysocki testifies vaguely that "they" were conducting investigation prior to his arrival, without indicating how he knew this information, when these other investigations began and/or ended, or what these investigations consisted of. (Id. at 52:2-53:7.) To the extent this allegation cites to any admissible evidence, it is admitted that IA was conducting some sort of surveillance of officers' reaction to crime conditions prior to Wysocki being assigned

---

[1] Joseph Wysocki's deposition was taken over the period of two days, January 16, 2012 and May 7, 2012. (See Ex. H.) Because the page and line numbers on the deposition transcript are continuous, the Plaintiffs will refer to both Volumes I and II of Wysocki's deposition as "Wysocki Dep."

to internal affairs. (Id. at 52:11-20.)

86.    Admitted that Wysocki testified that Holland was not the target of the surveillance on the day he was videotaped. (Id. at 56:17-57:1.)

87.    Admitted.

88.    Admitted.

89.    Denied. Wysocki was the incoming IA commander and was in charge of the frivolous investigations and/or allegations brought against Holland. (Holland Dep., 169:18-22.) Knew that Holland did not commit any violations, but made the decision to bring IA charges against Holland anyway. (Id. at 170:22-171:9; 172:20-23.) Wysocki specifically targeted Holland for investigation. (Id. at 173:12-15.)

90.    Admitted

VI.    Orders Issued by Commanders

91.    Admitted, that the general order was issued on April 3, 2009. However, it must be noted that this was in response to on April 1, 2009, the Camden FOP filed an Order to Show Cause to prevent the CPD from continuing the directed patrol program as it existed at that time. (See attached as Exhibit "U" Brief in Support of Order to Show Cause, April 1, 2009.) The credibility of Chief Thompson is an issue in this case.

92.    Denied. The document speaks for itself. The credibility of Chief Thompson is an issue in this case.

93.    Denied. The document speaks for itself. The credibility of Chief Thompson is an issue in this case.

14

94.    Denied. The document speaks for itself. The credibility of Chief Thompson is an issue in this case.

95.    Denied. The document speaks for itself. The credibility of Chief Thompson is an issue in this case.

96.    Denied.   The credibility of Anthony Carmichael  is an issue in this case.

97.    Denied.   The credibility of Deputy Chief Lynch is an issue in this case.

VII.    The Disbanding of the City of Camden Police Department

98.    Denied. The City does have a police force.

99.    Admitted that all Camden City police officers were terminated.

100.    Admitted that the document states this only.

101.    Admitted that the agreement states this in part. Denied that this is factually and legally correct.

102.    Admitted that the agreement states this in part. Denied that this is factually and legally correct.

103.    Admitted that the agreement states this in part. Denied that this is factually and legally correct.

104.    Admitted that the agreement states this in part. Denied that this is factually and legally correct.

105.    Admitted that the agreement states this in part. Denied that this is factually and legally correct.

106.    Admitted that the agreement states this in part.  Denied that it is factually and legally correct.

107.    Admitted.

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS

I.   **The Parties**

108.   Plaintiff Chad Holland began working for the Camden Police Department ("CPD") in March 2003 as a patrol officer. (Holland Dep., 19:8-10.)

109.   Prior to working at the CPD, Holland worked as a police officer in Brooklawn and other municipalities from 1996 to 2002. (Id. at 34:13-18.)

110.   Prior to working at CPD, Holland had never been disciplined during his seven years working at other police departments. (Id. at 36:4-7.)

111.   In 2008, Holland was working on supplemental patrol for the CPD, an elite unit where he received 11 percent shift differential. (Id. at 43:7-18; 45:8-16.)

112.   Shift differential was a percentage increase in an officer's base pay based on the unit and/or shift that the officer worked in. (Id. at 45:24-46:16.)

113.   In the supplemental patrol, officers did not respond to radio calls. Instead, they were "told to go out and look for drugs, guns, and bad guys." (Id. at 43:7-18.)

114.   Plaintiff Anthony Galiazzi began working for the CPD in April 2006 as a police officer on patrol. (Galiazzi Dep. 12:7-13:14.)

115.   Galiazzi was also assigned to the elite supplemental patrol unit in August 2008, where he received 11 percent shift differential. (Id. at 13:15-14:5.)

116.   Prior to August 2008, Galiazzi had never seen a therapist, and the only medications he ever took were for allergies. (Id. at 82:18-83:1.)

117.   John Williamson was hired by the CPD in December 1996, where he began as a patrolman. (Williamson Dep., 13:13-14:10.)

118.    In November 2003 Williamson was elected as the Camden FOP president, a position which he held at all times relevant to this matter. (Id. at 14:13-17.)

119.    In 2009 every patrolman and detective in the CPD was a member of the Camden FOP. (Id. at 16:16-19.)

120.    In his 13 years at the CPD prior to 2009, no disciplinary charges were ever brought against Williamson. (Id. at 44:21-23.)

121.    Defendant Thomson was hired as the CPD Chief of Police on July 31, 2008. (See attached as Exhibit "I" excerpts of Deposition of Chief J. Scott Thomson, Feb. 24, 2011, 9:15- 18.)

122.    As the Chief of Police, Thomson had responsibility of the entire CPD, to ensure the efficient operation of the CPD and that the policies and procedures of the CPD were followed. (Id. at 15:7-12.)

123.    The Deputy Chief, and the Chief of Internal Affairs ("IA") reported directly to Thomson. (Id. at 15:12-16:3.)

124.    In 2008, Defendant Orlando Cuevas was named the Inspector of the CPD. He also reported directly to Thomson. (See attached as Exhibit "J" excerpts of Deposition of Orlando Cuevas, March 5, 2012, 15:6-12.)

125.    As the Inspector, Cuevas was in charge of "operations." According the Cuevas "[he] deal[t] with criminal investigations and a lot of plain clothes officers, under cover operations . . . [he was] responsible for what happens essentially after the initial report." (Id. at 19:18-20:14.)

II.    Implementation of Directed Patrols

126.    Within the first few weeks of being named the Chief of Police in July 2008, Thomson instituted a policy referred to as directed patrols. (Thomson Dep., 9:16-17; 32:20-24; 41:4-42:1.)

127.    Officers in the CPD were initially told that they were to conduct directed patrols by going to crime "hotspots" that were identified using "crime mapping and crime analysis." (Holland Dep., 60:14-22.)

128.    The directed patrols consisted of going to these hotspots and collecting information from individuals in the area and putting that information on a field contact card. The information included each individual's name, date of birth, driver's license information, social security number, height, weight, and address. (Galiazzi Dep., 22:20-23:1.)

129.    Officers were required to conduct a minimum of 27 directed patrols if they were on the supplemental units and 18 directed patrols if they were on a regular patrol unit. (Holland Dep., 62:5-19.)

130.    If officers did not get all of the information on the field contact card, the directed patrol was not counted toward the minimum requirement. (Id. at 30:22-31:1.)

131.    If officers did not get the minimum required directed patrols during a shift they were disciplined. (Holland Dep., 63:4-19); (Galiazzi Dep., 23:14-17; 39:12-23.)

132.    Holland was told "it doesn't matter what else you do, you better hit the numbers on the patrol." (Holland Dep., 117:15-17.)

133.    With the directed patrols, the CPD officers' supervisors "were giving

19

directives to the officers to stop everyone on the street, get their information, and just to

let everybody in the city know that if there were to step out of their house, they were

going to be engaged by a police officer." (Williamson Dep., 22:21-23:2.)

134.    Officers were also directed to conduct "traffic funnels" where they were

commanded to stop every single vehicle in a directed patrol area. (Id. at 25:14-26:6.)

135.    Department Captain Burnett told officers that every vehicle stop in

a directed patrol area had to be issued a citation. (Id. at 35:1-4.)

## III.    The Effect of Directed Patrols

136.    In one incident after the direct patrol initiative was issued, Holland was

conducting a directed patrol in the area of 10th Street and Van Hook Street in Camden.

(Holland Dep. 75:12-15.)

137.    Holland pulled over his vehicle and got out to patrol the area. As he

was walking down the street, two African American males were walking toward him.

(Id. at 75:14-17.)

138.    As he was walking toward them, Holland looked both males in the face and
said

to them "hey, guys, how are you doing today?" (Id. at 80:18-22.)

139.    The two African American males dropped their eyes, and walked

past Holland without responding. (Id. at 80:22-25.)

140.    Approximately five to ten minutes later, the area was quiet, and

Holland went to his vehicle to patrol another area when his Sergeant, Fred Jefferson,

approached him. (Id. at 75:18-24.)

141.    Sgt. Jefferson told Holland that Cuevas rode by where he was

20

patrolling and wanted to know why Holland did not stop the two African American males that walked by him. (Id. at 76:2-6.)

142.    Holland explained to Sgt. Jefferson that he said hello to them, and they did not

respond. However, Sgt. Jefferson told Holland that he is going to get the "hammer," and that Captain Terrence Grimes wanted a "special" from Holland explaining why he did not stop the two individuals and get their information. (Id. at 76:5-11.)

143.    Sgt. Jefferson told Holland, "Stop them and get their information. If Cuevas wants you to stop them and get their info, stop them and get their info." (Id. at 77:1-9.)

## IV.    Officers' Complaints About Legality of Directed Patrols

144.    John Sosinavage was a Lieutenant of Patrol and Captain of a Patrol Unit for the CPD in 2009. (See attached as Exhibit "K", excerpts of Deposition of John Sosinavage, May 15, 2012, 10:15-22.)

145.    Sosinavage was also a lieutenant for IA from August 2004 until May 2009. (Id. at 10:24-11:1.)

146.    When the directed patrol program was initiated, Sosinavage heard complaints from at least four officers on his patrol, Jimmy Mills, Officer Ziegler, Martiza Cortes, and Henry McCleod, that they believed the directed patrols as implemented were an illegal quota system. (Id. at 20:3-17.)

147.    In September or October 2008, Williamson had a conversation with Thomson about the legality of stopping every citizen on the street during directed patrols. (Williamson Dep., 30:1-8.)

148.    In some instances officers were told they had to issue a citation or ticket

whenever they conducted a directed patrol. (Id. at 33:19-34:1.)

## V. Holland Place on Low Performer List

### A. Low Performer List

149.    At the end of January 2009, Holland's supervisors Sergeant Moffa, Sergeant Frett, "low performer" list for his low statistics in December 2008 and January 2009. (Holland Dep., 103:2-104:7.)

150.    Holland was placed on the low performer list along with Galiazzi and Officer McCausland. (Id. at 104:17-23); (see attached as Exhibit "M" counseling form for Michael McCausland, Feb. 3, 2009); (see also attached as Exhibit "N" counseling form for Anthony Galiazzi, Feb. 3, 2009.)

151.    When Holland asked Frett what his low statistics were based on, Frett responded, "who the fuck knows." (Id. at 105:6-17.)

152.    Holland asked his superiors if the statistics were based on the amount of directed patrols he conducted, and they responded, "Chad, we don't know. It could be directed patrols." (Id. at 105:23-35.)

153.    As a result of being placed on the low-performer list, Holland received a verbal counseling, which is a step in the progressive discipline process. (Id. at 107:11-108:1.)

### B. Written Counseling

154.    On February 4, 2009, Holland then received a written counseling for being on the low-performer list. (Id. at 110:11-111:3); (See attached as Exhibit "L" counseling form for Chad Holland, Feb. 4, 2009.)

155.    On the written counseling, Holland circled that he did not concur with

the counseling he received. (Holland Dep., 114:2-11);(Ex. L., p.1.)

156.    Holland wrote the following on his counseling form:

> I have not been provided with any type of baseline to gauge
> what my numbers should be. I have not been trained in or
> provided any type of training on the proper context of
> statistics that an officer is supposed to provide/generate. I
> have been a police officer for 14 yrs and have never been
> told that my statistics were below par. I . . . have not been
> advised of or trained in what statistics are used to measure
> productivity.

(Ex. L. pp. 1-2.)

157.    After responding that he did not concur, Holland was told by Cook that

Cuevas wanted him to write a special information report on why he did not concur.

(Holland, 114:22- 115:3.)

158.    On February 9, 2009, Holland wrote the following on his information

report:

> On February 9, 2009 I was ordered by Lt. F. Cook to write this
> special report in reference to my counseling form that I was given on
> 2/4/09. Lt. Cook advised me that this was per order of Inspector
> Cuevas. Lt. Cook advised me that Insp. Cuevas wished for me to
> explain my Non-Concurrence [explanation] on said counseling
> form. I am confused about what needs to be explained. I believe
> my non-concurrence [explanation] was clear concise and I have
> no idea how to further explain my [explanation]. Therefore, I
> respectfully submit that my non- concurrence [explanation] needs
> no further explanation and advise that my feelings are accurately
> reflected on said report.

(See attached as Exhibit "O" Holland information report, Feb. 9, 2009.)

159.    Holland also believed the directed patrols were illegal because he was

forced to stop people and get their information without any probable cause to stop

them, which he believed infringed on people's 4th Amendment rights. (Holland Dep.,

120:11-121:3.)

160.     On February 16, 2009, Sgt. Moffa wrote a letter to Lt. Cook stating that Holland's directed patrol and other statistics had improved since he was placed on the low performer list. (See attached as exhibit "P" Moffa letter about Holland, Feb. 16, 2009.)

161.     Despite his now improving statistics, on February 20, 2009, Holland was transferred from the elite supplemental patrol to regular patrol. (Holland Dep., 118:15-19.)

162.     As a result of the transfer, Holland was no longer in the elite unit, and his shift differential decreased from 11 percent to 8.5 percent. (Id. at 119:2-6.)

## VI.     Galiazzi Placed on Low Performer List

### A.  Low Performer List

163.     On January 28, 2009 Galiazzi was told by his sergeants that he was being placed on the low performer list. (Galiazzi Dep., 33:14-34:11.)

164.     As a result of being on the list, Galiazzi was given a verbal counseling, which is the first step in the progressive discipline process. (Id. at 35:9-15.)

165.     When Galiazzi received his discipline, he was told by his superiors that he needed to increase his directed patrol numbers. (Id. at 35:16-24.)

166.     Galiazzi was told by his sergeant, sergeant Moffa, that the reason he was being disciplined was because of low directed patrol numbers. (Galiazzi Dep., 37:21-39:7.)

### B.  Written Counseling

167.     On February 3, 2009, Cuevas ordered that Galiazzi receive a written counseling because of his low directed patrol numbers. (Id. at 36:4-13); (See Ex. N.)

168.    Galiazzi did not concur with the written counseling and wrote in the comments section of the counseling, "QUOTA'S [sic] ARE ILLEGAL!" (Galiazzi Dep., 36:185-21);(Ex.N) (emphasis in original).

169.    After writing quotas are illegal, Galiazzi was ordered to write a special information report on why he believed quotas were being enforced. (Galiazzi Dep., 40:13-19.)

170.    On February 9, 2009, Galiazzi wrote the following on his information report:

> I do not understand why I have to write this special. I have not been provided with any type of baseline to gauge what my numbers should be. I also have not been provided with any training on the proper amount of statistics an officer is supposed to produce in a shift. I have been a police officer for 2 ½ years and never had a problem with my statistics before, this is why I said quotas are illegal. It is my opinion that my comment on my counseling form is just that my opinion, and needs no further explaining.

(See Ex. D.)

171.    On February 16, 2009, Sgt. Moffa wrote a letter to Lt. Cook stating that Galiazzi's directed patrol and other statistics had improved since he was placed on the low performer list. (See attached as exhibit "Q" Moffa letter about Galiazzi, Feb. 16, 2009.)

172.    Despite his improved statistics, on February 20, 2009 Galiazzi was transferred from the elite supplemental unit to regular patrol. (Galiazzi Dep., 44:9-13.)

173.    As a result of the transfer, Galiazzi's shift differential decreased from 11 percent to one percent. (Id. at 44:24-45:5.)

174.    Galiazzi was told by his supervisors Sergeant Whitesell and Lieutenant

Strang that he was transferred because of what he wrote on his counseling form. (Id. at 47:13-16.)

## VII.    McCausland Not Transferred

175.    Of the three individuals on the low performer list, Galiazzi, Holland, and McCausland, McCausland was the lowest ranked. (Id. at 46:24-47:4.)

176.    Like Holland and Galiazzi, McCausland received a written counseling form on February 3, 2009. (See Ex. M.)

177.    However, unlike Galiazzi and Holland, McCausland did not write anything in the comments section of the form. (Id.)

178.    Also unlike Galiazzi and Holland, McCausland was not transferred to a less desirable unit where he would earn less money. (Galiazzi Dep., 46:2-8.)

## VIII.    More Complaints by Plaintiff

### A.  Holland Grievence

179.    On February 26, 2009, Holland filed a grievance on behalf of himself and Galiazzi, which he sent to Chief Thomson. (See attached as Exhibit "R" Holland Grievance, Feb. 26, 2013.)

180.    In his complaint, Holland argued that he and Galiazzi were unlawfully retaliated against by being transferred for questioning the legality of the directed patrol program. (Id. at p. 1.)

181.    Holland demanded that a decision be rendered within five days transferring he and Galiazzi back to the supplement unit, in accordance with the collective bargaining agreement. (Id. at p. 5.)

### B.  March to City Hall

26

182.    In March 2009, Williamson led a march with other officers to City Hall in Camden to protest the legality of the way the directed patrols were being implemented. (Williamson Dep., 42:16-43:3.)

183.    The march culminated with Williamson complaining to members of city council that the manner in which the directed were patrols being implemented forced officers to illegally stop civilians on the street. (Id.)

## C.  Civil Complaint

184.    On April 1, 2009, the Camden Fraternal Order of Police ("FOP") filed a Complaint in civil court against the City of Camden Police Department, the Office of Attorney General, and the State of New Jersey. (See attached "S" FOP Complaint, April 1, 2009.)

185.    The Complaint argued that the CPD was using illegal quotas because it was disciplining officers based on statistics, without telling the officers what statistics were being used. (Id. at ¶ 8.)

186.    The Complaint further alleged that "The use of the monthly statistics for discipline is a thinly veiled and illegal use of quotas." (Id. at ¶ 12.)

187.    The Complaint also alleged that officers were illegally required to knock on civilian's doors and stop people on the street in order to satisfy numerical requirements. (Id. at ¶ 22.)

## D.  Injunctive Relief

188.    On April 1, 2009, the Camden FOP filed an Order to Show Cause to prevent the CPD from continuing the directed patrol program as it existed at that time. (See attached as Exhibit "U" Brief in Support of Order to Show Cause, April 1, 2009.)

189.    The Brief in support of the Order to Show Cause stated, "It is the position of the Plaintiffs that the Police Department, under the supervision and direction of the Attorney General, are [sic] violating either statutes or judicial holding thus infringing the rights of the public being served by the officers and the officers themselves." (Id. at pp. 1-2.)

190.    The Brief further stated that "If quotas are being used by the Police Department, the citizens of Camden and those who drive through and use its streets are at risk of having their rights violated by the implementation of the illegal policy." (Id. at 3.)

191.    The Brief also stated that, "It is the position of the plaintiffs that police administration for Camden does in fact use quotas and that these quotas are being used to discipline officers." (Id.)

192.    Holland attached a certification to the Brief where he made statements about his questioning of the directed patrols, and CPD's subsequent retaliation. (Id. at p. 3); (see attached as Exhibit "T" Holland Certification, March 11, 2009.)

193.    Williamson also attached a certification to the Brief, where he stated the following: "I received some phone calls from officers last week that the city, as part of its crime initiative, was telling officers at roll call that if they could not contact enough people in directed patrols contacts that the officers should KNOCK ON DOORS of private homes and obtain names of residents as part of the overall number of required field contacts or engagements." (see attached as Exhibit "V" Williamson Certification, April 1, 2009) (emphasis in original).)

194.    Galiazzi also attached a certification to the Brief where he reiterated that

he was retaliated against for saying quotas are illegal. (See attached as Exhibit "W"

Galiazzi Certification, March 31, 2009.)

## IX.    Additional Department Retaliation

### A.  Additional Retaliation Against Holland

#### i.    Bike Patrol

195.    In April 28, 2009, Holland applied to be placed on a new bike patrol

with the CPD. (Holland Dep., 124:1-5.)

196.    Holland had been on the bike patrol in the past, and completed the

training for bike patrol. (Id. at 124:16-18.)

197.    Holland was not selected for the bike patrol. (Id. at 125:5-7.)

198.    Holland spoke to two officers where were selected for bike patrol, and

neither of them had training for the patrol. (Id. at 125:21-126:3.)

199.    Holland would have received an increase in shift differential had he been

selected for the bike patrol. (Id. at 124:8-12.)

#### ii.    Family and Medical Leave Act

200.    In April 2009, Holland's mother came to live with him because she was

diagnosed with breast cancer, and he had to take care of her. (Id. at 128:5-13.)

201.    In May 2009, Holland applied for and was approved for intermittent

FMLA to care for his mother. (Id. at 127:10-18.) Holland was approved for leave on

May 22, 2009, but on May 27, 2009 he received a verbal warning from Captain

Terrence Grimes stating that he was using too much sick time. (Id. at 130:23-131:8);

(see attached as Exhibit "X" Holland verbal warning, May 27, 2009.)

202.    Holland told Grimes that he should not be disciplined for using sick time

because he was on FMLA. Grimes responded that, "they don't care if you're on FMLA, go file a union grievance." (Holland Dep., 132:9-17.)

203.    On June 17, 2009, Holland received a letter from Lt. S. Leusner stating that he  was being placed in the "Chronic Sick Category" because of his use of sick says. (Id. at 133:2-7); (See attached as Exhibit "Y" Holland chronic sick category, June 17, 2009.)

204.    Holland told Leusner that he was on FMLA, and should not be disciplined for taking a sick day to care for his mother. Leusner responded that Cuevas does not "give a shit" that Holland was approved for FMLA, and that Holland would continue to be placed in sick categories and eventually disciplined. (Holland Dep., 133:10-135:2.)

### iii.    Holland Marked AWOL

205.    Holland was approved for administrative leave to conduct FOP business as the acting FOP President from August 2, 2009 to August 5, 2009. (Holland Dep., 142:2-10.)

206.    On August 4, 2009, there was a shooting in Camden. (Id. at 142:24-143:2.)

207.    Although Holland was on administrative leave, he went to the hospital after the shooting. Despite the fact that Holland was on administrative leave, and that he went to the hospital, he was later informed that he was going to be marked absent without leave ("AWOL") for that day. (Id. at 142:24-143:5.)

208.    When Holland asked his supervisor Sergeant Jefferson why he was being marked AWOL, when he was on administrative leave and had been at the

hospital, Jefferson said, "you know why they're fucking going to be coming after your head so you do what you got to do or whatever." (Id. at 144:24-146:12.)

209.    The AWOL charge against Holland was investigated by IA, but a resolution was never reached. (Id. at 148:11-5.)

210.    Prior to 2009, Holland was only investigated one time by IA in his 13 years as a police officer. (Id. 146:13-21.)

### iv.    Psychiatric Treatment for Holland

211.    In August 2009, after the AWOL incident, Holland spoke with Camden Risk Manager Marty Hahn because he was suffering from enormous stress because of all of the retaliation. (Id. at 157:6-11.)

212.    To deal with the stress, Holland began to see clinical social worker Elizabeth Staub beginning in August 2009. (Id. at 159:1-11.)

213.    Holland continued to see Staub until November 2009, and stopped seeing her after he transferred out of the CPD. (Id. at 160:17-25.)

### v.    More Internal Affairs Investigations

214.    In October 2009, Holland was told that he was once again being investigated by IA, this time for failing to back up an officer. (Id. at 146:22-146:6.)

215.    The investigation against Holland was never resolved, and he was never formally served with the charges. (Id. at 147:12-15.)

216.    On November 11, 2009, Holland was served with another IA investigation notification. (See attached as Exhibit "Z" IA complaint notification, Nov. 11, 2009.)

217.    Holland was being investigated because of a complaint that involved,

"an allegation of demeanor" for an incident that occurred November 11, 2009. (Ex. Z.)

218.    Sosinavage, who was previously in IA, told Holland that all of the IA investigations he was being subjected to were retaliation for his complaints about directed patrols, and his involvement in the April 2009 lawsuit. (Holland Dep., 148:21-149:1.)

219.    Sosinavage and Carmichael told Holland that the head of the IA department, Defendant Wysocki, was brought in by the department to be a "headhunter" and Holland's was one of the first heads that he was hunting. (Id. at 173:12-15.)

220.    After all of the retaliation, Holland requested a transfer to the Brooklawn Police Department, which was granted by Thomson for December 31, 2009. (Id. at 149:9-13; 181:4-9.)

221.    In transferring to Brooklawn, Holland was receiving a pay cut of approximately $20,000.00 per year. (Id. at 180:9-19.)

**B. Additional Retaliation Against Galiazzi**

**i.    Abuse of Sick Time List**

222.    In March 2009, Galiazzi went out on sick leave to care for his son who had broken his arm. (Galiazzi Dep., 49:12-18.)

223.    Galiazzi notified his supervisor that he was going out on sick leave to care for his son, and was told to call in everyday just to confirm he will be out, which Galiazzi did. (Id. 51:11-16; 53:21-24.)

224.    At that time officers were entitled to 15 sick days per year, and Galiazzi had over 20 sick days, because he carried days over from the previous year. (Id. at

49:12-18.)

225.    Galiazzi took off approximately three weeks to care for his son. (Id. at 49:23- 50:1.)

226.    Galiazzi was then placed on the abuse of sick time list for taking off the three weeks to take care of his son. (Id. at 50:10-19.)

### ii.    Another Transfer

227.    After being placed on the abuse of sick time list, Galiazzi was transferred from one midnight squad to another midnight squad. (Id. at 57:45-9.)

228.    Because he was in a different squad, Galiazzi worked different days. He was forced to rearrange his schedule for picking up his children, hiring a babysitter, among other things because of the transfer he did not ask for. (Id. at 58:10-20.)

229.    Galiazzi was told that he was transferred with another officer who was an FOP representative because there were too many FOP representatives on the other unit. (Id. at 59:23- 60:9.)

230.    Galiazzi knew this explanation was not true, because the FOP meetings were on Tuesday nights, which was a night when both of the midnight shifts worked. (Id. at 59:2-8.)

231.    Galiazzi was told by his superiors that the transfer was likely retaliation for his complaints about the legality of the directed patrols. (Id. at 59:12-22.)

### iii.    Vacation Interrupted

232.    In February 2009, Galiazzi put in for and was approved for eight days of vacation in August 2009. (Id. at 60:18-62:10.)

233.    Two days into his vacation, Galiazzi was called by Lieutenant Maddox

and told that his vacation had been revoked and if he did not report to work immediately he would be marked AWOL and ultimately fired. (Id. at 62:11-24; 70:17-20.)

234.    Galiazzi, his wife, and son never went to the vacation spot because Galiazzi was told his vacation was revoked. (Id. at 65:14-17.)

235.    After being told his vacation was revoked in the middle of the vacation, Galiazzi went out on leave due to work-related stress. (Id. at 63:14-23; 66:22-67:3.)

236.    While he was out on sick leave, Sergeant Profera from IA came to Galiazzi's home to make sure he was there. (Id. at 66:4-10.)

237.    Prior to this incident, no officer had ever come to Galiazzi's home to check on him while he was out on sick leave. (Id. at 65:22-24.)

238.    When Profera came to Galiazzi's home, he told Galiazzi to "watch myself because they're after me." (Id. at 66:4-10.)

239.    On at least five different occasions Galiazzi saw that he was being followed by an IA vehicle while he was on patrol. (Id. at 69:16-70:2.)

240.    Galiazzi was also told by Sergeant Hoffman in IA, that he was specifically being followed by IA. (Id. at 68:20-69:6.)

    **iv.    Stress Leave**

241.    From August 2009 to April 2010 Galiazzi was out on stress leave due to the retaliation of the Police Department. (Id. at 84:6-11.)

242.    Galiazzi was sent back to work by Dr. Kelly in April 2010. (Id. at 83:13-22.)

243.    On his sixth day back from work, Galiazzi had a panic attack and was

rushed to the hospital. (Id. at 81:16-82:13.)

244.    Galiazzi testified that on the day he had the panic attached "[I] [c]ouldn't catch my breath, I was sweating profusely, had massive chest pain like someone was sitting on my chest, like there was a car parked on my chest, my hands were shaking uncontrollably. Just all of a sudden started; my sergeant drove me to the hospital." (Id. at 95:8-14.)

245.    After the panic attached Galiazzi once again went out on stress leave, and never returned to work. (Id. at 87:8-11.)

246.    In August 2010, Galiazzi was placed on unpaid medical leave, and he was laid off in January 2011. (Id. at 31:12-17; 90:15-91:10.)

**C.  Additional Retaliation Against Galiazzi**

**i.    Charges For Hospital Incident**

247.    In August 2009, charges were brought against Williamson for the first time in his 13-year career, for an incident that was reported by a nurse at a hospital in May 2009. (Williamson Dep., 45:6-20.)

248.    According to the disciplinary report, on April 16, 2009, Williamson went to the Virtua West Jersey Hospital in Camden where an officer who had been involved in a shooting incident was being treated. (See attached as Exhibit "BB" Preliminary Notice of Disciplinary Action, Aug. 28, 2009, p. 1.)

249.    The disciplinary report states that Williamson violated CPD rules because he used "uncivil, harsh, profane or vulgar language," brought the CPD "disrepute," and "verbally engag[ed] in a loud confrontation" with a nurse. (Ex. BB pp. 1-3.)

250.    Williamson wrote an information report about the incident that was submitted to the CPD. (See attached as Exhibit "CC" Williamson Information Report, July 14, 2009.)

251.    In the information, Williamson explained that he asked the nurse if an officer who was in the hospital could receive medication because he was just involved in a shooting, and the nurse responded, "why does he need medication, he's a cop he gets paid to shoot people." (Id. at p. 1.)

252.    Williamson further explained that after the nurse made those comments, he told her that he did not want to talk to her any more. (Id.)

253.    The nurse left, and when she reentered the room she accused both Williamson and Officer Sanchez of physically touching her. (Id. at pp. 1-2.)

254.    Williamson spoke to the hospital's supervisor about the incident, and explained to her what happened, and even directed the supervisor to speak to Lt. Carlin, who was the highest ranking officer at the hospital at that time. (Id. at p. 2.)

255.    Williamson requested a disciplinary hearing regarding the charges, but that request was denied, and Williamson received a written reprimand as a result of the incident. (Williamson Dep., 45:23-46:2.)

**ii.    Charges for Thumb Drive**

256.    On May 28, 2009 a thumb drive containing information about the CPD was sent to the office of Camden FOP attorney Timothy Quinlan. (See attached as Exhibit "DD" Preliminary Notice of Disciplinary Action, Nov. 18, 2009, p. 1.)

257.    Williamson was charged with not reporting to the CPD that the attorney received the thumb drive. (Williamson Dep., 47:18-25.)

258.    Specifically, Williamson was charged with failing to take a police action, and violating the duty of loyalty to the department. (Ex. DD, pp. 1-2.)

259.    Williamson was later informed by Thomson that the charges against him regarding the thumb drive were dropped. (Williamson Dep., 49:14-20.)

### iii.    Williamson Investigated After An Argument at Union Hall

260.    On October 6, 2009, during a union meeting, two women got into an argument outside of the meeting. (Id. at 50:19-51:1.)

261.    As a result of that argument, Williamson was investigated. (Id. at 51:1-6.)

262.    Williamson was never told what the result of that investigation was. (Id. at 51:5- 25.)

### iv.    Internal Affairs Investigation During Union Campaign

263.    On December 8, 2009, Williamson told that he was again being investigated, this time for alleged "procedural violations" that occurred on November 21, 2009. (See attached as Exhibit "EE" IA Complaint, Dec. 8, 2009.)

## X.    Testimony  of Deputy Chief Michael Lynch

264.    Deputy Chief Michael Lynch is the second in command, executive officer of the Camden Police Department. (See attached as Exhibit "FF" excerpts of Deposition of Michael Lynch, 5:13-21.)

265.    An "engagement" is an interaction between the police officer and a citizen. (Id. at 24:24-25:1).

266.    The procedure for an engagement is that if an officer has a contact they are to fill out either a field contact card or community card. (Id. at 25:6-9.)

267.     Lynch admitted that essentially, engagement rate is measured based on the number of field contact and intelligence cards. (Id. at 24:5-12.)

268.     An officer under this policy has an obligation to engage a person sitting on the stoop of their home not engaged in any suspicious activity. (Id. at 44:4-24; 45:5-16.)

269.     If that person sat on the stoop for hours, each officer that passed by would be required to attempt to engage the citizen and get a field contact card. (Id. at 44:1-48:23.)

270.     There's no safeguard in the system to protect a citizen from being approached over and over again every half hour or every 15 minutes by however many police officers go by. (Id. at 47:2-7.)

271.     Police officers have either been disciplined or warned for failure to engage a citizen who was standing in line to get chicken for example. (Id. at 48:4-23.)

272.     Under this policy, an officer that makes a vehicle stop where the driver ran a stop sign and has three  passengers,  has an obligation and duty to attempt to get community field  cards from all three passengers and the passengers have an obligation to cooperate.  (Id. at 61:15- 62:22.)

273.     Lynch is aware that Inspector Orlando Cuevas asked that special operations be expected to perform at least 27 directed patrols per unit shift and the patrol officers were expected to perform at least 18 per shift. (Id. at 28:15-23.)

274.     Lynch became aware in 2008 that there were officers complaining that there was a quota system.  (Id. at 32:10-20.)

275.     The discussions about quota system related to the field cards (Id. at

38

35:6-10.)

276.    Officers on the street had the belief that they had to fill out a certain number of field cards or they would be rated as low performers (Id. at 37:21-38.) Lynch became aware of this early in the process (2008). (Id. at 38:4-7.)

277.    According to Deputy Chief Lynch there's no chance you're going to be a low performer if you have sufficient community policing cards. (Id. at 46:18-24.)

278.    There was a perception among the patrol officers and the Camden FOP that low performers were based simply on the number of community cards that were being obtained. (Id. at 50:21-51:2.)

279.    There were also supervisors that were bringing to the administration's attention that they had a concern that there was a quota. (Id. at 51:14-19.)

280.    And, there were supervisors having conversations with their officers telling them that they believed there was a quota. (Id. at 51:20-23.)

281.    Since 2008 there have been supervisors telling patrol officers that there was a quota. (Id. at 52:4-9.)

282.    As of November 12, 2012 (the date of Deputy Chief Lynch's deposition), there were still supervisors that had conversations with their officers telling them there was a quota. (Id. at 52:11-14.)

283.    It would be illegal if there was a quota. (Id. at 52:21-24.)

284.    From 2008 through 2012, Deputy Chief Lynch is sure that there were supervisors and patrol officers out on the street who still believed there was a quota. (Id. at 54:1-5.)

285.    Chief Thomson knew about this perception at the CPD. (Id. at 54:5-8.)

286.    He has had communication with the chief about this issue. (Id. at 54:14-16.)

287.    Lynch was also involved in communication about whether or not there should be training or some type of meeting to explain in detail that there is not a quota system and what should and should not be done. (Id. at 33:14-21.)  The chief of the department was present during some of these meetings. (Id. at 34:1-35.)

288.    He is not aware of any supervisor receiving anything in writing that would tell them who a low performer was and how the supervisor was to attempt to identify low performers. (Id. at 36:13-223.)

289.    In 2012, Lynch held videotaped interviews of police supervisors. One of the purposes of the video interviews was to ensure that supervisors communicated with patrol officers that there was no quota system. (Id. at 55:6-10.)

290.    Another purpose of the interviews was that he had a concern about performance issues relating to engagement in the field. (Id. at 12:18-20.)

291.    His concern regarding engagements was that among police officers, there was a lack of field contact cards. (Id. at 16:13-22.)

292.    Other than the lack of cards there was nothing else to lead him to believe that officers were not engaging appropriately. (Id. at 16:23-17:5.)

293.    There is no specific training provided to the officers regarding the field contact cards (Id. at 56:19-57:1.)

294.    Between 2008 and the time he conducted the interviews there was no other training or directives given to supervisors relating to these issues (Id. at 58:19-24.)

40

295.    If there was some training or directive to deal with this problem he would have been aware of it (Id. at 59:11-15.)

## XI.    Testimony of Chief Scott Thomson

296.    According to Police Chief Scott Thomson, it would be a violation of the Constitution to require officers to go out and stop X number of people a day because people have the right to be free in society and it would place undue pressure upon officers to do more than just a mere inquiry. (Thomson Dep., 129:17-130:15.)

297.    Regarding Holland, it was the Chief Thomson's understanding that Holland had been called the scene to back up Betancourt. (Id. at 105:25.)

298.    If Holland was called to the scene for a directed patrol and not to back up Betancourt, he probably would not have been disciplined. (Id. at 108:24-109:3.)

299.    The documents show that he was on a directed patrol and not backing up Betancourt.

## XII.    County Police Department

300.    The City of Camden is now being protected by a police department operated by the County of Camden. (See attached Exhibit "HH" Certification of John D. Williamson, November 11, 2013)

301.    The City of Camden has agreed to pay $14,000,000.00 for police services to the County per year. (See attached Exhibit "II" Redd v. Bowman, 433 N.J. Super. 178, 77 A.3d 1230 (App. Div. 2013), certif. granted, 217 N.J. 293, 88 A.3d 190 (2014).)

302.    The County will include a "Camden Metro Division – 'to provide for public safety and law enforcement in Camden" Id.

41

303.    The Camden Metro Police Department protects only the City of Camden and does not take calls or have responsibilities outside of the City of Camden. (Certification of John D. Williamson)

304.    The policies and procedures of the current  Camden Metro Police Department are consistent with those complained of in the above-captioned complaint including but not limited to requiring officers to maintain certain numbers of direct patrols and ticket quotas. (<u>Id.</u>)

# TABLE OF CONTENTS

INTRODUCTION ................................................................................. 1

STATEMENT OF FACTS .................................................................. 2

LEGAL ARGUMENT ........................................................................ 2

I.     A Reasonable Trier Of Fact Could Find That Defendants Used a Quota System That Violated New Jersey Law When They Required Officers To Perform A Minimum Number Of Directed Patrols And When They Disciplined Officers For Not Conducting Enough Directed Patrols........................................................ 2

II.    Private Cause of Action under N.J.S.A 40A:14-181.2............................... 5

III.   Reasonable Trier Of Fact Could Find That Defendants Violated The Conscientious Employee Protection Act When They Retaliated Against Plaintiffs For Complaining About The Legality Of The Direct Patrols........................... 7

A.     The Plaintiffs Have Established That They Reasonably Believed Their Employer's Conduct Was Violating Either A Law, Rule, Or Regulation Promulgated Pursuant To Law, Or A Clear Mandate Of Public Policy Pursuant To The CEPA................................................................................. 9

1.     Illegal Quotas................................................................................. 9

2.     Unlawful Seizures............................................................................ 12

B.     A Reasonable Trier Of Fact Could Find That There Was A Causal Connection Between The Plaintiffs' Protected Activity And The Adverse Employment Actions......................................................................... 14

1.     Prima Facie CEPA Claim.................................................................. 14

2.     Pretext........................................................................................... 17

IV.    Plaintiffs Withdraw their Claims For a Violation of Due Process in Counts II and V of Their Complaint............................................................... 19

V.     A Reasonable Trier Of Fact Could Find That Defendants Violated Plaintiffs First Amendment Rights By Retaliating Against The Plaintiffs For Making Complaints About The Unlawful Impact The Directed Patrols Were Having On The Citizens Of The City Of Camden....................................... 19

VI.    Monell Claim………………………………………………………..    21

A.    Plaintiffs Have Proven Enough Facts To Maintain A Due Process Monell
Claim…………………………………………………………………...    22

B.    Plaintiffs Have Sufficient Facts To Establish A Monell Failure To Train
Claim…………………………………………………………………...    25

VII.    A Reasonable Trier Of Fact Could Find That Defendants Interfered With    25
Holland's Ability To Exercise His Rights Pursuant To The FMLA and the New
Jersey Family Leave Act………………………………………………………

VIII.    Claims Against Wysocki……………………………………………….    27

IX.    Qualified Immunity…………………………………………………….    27

X.    Punitive Damages……………………………………………………...    29

XI.    Plaintiff's Request For Declaratory Judgment, Injunctive Relief, And Front    29
Pay Are Not Moot………………………………………………………..

CONCLUSION………………………………………………………….    32

**<u>TABLE OF</u>**
**<u>AUTHORITES</u>**

**<u>Cases</u>**                                                                    **<u>Page #</u>**

<u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469 (3d Cir. 1990).          22, 23

<u>Bielevicz v. Dubinon</u>, 915 F.2d 845, 850 (3d Cir. 1990).                22, 23

<u>Bocobo v. Radiology Consultants of S. Jersey, P.A.</u>, 477 Fed. Appx. 890 (3d   9, 10, 13
Cir. 2012).

<u>Butz v. Economou</u>, 438 U.S. 478 (1978).                                 28, 29

<u>Carswell v. Borough of Homestead</u>, 381 F.3d 235 (3d Cir. 2004).        22

<u>Caver v. City of Trenton</u>, 420 F.3d 243 (3d Cir. 2005).               9, 10

<u>City of Canton v. Harris</u>, 489 U.S. 378 (1989), cert. denied, 546 U.S. 899   22
(2005).

<u>Dzwonar v. McDevitt</u>, 177 N.J. 451 (2003).                            9, 11, 12, 13

<u>Ferraro v. Long Branch</u>, 714 A.2d 945 (N.J. Super. 1998).            5, 6

<u>Franek v. Tomahawk Lake Resort</u>, 754 A.2d 1237 (N.J. App.Div.).      6

<u>Garcetti v. Ceballos</u>, 547 U.S. 410 (2006).                           19

<u>Giles v. Kearney</u>, 571 F.3d 318 (3d Cir. 2009).                       28

<u>Gorum v. Sessoms</u>, 561 F.3d 179, (3d Cir. 2009).                      19, 20

<u>Greenfield v. NJ Dep't of Corrs.</u>, 888 A.2d 507 (App. Div. 2006).    32

<u>Groh v. Ramirez</u>, 540 U.S. 551 (2004).                                28

<u>Halpin v. City of Camden</u>, 310 Fed. Appx. 532 (2009).                28

<u>Harlow v. Fitzgerald</u>, 457 U.S. 800 (1982).                          28

<u>Huston v. Procter & Gamble Paper ProductsCorp.</u>, 568 F.3d 100 (3d Cir.   2
2009).

<u>Jiminez v. All Am. Rathskeller, Inc.</u>, 503 F.3d 247 (3d Cir. 2007).   22

<u>Klemash v. Monroe Twp.</u>, 2010 U.S. Dist. LEXIS 9382 (D.N.J. 2010).   23, 29

<u>Marra v. Twp. of Harrison</u>, 2012 U.S. Dist. LEXIS 179341 (D.N.J. Dec. 18,   20, 21
2012).

<u>Mehlman v. Mobil Oil Corp.</u>, 153 N.J. 163 (1998).                     10

<u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658 (1978).                 22, 24

<u>Pearson v. Callahan</u>, 129 S. Ct. 808 (2009).                          28

<u>Redd v. Bowman</u>, 433 N.J. Super. 178, 77 A.3d 1230 (App. Div. 2013),   30
certif. granted, 217 N.J. 293, 88 A.3d 190 (2014).

<u>Redd v. Bowman</u>,2014 N.J. LEXIS 335,217 N.J. 293,88 A.3d 190,2014 WL   30
1363994(N.J.2014).

<u>Romano v. Brown & Williamson Tobacco Corp.</u>, 665 A.2d 1139 (N.J. Super.   14
Ct. App. Div. 1995).

<u>Saucier v. Katz</u>, 533 U.S. 194 (2001).                                 28

<u>Schlichtig v. Inacom Corp.</u>,  271 F. Supp. 2d 597 (D.N.J. 2003).      14, 15

<u>Scott v. Harris</u>, 550 U.S. 372 (2007)                                  28

<u>Shtab v. Greate Bay Hotel & Casino, Inc.</u>, 173 F. Supp. 2d 255 (D.N.J. 2001).   25, 26

<u>Simpson v. Kay Jewelers, Div. Sterling, Inc.</u>, 142 F.3d 639 (3d Cir. 1998).     17, 18, 19

<u>Sommer v. Vanguard Group</u>, 461 F.3d 397 (3d Cir. 2006)     25

<u>Tice v. Bristol Myers Squip, Co.</u>, 325 Fed. Appx. 114 (3d Cir. 2009).     17

<u>Trafton v. City of Woodbury</u>, 799 F. Supp. 2d 417 (D.N.J. 2011).     25

<u>Turner v. Associated Humane Societies, Inc.</u>, 396 N.J. Super. 582 (App. Div. 2007).     8

<u>United States v. Crandell</u>, 668 F. Supp. 2d 635 (D.N.J. 2009).     12

<u>United States v. Drayton</u>, 536 U.S. 194 (U.S. 2002).     12

<u>Warren County Bar Ass'n. v. Bd. of Chosen Freeholders</u>, 899 A.2d 1028 (N.J. Super. 2006).     6, 7

<u>Woodson v. Scott Paper Co.</u>, 109 F.3d 913 (3d Cir. 1997).     14

<u>Zaffuto v. Wal-Mart Stores, Inc.</u>, 130 Fed. Appx. 566 (3d Cir. N.J. 2005).     14

**<u>Rules and Statutes</u>**            **<u>Page #</u>**

New Jersey Statute § 34:19-3.     7, 8, 9, 13

New Jersey Statute § 40A:14-181.1.     3, 4

New Jersey Statute § 40A:14-181.2     2, 3, 5,7

ZEFF LAW FIRM LLC
Gregg L. Zeff, Esquire
Jennifer L. Prior,  Esquire
100 Century Parkway, Suite 305
Mt. Laurel, NJ 08054
(t) (856) 778-9700
(f) (856) 702-6640

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| FRATERNAL ORDER OF POLICE, LODGE 1, et al. | : CIVIL ACTION |
|  | : |
|  | : |
| *Plaintiffs,* | : No. 1:10-CV-1502 |
|  | : |
| v. | : |
|  | : |
| CITY OF CAMDEN, et al. | : |
|  | : |
| *Defendants.* | : |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' RESPONSE TO  DEFENDANTS' STATEMENT  OF MATERIAL FACTS

## INTRODUCTION

Plaintiffs in the above referenced matter, John Williamson, Chad Holland, Anthony Galiazzi and the Camden Fraternal Order of Police ("Plaintiffs") submit the following Memorandum of Law in support their Response to Defendants' Motion for Summary Judgment. It appears as though Defendants' have submitted to the Court the same legal arguments submitted in there prior Motion for Summary Judgment, but have edited their headings.  (See Doc. No. 116-4 compra. Doc. No. 144-1.) In addition, Defendants' have also included sections in response to the Court's Memorandum Opinion & Order, dated

1

September 26, 2013 (Doc. 126) and Letter from Plaintiffs in Response to Order dated 9-26-13 (Doc. 133). Therefore, in response Plaintiffs will be responding incorporating their prior legal arguments and aligning them with the changes in the headings that Defendants have made.

## STATEMENT OF FACTS

The Plaintiffs adopt the facts articulated in the Plaintiffs' Response to Defendants' Statement of Material Facts and Plaintiffs' Supplemental Statement of Disputed Facts.

## LEGAL ARGUMENT

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Huston v. Procter & Gamble Paper ProductsCorp., 568 F.3d 100, 104 (3d Cir. 2009). The court must draw all reasonable inferences from the record in favor of the non-moving party. Id. Only where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party is there no genuine issue for trial. Id. Because a reasonable trier of fact could find for the Plaintiffs on all counts at issue, the Defendants' Motion for Summary Judgment should be denied.

    I.    **A Reasonable Trier Of Fact Could Find That Defendants Used a Quota System That Violated New Jersey Law When They Required Officers To Perform A Minimum Number Of Directed Patrols And When They Disciplined Officers For Not Conducting Enough Directed Patrols**

New Jersey Statute 40A:14-181.2 ("New Jersey Quota Law") states the following:

(a) A State, county or municipal police department or force engaged in the enforcement of Title 39 of the Revised Statutes or any local ordinance adopted pursuant to this title shall not establish any quota for arrests or citations. The

department or force may, however, collect, analyze and apply information concerning the number of arrests and citations in order to ensure that a particular officer or group of officers does not violate any applicable legal obligation.

(b) The department or force shall not use the number of arrests or citations issued by a law enforcement officer as the sole criterion for promotion, demotion, dismissal, or the earning of any benefit provided by the department or force. Any such arrests or citations, and their ultimate dispositions, may be considered in evaluating the overall performance of a law enforcement officer.

N.J. Stat. § 40A:14-181.2(a)-(b) (2000). The law further defines a "Quota" as "any requirement, in writing or otherwise, regarding the number of arrests made or the number of citations issued within a defined period of time by a law enforcement officer, or regarding the proportion of the arrests made and citations issued by the law enforcement officer relative to the arrests made and citations issued by another law enforcement officer or group of officers." § 40A:14-181.1.

Defendants violated the law when they required Camden police officers to perform a minimum amount of directed patrols and used directed patrols as the sole criteria in disciplining officers. After the directed patrol program was initiated, CPD officers were required to conduct a minimum of 27 directed patrols per shift if they were on supplemental patrol, and 18 directed patrols per shift if they were on regular patrol. (Holland Dep., 62:5-19.) If officers did not conduct the minimum amount of directed patrols per unit they were disciplined. (Id. at 63:4-19); (Galiazzi Dep., 23:14-17; 39:12-23.) Establishing a minimum amount of directed patrols that have to be performed within a specific amount of time is a violation of the New Jersey Quota Law. See §§ 40A:14-181.1(a), 40A:14-181.2. Furthermore, the CPD used the amount of directed patrols as the sole criterion for disciplining officers, transferring officers, and placing officers on the low performer list. Plaintiff Galiazzi was told specifically that the reason he was placed on the low performer list and ultimately transferred was because of his low directed

patrol numbers. (Galiazzi Dep., 35:16-24; 37:21-39:7.) Using an officer's number of directed patrols as the sole criterion for disciplining officers, transferring officers, and placing officers on the low performer list is a direct violation of the New Jersey Quota Law. See §§ 40A:14-181.1(b).

> The Defendants argue erroneously in their Motion that:
>
> Even if we accept [Plaintiffs'] contention that officers were being evaluated strictly on their directed patrol numbers, there is still no legal violation. There is no dispute that a directed patrol engagement did not necessarily result in an arrest or a citation of any individual; it could just be an interaction with a member of the public to learn crime conditions in the area.

(Def's Mot., p. 23.) This argument by Defendants is flawed in several respects. First, in some instances officers were ordered to issue a citation or ticket every time they conducted a directed patrol. (Williamson Dep., 33:19-34:1.) Furthermore, the purpose of the law, as expressed by the Governor at the time the law was passed, Christine Whitman, was to "help ensure that an officer's performance is accurately measured and it will allow our law enforcement officers to focus on public safety, not on ticket writing . . .  New Jersey police officers perform a difficult, dangerous and at times thankless job for our citizens. We need to do all we can to help them do that work to the best of their abilities . . . ." (See attached as Exhibit "GG" Governor Press Release, Dec. 12, 2000.) This statement by the former governor, and the language of the law itself, directly contradict Defendants' argument that "An officer who was determined to not have enough directed patrols was considered to not be effectively using his available time. There is nothing illegal about the police department evaluating an officer's performance by how productively he uses his time." (Def's Mot., p. 23.) However, the purpose of the law is to prevent police officer's in New Jersey from being evaluated solely on the basis of their interactions with the public. The law allows police departments to "collect, analyze and apply information

4

concerning the number of arrests and citations," but only to "ensure that a particular officer or group of officers does not violate any applicable legal obligation." N.J. Stat. § 40A:14-181.2(a). The CPD cannot use the directed patrol statistics as the sole criterion to measure how productive an officer is, as Defendants suggest.

Because Defendants used direct patrols as the sole criterion in disciplining and transferring officers, and set a minimum amount of directed patrols that officers were required to conduct within a set period of time, Defendants violated the New Jersey Quota Law in doing so.

## II.     Private Cause of Action under <u>N.J.S.A</u> 40A:14-181.2

<u>N.J.S.A</u> 40A:14-181.2 states:

a.  A State, county or municipal police department or force engaged in the enforcement of Title 39 of the Revised Statutes or any local ordinance adopted pursuant to this title shall not establish any quota for arrests or citations. The department or force may, however, collect, analyze and apply information concerning the number of arrests and citations in order to ensure that a particular officer or group of officers does not violate any applicable legal obligation.

b.  The department or force shall not use the number of arrests or citations issued by a law enforcement officer as the sole criterion for promotion, demotion, dismissal, or the earning of any benefit provided by the department or force. Any such arrests or citations, and their ultimate dispositions, may be considered in evaluating the overall performance of a law enforcement officer.

The statute does not state whether a private cause of action exists. Where a statute does not explicitly provide for a plaintiff's cause of action against a violator of the statute, courts will determine whether the statute implicitly creates a private cause of action, considering the following factors:

(1) whether plaintiff is a member of the class for whose *especial* benefit the statute was enacted;

(2) whether there is any evidence that the Legislature intended to create a private cause of action under the statute; and
(3) whether such an implied private cause of action would be consistent with the underlying purposes of the legislative scheme.

Ferraro v. Long Branch, 714 A.2d 945, 955 (N.J. Super. 1998).

In discerning the Legislature's intent to create a private cause of action, courts "look to the statute as a whole and consider all of its related sections." Warren County Bar Ass'n. v. Bd. of Chosen Freeholders, 899 A.2d 1028, 1032 (N.J. Super. 2006)(citing Franek v. Tomahawk Lake Resort, 754 A.2d 1237 (N.J. App.Div.)). The court held in Warren County Bar Ass'n that the plaintiffs lacked a private cause of action under a statute that required the Board of Chosen Freeholders to "provide safe, healthful and suitable courtrooms and facilities." 899 A.2d at 1033. The court reasoned that the statute was one of several that addressed the division of fiscal responsibilities between the state and counties in the support of the judicial system. Id. Furthermore, the legislative history clearly indicated the statute was enacted to address fiscal responsibilities in the maintenance of judicial facilities, not to safeguard citizens' right to demand suitable courtroom facilities. Id. The court also reasoned that proper enforcement of the statute did not depend on allowing a private cause of action. Id.

In the instant case, unlike in Warren County Bar Ass'n, no clear history or commentary exists indicating the legislative intent in acting the statute. Also unlike in Warren County Bar Ass'n, the statute at issue is intended to apply directly to Plaintiffs, not to an unrelated ancillary issue. Regarding factor number 1, police officers are directly affected if their promotions, demotions, dismissal, or earnings are determined by how many arrests or citations they issue.  In discerning the legislative intent behind the statute, the other statutes in the same chapter include statutes on appointing police officers and firefighters, adoption of guidelines for internal affairs, and the base salaries of the police chief and deputy chief.  While these statutes may be for the

6

benefit of the public in having an efficiently operating and accountable police department, salaries and appointment are also issues that directly affect the officers themselves.  Furthermore, unlike the statute in Warren County Bar Ass'n, the enforcement of NJSA 40A:14-181.2 may depend on allowing a private cause of action.  It is likely that an illegal quota system would not be revealed unless a police officer whose career depends on it sued the City.  Thus, the court should find that a private cause of action exists under the statute.

### III.    Reasonable Trier Of Fact Could Find That Defendants Violated The Conscientious Employee Protection Act When They Retaliated Against Plaintiffs For Complaining About The Legality Of The Direct Patrols

The New Jersey Conscientious Employee Protection Act ("CEPA") states that An employer shall not take any retaliatory action against an employee because the employee does any of the following:

> a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or another employer, with whom there is a business relationship, that the employee reasonably believes:
>
> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity, or, in the case of an employee who is a licensed or certified health care professional, reasonably believes constitutes improper quality of patient care; or
>
> b. Provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law by the employer, or another employer, with whom there is a business relationship, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity, or, in the case of an employee who is a licensed or certified health care professional, provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into the quality of patient care; or
>
> c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:

7

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity, or, if the employee is a licensed or certified health care professional, constitutes improper quality of patient care;

(2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity; or

(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

N.J. Stat. § 34:19-3. The CEPA is considered remedial legislation, and as such, New Jersey Courts "should construe CEPA liberally to achieve its remedial purpose." Turner v. Associated Humane Societies, Inc., 396 N.J. Super. 582, 592 (App. Div. 2007). The Legislature intended that the statute "encourage, not thwart, legitimate employee complaints." Id.

In order to maintain a cause of action under CEPA, a plaintiff must demonstrate that: (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment. Id. In their Motion for Summary Judgment, Defendants concede that Plaintiffs engaged in whistle-blowing activity, and were subjected to adverse employment actions. (Defs' Mot., p. 26.) Therefore, Plaintiffs will limit their argument to whether Plaintiffs reasonably believed that the CPD's conduct was in violation of law and/or a clear mandate of public policy, and whether a causal connection exists between the whistle-blowing activity and the adverse employment actions.

8

**A. The Plaintiffs Have Established That They Reasonably Believed Their Employer's Conduct Was Violating Either A Law, Rule, Or Regulation Promulgated Pursuant To Law, Or A Clear Mandate Of Public Policy Pursuant To The CEPA**

In establishing that an employee reasonably believed that his or her employer was violating a law or public policy mandate for the purposes of a CEPA claim, the employee does not have to prove that the employer was actually violating the law or public policy. Dzwonar v. McDevitt, 177 N.J. 451, 464 (2003). In Dzwonar, the New Jersey Supreme Court reasoned as follows:

> We therefore conclude that N.J.S.A. 34:19-3c does not require a plaintiff to show that a law, rule, regulation or clear mandate of public policy actually would be violated if all the facts he or she alleges are true. Instead, a plaintiff must set forth facts that would support an objectively reasonable belief that a violation has occurred. In other words, when a defendant requests that the trial court determine as a matter of law that a plaintiff's belief was not objectively reasonable, the trial court must make a threshold determination that there is a substantial nexus between the complained-of conduct and a law or public policy identified by the court or the plaintiff. If the trial court so finds, the jury then must determine whether the plaintiff actually held such a belief and, if so, whether that belief was objectively reasonable. A review of a prior CEPA decision by this Court is instructive of the standard to be employed by a trial court when a plaintiff asserts a claim under N.J.S.A. 34:19-3c.

Id. at 464-65; accord Caver v. City of Trenton, 420 F.3d 243, 254 (3d Cir. 2005); see also Bocobo v. Radiology Consultants of S. Jersey, P.A., 477 Fed. Appx. 890, 899 (3d Cir. 2012).

**1. Illegal Quotas**

Plaintiffs have established there was a reasonable nexus between the conduct they complained of and the New Jersey Quota Law.

In Caver, the Third Circuit reasoned that the plaintiff had established a reasonable nexus between the complained of conduct by the city and public policy. The plaintiff in Caver was a police officer for the Trenton Police Department. He made complaints that there were mistakes

9

in the radio room's record keeping in the Trenton Police Department's Communication Center. 420 F.3d at 249. The plaintiff then brought a civil complaint arguing that he was retaliated against for, among other things, making complaints about problems in the radio room. Id. at 248-49. The district court dismissed the plaintiff's CEPA claim, reasoning that his complaints were unreasonable as a matter of law. Id. at 254. On appeal the Third Circuit rejected the district court's holding, reasoning as follows:

> In this case, the District Court properly determined that the complained of conduct (the radio room's poor record keeping and inappropriate assignments) implicates public policy concerns in that Davis' complaints "identified potential official misconduct issues." However, the District Court overstepped its bounds by deciding for itself whether the complaints were "trivial" or "reasonable." This is an issue of fact that has been specifically reserved for the jury under New Jersey case law. Therefore, we could not affirm summary judgment based on the first element of a CEPA standard.

Id. at 254-255 (internal citations omitted); accord Bocobo, 477 Fed. Appx. at 899 ("The plaintiff need not 'set forth facts that, if true, would constitute a violation of [a statute],' but he must establish a 'substantial nexus between the complained-of conduct and a law or public policy identified by the court or the plaintiff,'). In rejecting an employer's claim that the plaintiff-employee's complaint did not specifically allege a statutory violation, the New Jersey Supreme Court has reasoned that "The object of CEPA is not to make lawyers out of conscientious employees but rather to prevent retaliation against those employees who object to employer conduct that they reasonably believe unlawful or indisputably dangerous to the public health, safety or welfare." Mehlman v. Mobil Oil Corp., 153 N.J. 163, 193-194 (1998).

The Plaintiffs have established a reasonable nexus between their complained of activity and the New Jersey Quota Law. The Plaintiffs made complaints that they were being disciplined, and transferred because their statistics were low. (See Ex. L, pp. 1-2); (see also Ex. N); (see Ex. S, ¶ 8); (see Ex. U, p. 3.) One of the reasons for Plaintiffs' complaints was that they were told

10

that their statistics were low, but were not given any information as to what the statistics were based on. (See exhibits L, N, S and U.) Plaintiffs argued that they believed their discipline for not recording a certain number of directed patrols was an illegal use of quotas to discipline employees. (Id.) As the former governor stated in signing the New Jersey Quota Law, one of the main purposes of the law is to "help ensure that an officer's performance is accurately measured . . . ." (See Ex. GG.) Punishing police officers for not recording enough directed patrols, or for reasons unknown to the officers violates the purpose of the New Jersey Quota Law. Plaintiffs were not the only officers in the department that believed this to be the case. (Sosinavage Dep., 20:3-17.) Therefore, Plaintiffs have established that there is a substantial nexus between the way the directed patrol program was being implemented and the New Jersey Quota Law for the purposes of their CEPA claim.

Defendants argue that Plaintiffs have not established the first prong of their CEPA claim because "it was not reasonable for plaintiffs to believe that the method used by the defendants to evaluate their performance was illegal or against public policy." (Defs' Mot., p. 28.) First, Plaintiffs have not only established that the CPD was in fact violating the New Jersey Quota Law, but have certainly established the lower standard that a belief that the CPD was violating the law was reasonable. Furthermore, as the New Jersey Supreme Court has held, whether an employee was reasonable in his or her belief that a law was being violated is a question of fact for the jury. See Dzwonar, 177 N.J. at 464-65.

> In other words, when a defendant requests that the trial court determine as a matter of law that a plaintiff's belief was not objectively reasonable, the trial court must make a threshold determination that there is a substantial nexus between the complained-of conduct and a law or public policy identified by the court or the plaintiff. If the trial court so finds, **the jury** then must determine whether the plaintiff actually held such a belief and, if so, whether that belief was objectively reasonable.

Id.  (emphasis added).

Because the Plaintiffs complained of the directed patrol program for creating minimum directed patrol requirements, and disciplining officers for having low directed patrol statistics, Plaintiffs have established a reasonable nexus between their complaints and the New Jersey Quota Law.

## 2. Unlawful Seizures

Plaintiffs have also established there was a reasonable nexus between the conduct they complained of and Fourth Amendment right against search and seizures. Police officers violate a citizen's rights under the Fourth Amendment when a reasonable person under the circumstances would not feel free to terminate their encounter with an officer. United States v. Drayton, 536 U.S. 194, 200-201 (U.S. 2002). A seizure occurs when there is either "(a) a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful, or (b) submission to a show of authority." United States v. Crandell, 668 F. Supp. 2d 635, 642 (D.N.J. 2009). "Put another way, when a seizure is effected by even the slightest application of physical force, it is immaterial whether the suspect yields to that force." Id.

The Plaintiffs made complaints to the Defendants that they were being forced to conduct illegal seizures of citizens under the directed patrol program. (Williamson Dep., 42:16-43:3); (see Holland Dep., 76:5-11); (see also Ex. U, pp. 1-3.) In their civil complaint, Plaintiffs stated the following "It is the position of the Plaintiffs that the Police Department, under the supervision and direction of the Attorney General, are [sic] violating either statutes or judicial holding thus infringing the rights of the public being served by the officers and the officers themselves," (Ex. U, pp. 1-2), "If quotas are being used by the Police Department, the citizens of Camden and those who drive through and use its streets are at risk of having their rights violated

by the implementation of the illegal policy." (Id. at 3.) Holland testified to a specific event where he was told that if individuals did not respond to his initial inquiry, he was required to stop the individuals and get their information. (Holland Dep., 76:5-77:9.) Therefore, Plaintiffs have demonstrated that there is a reasonable nexus between their complaints and "a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment," the protection of citizen's Fourth Amendment rights. N.J. Stat. § 34:19-3(c)(3).

In their Motion, Defendants argue that "Plaintiffs allege that they were so pressured to attain a minimum number of engagements, that there was a risk that citizens would be illegally detained and forced to give information. However, no reasonable jury could find that the administration required an unreasonable mandatory minimum number of directed patrol engagements." (Defs' Mot., p. 31.) This argument by Defendants is erroneous for several reasons. First, as was articulated at length *supra*, Plaintiffs are not required to establish that Defendants' policy actually violated the law, but are required only to establish there is a reasonable nexus between their complaints and clear mandate of public policy. Bocobo, 477 Fed. Appx. at 899. There is a sufficiently reasonable nexus between complaints about violating citizen's rights by being required to stop every citizen without any probably cause, and the clear public policy against unlawful seizures. Furthermore, Holland testified that he was told by his supervisor that Cuevas wanted him to physically stop individuals and get their information, if the individuals were not willing to provide him with information voluntarily. (Holland Dep., 76:5-77:9.) Therefore, Plaintiffs have established a "nexus between the complained-of conduct and a law or public policy identified by the court or the plaintiff." Dzwonar, 177 N.J. at 464-65.

Because the Plaintiffs have established a substantial nexus between the activity they complained about, and several laws and clear mandates of public policy, a reasonable trier of fact

could find that the Plaintiffs reasonably believed that the Defendants' conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy.

### B. A Reasonable Trier Of Fact Could Find That There Was A Causal Connection Between The Plaintiffs' Protected Activity And The Adverse Employment Actions

The Plaintiff in a CEPA claim can prove causation by presenting either direct evidence of retaliation or circumstantial evidence that justifies an inference of retaliation. Zaffuto v. Wal-Mart Stores, Inc., 130 Fed. Appx. 566, 569 (3d Cir. N.J. 2005); Romano v. Brown & Williamson Tobacco Corp., 665 A.2d 1139, 1143 (N.J. Super. Ct. App. Div. 1995). In circumstantial evidence cases, New Jersey courts apply the burden shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), and its progeny. Zaffuto, 130 Fed. Appx., 569. Therefore, a plaintiff must first make out a prima facie case of retaliation. Id.  Once the employee has made a prima facie showing of retaliation, the burden shifts to the employer, who must articulate a legitimate, nonretaliatory reason for the adverse employment action. Id. If the employer does produce evidence showing a legitimate, nonretaliatory reason for the action, the burden of production shifts back to the employee who must show that the employer's proffered explanation is incredible. Id.

### 1. Prima Facie CEPA Claim

In determining whether a plaintiff has produced prima facie evidence of causation, the decisions of our Court of Appeals have generally focused on two indicia: timing and evidence of ongoing antagonism. Schlichtig v. Inacom Corp., 271 F. Supp. 2d 597, 609 (D.N.J. 2003); see Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997). Although the timing of an employer's adverse employment action can, by itself, provide sufficient prima facie evidence of retaliation, the temporal proximity between an employee's termination and his protected activity

14

may permit an inference of causation where the relatively short interval between the two is unusually suggestive of retaliation. <u>Schlichtig</u>, 271 F. Supp. 2d at 609. In cases where the timing of an employer's adverse action is, by itself, inconclusive, an employee may demonstrate the requisite causal link by producing circumstantial evidence of ongoing antagonism or retaliatory animus in the intervening period between his protected activity and the adverse action. <u>Id.</u> at 609-610. In CEPA cases "the case law has set forth few limits on the type of evidence which might suffice to establish a prima facie showing of causation." <u>Id.</u> at 613.

In <u>Schlichtig</u>, the New Jersey District Court held that the plaintiff introduced sufficient evidence to establish a prima facie showing of causation for his CEPA claim. The employer in <u>Schlichtig</u> terminated the plaintiff less than two weeks after plaintiff engaged in protected activity. <u>Id.</u> at 613. The court also found that there was testimony that the plaintiff was told that he was being terminated in part because of his protected activity. <u>Id.</u> at 610-11. The court reasoned that this direct evidence of retaliation combined with the timing of his termination was enough to establish a prima facie showing of causation for the plaintiff's CEPA claim. <u>Id.</u> at 613.

Like the plaintiff in <u>Schlichtig</u>, the Plaintiffs have introduced sufficient evidence for a prima facie showing of causation. Plaintiffs Galiazzi and Holland complained on February 9, 2009 in their information reports to the CPD about the directed patrol program. (See exhibits L and D.) Eleven days later, both Galiazzi and Holland were told that they were being transferred from elite supplemental patrol to regular patrol where they would also receive a decrease in pay. (Galiazzi Dep., 44:9-45:5); (Holland Dep., 119:15-19); <u>see Schlichtig,</u> 271 F. Supp. 2d at 613 (employer terminated plaintiff less than two weeks after protected activity). Galiazzi was told by his supervisors that he was being transferred because of his complaint on his counseling form. (Galiazzi Dep., 47:13-16.) Furthermore, McCausland, who had lower statistics than Galiazzi and

Holland but did not complain about the directed patrols, was not transferred. (Ex. M); (Galiazzi Dep., 46:2-8.)

After Plaintiffs filed a complaint in April 2009, the Defendants' retaliatory actions became even more obviously motivated by retaliation. In May 2009, Defendants began disciplining Holland for missing days to take care of his mother, even though he had applied for and was approved for FMLA for those days. (Holland Dep., 127:10-135:2.) In August 2009, Holland was wrongfully marked AWOL, while he was on administrative leave. (Id. at 142:2-143:5.) Holland's sergeant told him that he was being marked AWOL because of his complaints about directed patrols. (Id. at 144:24-146:12.) In October and November, 2009, Holland was investigated by IA for three different incidents. (Id. at 146:22-146:6; 148:11-149:5);(see Ex. Z.) In his 13 prior years on the force, Holland had only been investigated by IA once. (Holland Dep., 146:13-21.) Sosinavage, who was previously in IA, told Holland that he was being investigated in retaliation of his complaints. (Id. at 148:21-149:1.) Galiazzi was transferred a second time, and told by his supervisors that it was in retaliation for his complaints about directed patrols. (Galiazzi Dep., 59:12-22.) Defendants also called Galiazzi in the middle of his pre-planned vacation and told him he had to come to work immediately or he would be fired. (Id. at 62:11-24; 70:17-20.) While Galiazzi was out on leave, Sergeant Profera told him to watch himself because the CPD was trying to get rid of him. (Id. 66:4-10.)

The adverse actions Williamson was subjected to are also suggestive of retaliation. Prior to the filing the complaint about the directed patrols in April 2009, Williamson had never been subject to a police investigation in his over 13 years on the force. (Williamson Dep., 45:6-20.) However, in a five-month period from August 2009 to December 2009 Williamson was investigated on four different occasions and charged with violations such as bringing "disrepute"

16

to the department and violating his duty of loyalty to the department for not reporting a thumb drive that was sent to the union attorney. (Exhibits BB, CC, DD, EE); (Williamson Dep., 50:19-51:1.) In three of the four investigations, the charges were ultimately dropped, or the investigation has just remained open. (Williamson Dep., 49:14-20; 51:5-25); (see Ex. EE.) For the hospital investigation, Williamson was denied the right to a disciplinary hearing regarding the accusations, and ultimately received a written reprimand. (Williamson Dep., 45:23-46:2.)

Given the timing of the adverse employment actions Plaintiffs were subjected to, the nature of the incidents, and the direct evidence of retaliation, a reasonable trier of fact could find Plaintiffs were retaliated against because of their protected activity.

### 2. Pretext

Plaintiffs have established that any articulated non-retaliatory reason given by the Defendants is pretext for retaliation. To survive summary judgment when the employer has articulated a legitimate nondiscriminatory reason for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. Simpson v. Kay Jewelers, Div. Sterling, Inc., 142 F.3d 639, 644 (3d Cir. 1998); see Tice v. Bristol Myers Squip, Co., 325 Fed. Appx. 114, 116 (3d Cir. 2009).  To discredit the employer's reason, the plaintiff does not have to produce evidence that leads to the conclusion that the employer acted for discriminatory reasons, nor produce additional evidence beyond her prima facie case.  Simpson, 142 F.3d at 644.  To show that discrimination was more likely than not a cause for the employer's action, the plaintiff must point to evidence that a factfinder could conclude that membership in the protected class was a motivating or determinative factor in the

employment decision.  Simpson, 142 F.3d at 644-45.  For example, the plaintiff may show that (1) the employer has previously discriminated against her, (2) that the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, or (3) that the employer has treated more favorably similarly situated persons not within the protected class.  Id. at 645.

Defendants argue in their Motion that Plaintiffs Galiazzi and Holland were transferred because they were on the low performer list. (Defs' Mot. pp. 33-34.) This argument, however, is clearly contradicted by the fact that McCausland, who was on the low performer list but did not complain about the directed patrols, was not transferred. (Galiazzi Dep., 46:2-8.) Furthermore, as articulated at length *supra*, Plaintiffs were told on several occasions that the adverse actions they were subjected to were in retaliation for their complaints. Defendants proffered non-retaliatory reasons for the adverse actions against Williamson are that "those investigations were not initiated by any of the defendants, but were initiated by people outside of the police department and/or persons not in the police or city administration." (Defs' Mot., 35.) Defendants appear to be arguing that they in fact had no choice but to investigate Williamson on four different occasions during the five month period in 2009. However, the policy cited by Defendants to support this contention states otherwise: "In some cases, a complaint is based on a misunderstanding of accepted law enforcement practices or the duties of the officer. Supervisors should be authorized to informally resolve minor complaints, whenever possible, at the time the report is made." (See Ex. E, pp. 17-18.) Defendants fail to articulate any reason why these minor complaints about Williamson were not informally resolved, and instead resulted in four different full-blown IA investigations. Therefore, Defendants fail to articulate any non-retaliatory reason

18

why Williamson was investigated on four different occasions in the span of five months at the end of 2009.

The Plaintiffs here can show all three factors to establish pretext: (1) that they were previously retaliated against; (2) that the Defendants retaliated against other people who made complaints; and (3) that similarly situated employees who did not make complaints were treated more favorably. Simpson, 142 F.3d at 645. For these reasons, and those articulated *supra*, a reasonable trier of fact could find that Defendants proffered non-retaliatory reasons for the adverse actions against the Plaintiffs are pretext for retaliation.

**IV.    Plaintiffs Withdraw their Claims For a Violation of Due Process in Counts II and V of Their Complaint.**

Plaintiffs withdraw Counts III and V of their complaint.

**V.    A Reasonable Trier Of Fact Could Find That Defendants Violated Plaintiffs First Amendment Rights By Retaliating Against The Plaintiffs For Making Complaints About The Unlawful Impact The Directed Patrols Were Having On The Citizens Of The City Of Camden**

The United States Supreme Court has held that employees do not surrender all their First Amendment rights by reason of their employment. Garcetti v. Ceballos, 547 U.S. 410, 417 (2006). The First Amendment protects an employee's right, to speak as a citizen when addressing matters of public concern. Id. at 418. To receive First Amendment Protection the employee must speak as a citizen on a matter of public concern. Id. Where that is established, then the possibility of a First Amendment claim arises. Id. The question then becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. Id.; accord Gorum v. Sessoms, 561 F.3d 179, 185 (3d Cir. 2009). The Third Circuit has further held that to state a First Amendment retaliation claim, an employee must allege that his activity is protected by the First Amendment, and that the

protected activity was a substantial factor in the alleged retaliatory action. Gorum, 561 F.3d at 184. "The first factor is a question of law; the second factor is a question of fact." Id.  If these two elements are satisfied, the burden shifts to the defendants to demonstrate that the same action would occur if the speech had not occurred. Id.

Defendants argue in their Motion that Plaintiffs Galiazzi and Holland's complaints were not made as citizen's speaking on matters of public concern, and that any speech that was made about matters of public concern were made in the Plaintiffs' official capacity and not as citizens. (Def. Mot., 37-38.) The Defendants conceded that "any statements critical of the department's directed patrol policy could be found to be a matter of public concern because they alleged that the policy had an unconstitutional impact on the city's residents." (Id. at 38.) Therefore, Plaintiffs will limit their argument to establishing that Plaintiffs made their complaints as citizens and not in their official capacity.

This court recently held in an unpublished decision that a police officer who testified about sexual harassment in the department was not speaking in his role as a police officer for the purposes of his First Amendment claim. Marra v. Twp. of Harrison, 2012 U.S. Dist. LEXIS 179341 at *21-22 (D.N.J. Dec. 18, 2012). In denying the Defendant's motion to dismiss in Marra, the court reasoned as follows:

> Plaintiff was not fulfilling a responsibility to his police department under the terms of his employment by testifying on Kemp's behalf. If Plaintiff felt ethically compelled to testify against Rodgers, he was fulfilling a responsibility to the department only in a larger, public-interest sense: to report and expose potentially illegal conduct by the Police Chief. Plaintiff was obliged to testify against Rodgers no more than any citizen would, who happened to witness discriminatory conduct. Therefore, the Court will deny Defendants' motion to dismiss Count III on this ground.

Id.

Like the plaintiff in Marra, the Plaintiffs were not fulfilling a responsibility to the police

department when they made following complaints in their previous civil complaint: "It is the position of the Plaintiffs that he Police Department, under the supervision and direction of the Attorney General, are [sic] violating either statutes or judicial holding thus infringing the rights of the public being served by the officers and the officers themselves." (See Ex. U, pp. 1-2.) "If quotas are being used by the Police Department, the citizens of Camden and those who drive through and use its streets are at risk of having their rights violated by the implementation of the illegal policy." (Id. at 3.) Like the plaintiff in Marra, the Plaintiffs may have been "fulfilling a responsibility to the department only in a larger, public-interest sense" by exposing and attempting to prevent potential violations of citizen's rights. Marra, 2012 U.S. Dist. LEXIS 179341 at *21-22. However, by making complaints in a civil complaint about the violation of the rights of citizens of Camden Plaintiffs were not speaking in their official capacity as police officers, but in their capacity as citizens of Camden.

Defendants do not argue the causation prong, or that the same adverse actions would have occurred had the Plaintiffs not made their complaints in the First Amendment section of their brief. (Defs' Mot., pp. 38-41.) Therefore, Plaintiffs will rely in their argument made in the CEPA section of their brief to establish causation, and that Plaintiffs would not have been subjected to the same adverse employment actions had they not engaged in protected activity.

## VI.    <u>Monell</u> Claim

Plaintiffs' complaint contains two Count VIs in error. The first Count VI is a "<u>Monell</u>" claim.  The second is a failure to train the claim under <u>Monell</u> and should be identified as County VII.[2]

Defendants' brief at Part V argues that "Plaintiffs cannot prove that the city instituted an

---

[2]  If the court so orders, plaintiff shall file an amended complaint correcting the second Count VI and modifying it to be called Count VII.

illegal policy, custom or practice quotas and therefore their Monell claim against the defendants at Count VI of their complaint must fail." In so arguing, defendants assert that there is no evidence that the directed patrol policy at issue is illegal.

While defendants only refer to one of the Count VIs in the complaint, this motion shall address both Count VIs to demonstrate why the summary judgment should be denied.[3]

## A. Plaintiffs Have Proven Enough Facts To Maintain A Due Process Monell Claim

To state a claim for municipal liability under § 1983, Plaintiff must establish a violation of a constitutional right and that such violation was committed or caused by a "person," here understood to be the municipality, acting under the color of state law. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978). A municipality "'can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue.'" Carswell v. Borough of Homestead, 381 F.3d 235, 244 (3d Cir. 2004)(quoting City of Canton v. Harris, 489 U.S. 378, 385 (1989)), cert. denied, 546 U.S. 899 (2005)). "There must be a 'direct causal link between a municipal policy or custom and the alleged constitutional deprivation' to ground municipal liability." Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 249-50 (3d Cir. 2007) (quoting City of Canton, 489 U.S. at 385). "Thus, municipal liability attaches only when 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'" Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990) (quoting Monell, 436 U.S. at 694).

"Policy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." Id. (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990)). A plaintiff can

---

[3] In Section I of this brief, Plaintiffs argue that the directed patrol practice and custom as applied was illegal. That section is incorporated herein by reference.

establish a custom "by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." Id. (citing Andrews, 895 F.2d at 1480; Fletcher v. O'Donnell, 867 F.2d 791, 793-94 (3d Cir.) ("Custom may be established by proof of knowledge and acquiescence."), cert. denied, 492 U.S. 919 (1989)). "In either instance, a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom." Id. (citing Andrews, 895 F.2d at 1480), see also Klemash v. Monroe Twp., 2010 U.S. Dist. LEXIS 9382 at *24-25 (D.N.J. 2010).

In this case, police officers were given the impression by command staff in the department that they needed to violate the Constitution in order to maintain their jobs.  As a result, the custom and practice of the Department was different than the official policy. According to Police Chief Scott Thomson, it would be a violation of Constitution to require officers to go out and stop X number of people of  a day because people have a right to be free in society and it would place undue pressure upon officers to do more than just a mere inquiry (Thomson Dep., 129:17-130:15.) The policy of directed patrols and community policy cards was not the same as the custom and practice in the field.  According to Deputy Chief Lynch, police officers believed that they had to fill out a certain number of field cards a day or they would be rated as low performers. (Lynch Dep., 37:21-31.) In addition, there would be no chance that a police officer would be a low performer if they had a sufficient number of community policy cards.  (Id. at 46:18-24.)  Police officers had been disciplined or warned for their failure to engage a citizen and not seek a card from them.  (Id. at 48:4-23.)

Thus, the practice of the police department as it related to community policing cards and directed patrols violates the Constitution.  Police officers are required and obligated to stop every

person on the street that they meet and try to get information from them including but not limited to Social Security numbers, driver's license, addresses, etc. (Galiazzi Dep., 22:20-23:1.) If they failed to obtain a certain number of cards per shift, they would be considered low performers and would be subject to discipline. Therefore, police officers were placed under the undue pressure that Chief Thomson said would be illegal. Police officers are placed in a position where they were pressured to obtain community policing cards from citizens who were not committing crimes and were not under any suspicion of committing a crime. If they do not obtain a certain number of cards per shift, there careers could be jeopardized. This places an unconstitutional burden on officers to violate the rights of citizens.

For example, if a citizen in Camden was sitting in front of their house on their stoop, every police officer that walked by that citizen would be required and obligated to stop and try to engage that citizen in not only conversation but to get information for a community policing card.  This means, if the citizen was sitting on the stoop for hours, every police officer that walked by would be required to engage the citizen.  There were no safeguards in place to protect citizens from being interrupted in their daily lives all day long by different police officers trying to engage them.  Moreover, the police officers themselves were under pressure to not only engage but to get information and fill out these cards.

Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978), teaches that the municipality can be found liable under Section 1983 under such circumstance.

Police Chief Scott Thomson, the decisionmaker, (see Thomson Dep., 59:12-18)  was aware that  his supervisors and his officers believed  there was an illegal  quota system relating to police community cards from 2008 through 2012, which put undue pressure on officers to collect data from law abiding citizens. (Id. at 54:1-5; 54:5-8; 129:17-130:15.) Yet, no action was taken

24

to cure this custom or practice amongst the officers or supervisors. (Id. at 33:14-21; 34:1-35; 36:13-22.)

Therefore, Plaintiffs may maintain a section 1983 claim in this matter.

**B.  Plaintiffs Have Sufficient Facts To Establish A Monell Failure To Train Claim**

In order to bring a claim of failure to train, a plaintiff must: (1) identify the deficiency; (2) prove that the deficiency caused the alleged constitutional violation; and (3) prove that the failure to remedy the deficiency reflected deliberate indifference on the part of the municipality. Trafton v. City of Woodbury, 799 F. Supp. 2d 417, 431 (D.N.J. 2011).

The testimony has established that Chief Thomson knew that a policy or practice of his department was violating the Constitution. He was also made aware that officers on the street as well as a number of his own supervisors believed there was an illegal quota resulting in an illegal custom or practice. The Chief participated in communications about whether or not there should be training or some type of meeting to explain in detail that there is not a quota system and what could and could not be done by police officers relating to the community policing cards and directed patrols. (Lynch Dep., 33:14-21; 34:1-35).  When Plaintiffs, the union and supervisors complained about the practice, they were retaliated against. Despite the Constitutional violation, the obvious need to train, no training was provided. These actions demonstrate deliberate indifference and support a failure to train cause of action.

**VII.    A Reasonable Trier Of Fact Could Find That Defendants Interfered With Holland's Ability To Exercise His Rights Pursuant To The FMLA and the New Jersey Family Leave Act**

Under the FMLA, an employer is prohibited from interfering with an employee's exercise of his FMLA rights. Sommer v. Vanguard Group, 461 F.3d 397, 399 (3d Cir. 2006) In Shtab v. Greate Bay Hotel & Casino, Inc., 173 F. Supp. 2d 255 (D.N.J. 2001), this court held that the

employer interfered with the plaintiff's rights in violation of the FMLA. Id. at 267-68. The plaintiff in Shtab was laid off from his job in February 1998. Id. at 258. While he was laid off, he became the primary care-giver for his son, who was diagnosed with autism. Id. In May 1998, the employer issued a recall, officering the plaintiff the opportunity to return to work. Id. The plaintiff returned, but informed the employer that he wanted FMLA leave immediately to care for his son. The employer requested that the plaintiff delay his leave until after the Memorial Day weekend, which he refused to do. Id. at 258-59. The plaintiff brought a claim for interfering with his FMLA, rights, and defendant filed a motion for summary judgment. This court denied the defendant's motion, holding that "reasonable persons could conclude that [defendant's] request chilled [plaintiff's] assertion of his rights under the FMLA." Id. at 267-68.

In May 2009, Holland applied for and was approved for intermittent FMLA to care for his mother. (Holland Dep., 127:10-18.) Holland was approved for leave on May 22, 2009, but on May 27, 2009 he received a verbal warning from Captain Terrence Grimes stating that he was using too much sick time. (Id. at 130:23-131:8); (see Ex. X.) Holland told Grimes that he should not be disciplined for using sick time because he was on FMLA. Grimes responded that, "they don't care if you're on FMLA, go file a union grievance." (Holland Dep., 132:9-17.) On June 17, 2009, Holland received a letter from Lt. S. Leusner stating that he was being placed in the "Chronic Sick Category" because of his use of sick says. (Id. at 133:2-7); (See Ex. Y.) Holland told Leusner that he was on FMLA, and should not be disciplined for taking a sick day to care for his mother. Leusner responded that Cuevas does not "give a shit" that Holland was approved for FMLA, and that Holland would continue to be placed in sick categories and eventually disciplined. (Holland Dep., 133:10-135:2.) A reasonable trier of fact could find that Defendants' refusal to acknowledge that Holland was on FMLA, placing him on a chronically sick list, and

threatening to fire him, chilled Holland's assertion of his FMLA rights.

The New Jersey Family Leave Act (NJFLA) contains a near identical provision to the FMLA, therefore Plaintiffs incorporate there above argument as to the NJFLA claim.

**VIII.    Claims Against Wysocki**

Sgt Wysocki was the Commander of Internal Affairs from May of 2009 to present. (Wysocki Dep., 7:13.) As Commander, he was privy to the complaints made by Plaintiffs regarding quotas. (Id. at 47:24-48-7); (Holland Dep., 173:4-10.) Subsequently, he was in charge of the retaliatory internal affairs investigations into Holland and Willamson. (Wysocki Dep., 78:12-16; 92:21-93:21.) As the supervisor of Internal Affairs, Wysocki worked closing with Chief Thomson and was in a position to further the retaliation or end it through the investigations he maintained. Wysocki told Holland's lawyer that the charges against him were unfounded, but he brought the charges anyway. (Holland Dep., 170:22-171:9.) Holland was told by Lieutenant Sosinovage, formerly  of  Internal Affairs  that the internal affairs investigations were retaliation for his complaints about directed patrols and his lawsuit. (Id. at 148:21-149:1.) Holland was also told by  Lt. Sosinovage and Captain  Carmichael that Wysocki retaliated against him under the orders of  Inspector Cuevas and Chief  Thomson by investigating him (Id. at 170:2-7).   Lt. Sosinovage and Capt.  Carmichael also told  that they brought in Wysocki to be a head hunter and he is one of the first heads he was hunting  (Id. at 173:12-15)

Accordingly, Wysocki was at least a aider and abettor in the retaliation toward Plaintiffs.  In Plaintiffs' best light, Wysocki was more. He directly retaliated against Plaintiffs based through unfounded internal affairs investigations and threats of termination.

**IX.    Qualified Immunity**

"The doctrine of qualified immunity protects government officials 'from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 129 S. Ct. 808, 815 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The doctrine serves two, important interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Id.

"The primary step in assessing the constitutionality of the officers' alleged actions is to determine the relevant facts." Giles v. Kearney, 571 F.3d 318, 326 (3d Cir. 2009)(citing Scott v. Harris, 550 U.S. 372, 378 (2007)). "The District Court [is] required to view the facts in the light most favorable to the plaintiff." Id. (citing Saucier v. Katz, 533 U.S. 194, 201(2001); Scott, 550 U.S. at 378). Said differently, "the court must determine if the facts alleged, taken in the light most favorable to the injured party, show a constitutional violation." Halpin v. City of Camden, 310 Fed. Appx. 532, 533 (2009) (citing Saucier, 533 U.S. at 201). If the Court answers this question in the affirmative, the Court next asks whether the officer made a reasonable mistake of law or fact. Id. "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" Pearson, 129 S. Ct. at 815 (quoting Groh v. Ramirez, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)(citing Butz v. Economou, 438 U.S. 478, 507 (1978) ("noting that qualified immunity covers 'mere mistakes in judgment, whether the mistake is one of fact or one of law'")).

"If the constitutional right in question was clearly established at the time of the violation, such that an objectively reasonable officer could not be mistaken that his conduct violated that right, then there is no mistake of law." Halpin, 310 Fed. Appx. at 533 (citing Butz, 438 U.S. at

507); see also Klemash v. Monroe Township, 2010 Lexis 9382, *18-19 (D.N.J. 2010).

The individual Defendants attempt to hide behind the shield of qualified immunity is misplaced. There can be no doubt that the laws regarding stops, searches and seizures are well known and well established for all law enforcement officers. In this case, Defendants actions in failing to enforce the constitutional rights of citizens and then retaliating against officers who brought this violation to there attention cannot be considered a "mistake of law" or other mistake. In the face of officers and superior officers explicitly telling them that the practice and custom of stopping all citizens in Camden in order to collect community policing cards was illegal, the individual Defendants not only maintained the policy but punished those who spoke out against it. Qualified immunity was not intended to protect such conduct and should be denied here.

## X.    Punitive Damages

The Plaintiffs adopt the arguments articulated at length in this memorandum to support her claims for punitive damages. Defendants in this matter willfully and wantonly punished the Defendants for making complaints that the CPD's policies was unlawful and a danger to the citizens of Camden. Therefore, a reasonable trier of fact could award Plaintiffs punitive damages.

## XI.    Plaintiff's Request For Declaratory Judgment, Injunctive Relief, And Front Pay Are Not Moot

The City of Camden is now being protected by a police department operated by the County of Camden.  However, the inquiry regarding Camden City's responsibility and control over the police department, and how the police department interacts in the City, demonstrates

that an order from this Court declaring certain polices and procedures illegal, would have a significant impact and not be moot.[4]

The issue of the permanent status of the Camden County police department protecting Camden City is still uncertain. On March 17, 2014, the Supreme Court of New Jersey granted certification to review the judgment of the Superior Court of New Jersey, Appellate Division to remanded to the trial court, a case that would potentially reverse the Camden County takeover of the Camden City Police Department. Redd v. Bowman, 2014 N.J. LEXIS 335, 217 N.J. 293, 88 A.3d 190, 2014 WL 1363994 (N.J. 2014). If the plaintiffs in Redd are successful, the City of Camden will retain its police department. Thus, the issue of whether the City of Camden police department is now and forever defunct is unsettled, and an order from this Court regarding the Camden City police department may have full effect.

Even if the County takeover is not reversed, the Redd case is informative regarding the status of the police department vis-à-vis Camden City, and supports the Plaintiff's requested relief here. See Redd v. Bowman, 433 N.J. Super. 178, 77 A.3d 1230 (App. Div. 2013), certif. granted, 217 N.J. 293, 88 A.3d 190 (2014). In Redd, the court describes in some detail the manner in which the Camden Police Department was converted into the County department. Id. The opinion includes that the City of Camden has agreed to pay $14,000,000.00 for police services to the County per year. Id. Furthermore, the County will include a "Camden Metro Division – 'to provide for public safety and law enforcement in Camden" Id. Thus, the City of Camden while not currently claiming a police department of its own, has its own separate branch of the County police force known as the "Camden Metro" for which it pays $14,000,000.00 to

---

[4] It is also offensive to the fundamental equities and equitable powers of this court, that a police entity could simply change its governing structure mid- litigation in order to continue violating the Constitution and laws of New Jersey.

the County for police protection. In fact the City of Camden is the only area in Camden County which is patrolled by the County police department.  (Certification of John D. Williamson)

It would seem to be disingenuous for the City of Camden to claim here that it has no responsibility, duty or oversight over Camden Metro when it pays $14,000,000.00 for its exclusive services.  If the court were to find Plaintiff Camden FOP's claims against the City of Camden extinguished by the change in controlling government but not departments, municipalities and law enforcement agencies could simply convert their governing body to elude litigation and violate the law.  It is important for the Court to recognize that the state and County have always had oversight over the police department. The change that has occurred is the specific governing body of the police department, and that the union has been broken.  There is no indication that any policies or practices related to the new department are different in any way.  (Certification of John D. Williamson)

Given that the Defendant City of Camden has its own division of the County police department, pays $14 million to the County for the Camden Metro division, and still exercises control over whether the County polices Camden City, the Court should recognize that a declaratory judgment and injunction against the City of Camden here, on behalf of the Camden FOP, would not be moot.  More than ever, such a declaratory judgment and injunction would safeguard the citizens of Camden, who have been disenfranchised in this matter and for which the Camden FOP seeks protection.

While it is true that a finding of illegality would not bind Camden County's current operation of the police department, the illegal quota issue at hand is not moot, and a ruling on it would be applicable to Camden County's operation of the department. "An issue is moot when

31

the decision sought in a matter, when rendered, can have no practical effect on the existing controversy." Greenfield v. NJ Dep't of Corrs., 888 A.2d 507 (App. Div. 2006).

Plaintiff Camden FOP seeks injunctive and declaratory judgment from the Court stating that the policies and practices of the police department violate the Constitution and state law. See, Complaint "wherefore clause" part D.  While it may not be possible at this time for the Court to issue an injunction against the County of Camden, because the County is not a party to this case, the Court does have jurisdiction over the City of Camden, and can issue a declaratory judgment that the City's policies and procedures violate the Constitution and state law. Moreover, the Court can issue an injunctive order against the City of Camden, requiring the City to refrain from illegal policing activities within its borders.[5]

A decision on the illegality of the quota system would undoubtedly have a practical effect on the existing controversy.  Public policy dictates that the police department's actions in implementing an illegal quota system must be declared illegal, regardless of what entity is currently controlling the department.  The police department should not escape reprimand for its actions just because it disbanded and control was shifted. Therefore, Plaintiff's request for declaratory judgment, injunctive relief, and front pay are not moot.

**CONCLUSION**

For all of the foregoing reasons, Plaintiffs respectfully request this honorable court rule in favor of the Plaintiffs and deny Defendants' Motion for Summary Judgment.

---

[5] Plaintiff Camden FOP could join the County of Camden as an additional Defendant if the court requires.  As a more practical matter, it would seem that if the Court granted Plaintiff's relief, the County police department would be on actual notice that the past and ongoing policies and procedures are wrongful.  A new action seeking injunctive relief against the County could be instituted if necessary at that time if voluntary corrective action was not instituted.

Respectfully submitted,


/s/ Gregg L. Zeff
Gregg L. Zeff, Esquire

Dated: October 7, 2014

Jennifer L. Prior Esquire