UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| FRATERNAL ORDER OF POLICE, LODGE 1, JOHN WILLIAMSON, ANTHONY GALIAZZI, and CHARLES J. HOLLAND, Plaintiffs,<br><br>v.<br><br>CITY OF CAMDEN, SCOTT THOMSON, ORLANDO CUEVAS, and LIEUTENANT JOSEPH WYSOCKI, Defendants. | CIVIL NO. 10-1502 (NLH)(AMD)<br><br><br>**REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

**TABLE OF CONTENTS**

Table of Contents ..................................................................................................................... i

Table of Authorities ................................................................................................................ ii

Legal Argument ...................................................................................................................... 1

    I.    A Reasonable Trier of Fact Could Not Find that A Directed Patrol is an Arrest or Citation ............................................................................................................... 1

    II.    The Plaintiffs Cannot Prove a CEPA Claim ............................................................. 3

        A.    There is No Substantial Nexus Between the Complained-of Policy and the Quota Law ..................................................................................................................... 3

        B.    There is No Substantial Nexus Between the Freedom from Search and Seizure and the Complained-of Policy ........................................................................... 4

        C.    No Reasonable Jury Could Conclude That There is a Causal Connection Between the Alleged Whistleblowing and Any Adverse Employment Actions ............ 6

    III.    Plaintiffs Have Produced No Evidence of First Amendment Retaliation From the April 2009 Lawsuit ............................................................................................ 11

    IV.    Monell Claim ............................................................................................................ 12

        A.    The Plaintiffs Lack Standing to Sue on Behalf of the Citizenry ......................... 12

        B.    The Plaintiffs Have Not Established an Unconstitutional Custom .................... 12

    V.    The Plaintiffs' Requests for Declaratory Judgment, Injunctive Relief, and Front Pay are Moot ........................................................................................................ 14

Conclusion ............................................................................................................................. 15

# TABLE OF AUTHORITIES

Abdul-Akbar v. Watson, 4 F.3d 195 (3d Cir. 1993) ............................................................................ 15

Bart v. Telford, 677 F.2d 622 (7th Cir.1982) .................................................................................... 11

Bielevicz v. Dubinon, 915 F.2d 845 (3d Cir. 1990) .......................................................................... 13

Blackburn v. United Parcel Service, Inc., 3 F.Supp.2d 504 (D.N.J. 1998) ........................................ 5

Bracey v. Pennsylvania Dept. of Corrections, 456 Fed.Appx. 76 (3d Cir. 2012) ............................. 15

Caver v. City of Trenton, 420 F.3d 243 (3d Cir. 2005) ................................................................... 6, 8

City of Los Angles v. Lyons, 461 U.S. 95 (1983) .............................................................................. 12

Curran v. Dural, 512 F.Supp. 699 (E.D.Pa. 1981) ............................................................................. 2

Dzwonar v. McDevitt, 177 N.J. 451 (2003) .................................................................................... 3, 4

Floyd v. City of New York, 959 F.Supp.2d 540 (S.D.N.Y. 2013 .......................................................... 3

Friends of the Earth, Inc. v. Laidlaw Env'l Services (TOC), Inc., 528 U.S. 167 (2000) .................... 12

Higgins v. Pascack Valley Hosp., 158 N.J. 404, 730 A.2d 327 (1999) ............................................ 10

Schlichtig v. Inacom Corp., 271 F.Supp.2d 597 (D.N.J. 2003) .......................................................... 9

Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639 (3d Cir. 1998) .................................... 9

Smith v. Township of East Greenwich, 344 Fed.Appx. 740 (3d Cir. 2009) ...................................... 10

Suppan v. Dadonna, 203 F.3d 228 (3d Cir. 2000) ........................................................................... 11

U.S. v. Gonzales, 520 U.S. 1 (1997) .................................................................................................... 2

Whren v. U.S., 517 U.S. 806 (1996) ................................................................................................... 2

# LEGAL ARGUMENT

## I. A Reasonable Trier of Fact Could Not Find that A Directed Patrol is an Arrest or Citation

In their brief, the plaintiffs argue that "[e]stablishing a minimum amount of directed patrols that have to be performed within a specific amount of time is a violation of the New Jersey Quota Law." Plt.Brief at 3. Recognizing that merely directing an officer to a specific location and/or requiring the officer to fill out a field contact card does not fit the definition of an arrest or citation, the plaintiffs attempt to dispute that a directed patrol did not require an arrest or citation. Plt.Brief at 4. In support, the plaintiffs cite to the deposition of John Williamson, who stated that "I believe in some instances," officers were required to issue a citation as part of a directed patrol. Ex. M[1] (Williamson Deposition) at 33:19 - 34:1. However, Williamson clarified his statement to say that no person of any supervisory authority ever told him that officers were required to issue a citation or arrest as a result of a directed patrol. Ex M. at 34:12-20. Williamson was merely referring to a statement by Captain Burnett that "every person who is on a directed patrol that did a motor vehicle stop must issue a citation." Ex. M at 34:21-24.

Even if Burnett's statement is accurate, it does not convert the alleged requirement for a directed patrol into a requirement for a citation. Officers were expected to perform 18-27 directed patrols per shift, but there is no evidence that each directed patrol, or in fact *any* of the 18-27 directed patrols in a shift had to involve a car stop, and thus (allegedly) a citation. The alleged "quota" refers only to directed patrols, not car stops. There is no suggestion that the directed patrol program required officers to perform 18-27 car stops per shift, and in fact substantial evidence that officers were expected to engage citizens on the street, outside of any

---

[1] Exhibit references refer to exhibits attached to Defendants' Motion for Summary Judgment.

1

motor vehicle. In fact, Galiazzi and Holland both admitted that directed patrols did not necessarily involve an arrest, citation, or search. Ex. C at 36:22-37:8; Ex. D at 98:19-99:24.

Furthermore, the requirement that a citation be issued for every car stop is legal, and serves to ensure that officers do not stop cars without probable cause. An officer is required to have probable cause that a traffic violation occurred before stopping a motor vehicle. Ex. M at 35:11-14. *See also Whren v. U.S.*, 517 U.S. 806, 810 (1996). Probable cause is also the standard required to issue a traffic citation. *See Curran v. Dural*, 512 F.Supp. 699, 702-03 (E.D.Pa. 1981). The requirement that every car stop result in the issuance of a traffic citation is merely a requirement that (a) no traffic stop occur without probable cause of a traffic violation; and (b) that where an officer *does* have probable cause to issue a traffic citation, that the officer refrain from looking the other way and failing to issue a citation. Neither of those requirements is illegal in any way, and certainly neither is an imposition of a quota.

The plaintiffs next argue that, while the plain text of the Quota Law does not support their position, the former governor who signed the law made a vague statement that could be twisted to support the plaintiffs' position. Firstly, where the plain meaning of a statute is clear, the legislative history is irrelevant. *See U.S. v. Gonzales*, 520 U.S. 1, 6 (1997). The quota statute is exceedingly clear about what is prohibited – arrests and citations. Citations are specifically defined by statute, and an "arrest" is not an ambiguous term. Therefore, there is no need to resort to legislative history arguments. Further, even if the legislative history is considered, one isolated statement by the former governor (who is not a legislator) is not evidence that the law was intended to prevent officers from being evaluated by any statistical measurements whatsoever. It merely shows that the intention is exactly what the law says – to prevent the imposition of a requirement of a certain number of arrests or citations.

2

Further, there is no private cause of action authorized for police officers under the quota law. In arguing for a private cause of action for police officers, the plaintiffs argue that the enforcement of the statute depends on allowing police officers to sue. Plt.Brief at 7. There is no reason to believe that commanders of police departments will implement illegal quota systems without the threat of lawsuit. Further, even if a lawsuit threat is necessary to motivate police departments to comply with the law, that threat may come from the citizens. *See Floyd v. City of New York*, 959 F.Supp.2d 540 (S.D.N.Y. 2013) (class action by citizens alleging that New York City police operate under illegal quota system). There is no justification for subverting the will of the legislature by implying a private cause of action under N.J.S.A. 40A:14-181.2.

## II.   The Plaintiffs Cannot Prove a CEPA Claim

### A.   There is No Substantial Nexus Between the Complained-of Policy and the Quota Law

In order to establish a CEPA claim,

> a plaintiff must set forth facts that would support an objectively reasonable belief that a violation has occurred. In other words, when a defendant requests that the trial court determine as a matter of law that a plaintiff's belief was not objectively reasonable, the trial court must make a threshold determination that there is a substantial nexus between the complained-of conduct and a law or public policy identified by the court or the plaintiff. If the trial court so finds, the jury then must determine whether the plaintiff actually held such a belief and, if so, whether that belief was objectively reasonable.

*Dzwonar v. McDevitt*, 177 N.J. 451, 464 (2003). The *Dzwonar* plaintiff objected to her union's failure to read its Executive Board minutes at its general membership meetings, and felt that such refusal denied rank-and-file members the right to participate pursuant to the Labor Management Report and Disclosure Act (LMRDA), 29 U.S.C.A. §§ 401-531. *Dzwonar, supra* at 458. The New Jersey Supreme Court held that the plaintiff's belief that the union's behavior violated the anti-discrimination provisions of the LMRDA could not be found reasonable by a

3

jury because the dispute regarded access to information, not unlawful discrimination. *Id.* at 467. Thus, the relationship between the behavior and the statute at issue was not close enough to come under CEPA protection. *Ibid*.

The plaintiffs argue that there is a reasonable nexus between their complained-of behavior and the Quota Law because the plaintiffs "believed their discipline for not recording a certain number of directed patrols was an illegal use of quotas to discipline employees." Plt.Brief at 11. Each plaintiff (Holland, Galiazzi, and Williamson) complained about their belief that officers were being evaluated solely according to the number of directed patrols completed. Even if such a thing were true, there is no substantial nexus between the Quota Law and evaluating officers based on directed patrols. Like in *Dzwonar, supra*, the plaintiffs cannot simply point to a statute that regulates behavior that sounds somewhat similar. Much like the *Dzwonar* plaintiffs could not show a substantial nexus between an information-sharing policy and an anti-discrimination statute, the instant plaintiffs cannot show a substantial nexus between a statute prohibiting quotas based on arrests and citations and an alleged policy of evaluating officers based on directed patrols. Directed patrols are not arrests or citations, and thus there is no substantial nexus between the complained-of behavior and the Quota Law.

  **B. There is No Substantial Nexus Between the Freedom from Search and Seizure and the Complained-of Policy**

The plaintiffs allege that each plaintiff made complaints to the City that they believed that they were being forced to conduct illegal seizures of citizens under the directed patrol program. However, the facts do not establish any such complaints. The plaintiffs cite to "Holland Dep., 76:5-11" as support for the fact that Holland made complaints regarding seizures. That section of Holland's deposition reads:

  I said hello to them, they kept going. I had just pulled up there.

4

> Well, he – dude, you know what's going to happen now, you're going to get the hammer. He wants a special, Captain Grimes said he wants a special explaining why you didn't stop those guys and get their information.

Ex.D. Nowhere does Holland indicate that he made a complaint to anyone about potential illegal seizures. Likewise, Holland's certification in support of the FOP's lawsuit (Plaintiffs' Exhibit T) complains extensively about the quota issue, but does not mention anything about illegal seizures. Similarly, there is no evidence that Galiazzi made any complaints regarding illegal seizures. A review of Galiazzi and Holland's reports regarding their low performance (Exhibits R, S, U, and X) shows that Galiazzi's and Holland's complaints were merely about not being given a baseline to judge what their statistics should be, not concerns regarding the Fourth Amendment rights of citizens.

A review of the lawsuit filed by the FOP, including the Verified Complaint, Brief, Certification of Holland, and Certification of Galiazzi (Plaintiffs' Exhibits S, U, T and V respectively) show no allegations that anyone's Fourth Amendment rights were being violated. The complaints of the individual officers squarely dealt with the quota issue, and even the legal argument dealt only with the quota issue and the allegedly inappropriate role taken by the Attorney General.

Furthermore, there is no substantial nexus between the Fourth Amendment and the complained-of behavior. Nobody identified any situation in which anyone's Fourth Amendment rights were violated because of the directed patrol policy, nor did anyone show that such violations were imminent. Any concerns regarding Fourth Amendment rights would be analogous to those addressed in *Blackburn v. United Parcel Service, Inc.*, 3 F.Supp.2d 504, 516 (D.N.J. 1998), *aff'd* 179 F.3d 81 (3d Cir. 1999), whereby "plaintiff merely conveyed his concerns… that a law might at some point in the future be violated if certain precautions were not taken."

5

### C. No Reasonable Jury Could Conclude That There is a Causal Connection Between the Alleged Whistleblowing and Any Adverse Employment Actions

To be an "adverse employment action" under CEPA, an employer's action must have an impact on either

> the employee's compensation or rank or be virtually equivalent to discharge in order to give rise to the level of a retaliatory action required for a CEPA claim….
>
> Similarly, in deciding a Title VII retaliation claim, this Circuit stated, "retaliatory conduct must be serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." As such, in cases not involving actual discharge or refusal to hire, courts may find unlawful retaliatory conduct only if it alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.

*Caver v. City of Trenton*, 420 F.3d 243, 255 (3d Cir. 2005) (internal citations and quotations omitted). Each plaintiff claims that different actions constituted "adverse employment actions" under CEPA. Holland claims that:

- in February of 2009, he was transferred from Special Operations Platoon 4 to Patrol Operations, which resulted in a lower shift differential;

- in April of 2009, his request to be put on bike patrol was denied;

- in June of 2009, he was told that he would be placed in the "chronic sick" category, though he never confirmed that such placement took place nor identified any adverse consequences from being placed on the list (Ex. D at 133:2-7);

- in August of 2009, he was told that he would be marked AWOL from a shooting, though he was never charged by internal affairs nor did he identify any adverse consequences from such marking (Ex. D at 142:14-146:21);

- in October of 2009, he was visited at home by a supervisor to confirm that he was not abusing sick leave time;

6

- in November of 2009, he received a preliminary notice of disciplinary charges for failure to report. The charges were never resolved (Ex. D at 147:3-15).

Galiazzi claims that:

- in February of 2009, he was transferred from Special Operations Platoon 4 to Patrol Operations Platoon 4, which resulted in a lower shift differential;

- he was placed on the "abuse of sick time," though he did not identify any adverse consequences of being on the list, nor was he aware of who placed his name on the list (Ex. C at 54:4-5);

- in March of 2009, he was transferred to a different squad with the same hours and compensation;

- he was followed by Internal affairs;

- in August of 2009, his vacation was cancelled due to a manpower shortage (Ex. C at 62:3 – 65:10).

Williamson claims that he was charged with several disciplinary violations:

- In August of 2009, he was charged with creating a disturbance at Virtua West Jersey Hospital. Williamson received a written reprimand for the incident, and did not appeal (Ex. M at 45:21 – 47:14);

- in October of 2009, he was investigated concerning a fight outside of a union meeting. No discipline was imposed (Ex. M at 50:19 – 51:12);

- in October of 2009, Williamson was investigated for allegations that he send out an improper letter regarding an upcoming FOP election. He was not charged or disciplined for this incident (Ex. M at 50:19 – 51:12);

- In November of 2009, he was charged with failing to report the existence of a USB flash drive which contained sensitive information. The charges were dismissed by Chief Thompson (Ex. M at 47:18 – 49:20).

Under the standard articulated in *Caver*, very few of the actions alleged by the plaintiffs qualify as "adverse employment action." The only action taken by the City which affected Holland's compensation or rank was the decision to transfer him to a patrol with a lower shift differential. Holland's other complaints do not rise to level of action which receives CEPA protection. Likewise, the only actions taken by the City which affected Galiazzi's compensation, terms, conditions, or privileges of employment were (a) the decision to transfer him to a patrol with a lower shift differential, and (b) the cancellation of his vacation. All other complained-of behavior did not rise to the level of "adverse employment action" under CEPA. Similarly, the only consequences suffered by Williamson which could even arguably be considered an adverse employment action was the finding of sustained on his internal affairs charges pursuant to the Virtua Hospital incident. All other investigations resulted in charges not being filed or the charges being dismissed with no effect on Williamson's compensation, terms, conditions, or privileges of employment.

The adverse employment actions actually identified by the plaintiffs cannot be causally linked to the complaints made by each individual plaintiff. Galiazzi's and Holland's transfers cannot be shown to be motivated by their complaints about quotas.[2] The City has proffered a legitimate, nonretaliatory reason for the transfer – namely, that Galiazzi and Holland were low performing officers, and their supervisor requested that they, as well as the other low performing officer, be transferred . *See* Ex. V. Officer McCausland was not transferred because

---

[2] The transfer of Holland and Galiazzi took place before any alleged complaints about potential Fourth Amendment rights, so it obviously could not be motivated by complaints relating to the Fourth Amendment.

8

his performance improved. *See* 2/16/09 Memo from Sgt. Moffa, attached as Exhibit OO.[3] In the attached memo, Sgt. Moffa clearly states to Lt. Cook (the plaintiffs' superior officer) that Ofc. McCausland's statistics "in the areas of Directed Patrols, Summonses Issued, Field Contact Cards, and Pedestrian Stops" improved, and in particular, "[h]is number of Directed Patrols has more than doubled."[4] It was for this reason that Ofc. McCausland was not transferred. Likewise, Galiazzi's vacation was canceled due to a manpower shortage. Ex. C at 64:24 – 65:1.

As the plaintiffs correctly note, to establish that a proffered reason is pretextual, a plaintiff must provide evidence that the employer's reason is false or otherwise disingenuous. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644 (3d Cir. 1998). Where a plaintiff cannot produce which could lead a reasonable jury to believe that the defendant's proffered reason is pretextual, summary judgment must be granted. *Id.* at 649.

As noted in the defendants' prior brief, all proposed direct evidence of pretext is inadmissible hearsay.[5] The sum total of such evidence consists of Galiazzi's and Holland's testimony regarding statements made by Sgt. Whitesell, Lt. Strang, Sgt. Profera, and Lt. Sonsinavage. The plaintiffs produced no affidavits or other sworn testimony of any of those individuals. Lt. Sosinavage was deposed in this matter, and specifically denied telling Holland that he was being retaliated against.[6] *See* Deposition of Sosinavage, Plaintiffs' Exhibit K, at 26:3-15. The only "evidence" that any such statements were made is the testimony of the plaintiffs

---

[3] Exhibit numbers continue from Defendants' prior brief.
[4] Notably, Ofc. McCausland's number of arrests did not go up, providing further evidence that directed patrols did not require any sort of arrest to be counted.
[5] Plaintiffs' claims regarding FMLA violations as well as the claims against Sgt. Wysocki are likewise reliant upon hearsay statements.
[6] In their brief, the plaintiffs cite *Schlichtig v. Inacom Corp.*, 271 F.Supp.2d 597 (D.N.J. 2003) for the prospect that statements from supervisors can be evidence of retaliation. However, in *Schlichtig*, the testimony came directly from the supervisor in question's deposition, not merely as a hearsay statement from the plaintiff. *Schlichtig*, *supra* at 602.

9

claiming that such statements were made. As discussed in the defendants' prior brief, such statements are inadmissible hearsay and cannot be considered on summary judgment.

Galiazzi and Holland have not produced any evidence that their transfer was for any reason other than that they were low-performing officers. The plaintiffs point only to the fact that Ofc. McCausland was not transferred as circumstantial evidence of retaliation. However, as shown *supra*, the evidence shows that Ofc. McCausland's statistics improved after his counseling, which was the reason why he was not transferred. The plaintiffs have not offered any evidence that the manpower shortage with resulted in Galiazzi's vacation being canceled was pretextual.

Holland and Williamson claim that being investigated for violations of the Camden City Police Department Rules and Regulations is "retaliation" under CEPA. However, CEPA "does not insulate the complaining employee from discharge or other disciplinary action for reasons unrelated to the complaint." *Higgins v. Pascack Valley Hosp.*, 158 N.J. 404, 730 A.2d 327, 338 (1999). Disciplinary charges that result from a properly conducted investigation are not a valid basis for a retaliatory act under CEPA. *Smith v. Township of East Greenwich*, 344 Fed.Appx. 740, 748-49 (3d Cir. 2009). In *Smith*, the plaintiff claimed that he was investigated by internal affairs as retaliation for an EEOC complaint. *Id.* at 748. The court found that there was no causal connection because the investigation was "prompted by the complaints of two of Smith's subordinates," and not by his superiors. *Id.* at 748-49.

The undisputed facts show that all internal affairs investigations were proper. The evidence shows that, for each incident, the internal affairs department had reason to believe that the Camden City Rules and Regulations had been violated. There is no evidence that Holland's November 2009 charge was made in bad faith, and in any case, Holland suffered no adverse employment consequences for it. Williamson's August 2009 investigation originated with

10

complaints from the president of Virtua Hospital, who reported that Williamson had gotten into a verbal altercation with hospital staff. Ex. A at 340:3 – 341:4. The first October 2009 incident was investigated because a fight occurred outside of a union meeting, and no charges were ever filed. Ex. M at 50:19 – 51:12. The second October 2009 incident originated with Officer Leon Reed, who filed a complaint against Williamson, and no charges were filed. Ex. M at 50:13-15. The November 2009 incident was filed because Williamson viewed confidential documents on a USB flash drive and failed to report it to his superiors, and the charges were dismissed by Chief Thompson. Ex. M at 47:18 – 49:20. Williamson does not dispute the factual basis for any of these charges. As *Smith* shows, disciplinary charges resulting from a properly conducted investigation are not "retaliation." In every circumstance, the internal affairs department had good reason to believe that rule violations had occurred, and proceeded accordingly.

### III. Plaintiffs Have Produced No Evidence of First Amendment Retaliation From the April 2009 Lawsuit

In order to show a First Amendment speech violation, a plaintiff must demonstrate, *inter alia*, that a reasonable trier of fact could find that the plaintiff's protected activity "played a substantial role" in causing the retaliatory acts. *Suppan v. Dadonna*, 203 F.3d 228, 237 (3d Cir. 2000). Any adverse action must have been "sufficient 'to deter a person of ordinary firmness' from exercising his First Amendment Rights" *Id.* at 235 (*quoting Bart v. Telford*, 677 F.2d 622, 625 (7th Cir.1982)). First Amendment analysis uses a burden shifting analysis substantially similar to CEPA. *Id.* at 235.

In their brief, the plaintiffs seemingly concede that Holland's and Galiazzi's statements to their supervisors complaining about quotas are not protected speech. The plaintiffs then go on to argue that they have a First Amendment claim based on retaliation from statements made in the April 2009 lawsuit. Firstly, the April 2009 lawsuit occurred after the transfers of Galiazzi

11

and Holland, so they cannot possibly be causally related. As shown *supra* and in the defendants' prior brief, all alleged adverse actions taken after April of 2009 were done for legitimate reasons, and the plaintiffs have not provided any admissible evidence of pretext.

### IV. Monell Claim

#### A. The Plaintiffs Lack Standing to Sue on Behalf of the Citizenry

In their complaint, the Plaintiffs allege in both counts labeled "Count VI" that the actions of the City deprived <u>the plaintiffs</u> of their due process rights. Now, in their opposition brief, for the first time, the plaintiffs claim that the City is liable under *Monell* for maintaining practices which violate the rights of the <u>City residents</u>. Needless to say, the general citizenry of the City of Camden is not a party to this action, nor is any individual who has claimed to be deprived of his Fourth Amendment rights by any action of the city. The plaintiffs do not have standing to sue on behalf of City residents. *See, e.g. City of Los Angles v. Lyons*, 461 U.S. 95, 101 (1983) (plaintiffs must have a "personal stake in the outcome" to assert standing); *Friends of the Earth, Inc. v. Laidlaw Env'l Services (TOC), Inc.*, 528 U.S. 167, 168-69 (2000) (for Article III standing, plaintiff must show injury in fact, causation, and redressability). Even if the plaintiffs had some argument as to how they have standing to sue on behalf of nonparty city residents, such a claim would need to be included in their complaint, which it is not. The plaintiffs cannot inject a new theory of liability at the summary judgment stage.

#### B. The Plaintiffs Have Not Established an Unconstitutional Custom

The only constitutional injury alleged to any of the actual plaintiffs in this matter (now that the Due Process claims have been withdrawn) is contained in Count IV, where the plaintiffs allege a First Amendment violation. As discussed *supra*, there was no First Amendment violation. However, even if a First Amendment violation is found, the City cannot be held liable.

12

The plaintiffs correctly note that to establish *Monell* liability, a plaintiff must show that "an official who has the power to make policy is responsible" for the acquiescence in the alleged custom. *See Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990). The plaintiffs point the finger at Chief Thompson, arguing that he was aware that his officers believed there was an illegal quota system, but no action was taken. As evidence, the plaintiffs cite to Chief Thompson's Deposition at 33:14-21; 34:1-35; 36:13-22. Plt.Brief at 25. Those deposition sections have nothing to do with any action taken or not taken by Chief Thompson to address the perceptions of the officers. Regardless, the undisputed facts show that Chief Thompson, far from being indifferent to such allegations, was very concerned, and took numerous steps to set the record straight.

In 2009, the City implemented a violence reduction initiative clearly laying out the goals of the directed patrol program, including reducing crime and improving the quality of life of Camden residents. Ex. B. The written initiative clearly stated that extenuating circumstances could result in a directed patrol taking longer than the 15-20 minute goal time. *Id.* at 9. In January of 2009, Inspector Cuevas ordered each lieutenant and captain to submit a list of the three (3) lowest performing officers in his or her command unit and to submit a detailed explanation of why each officer was chosen and an improvement plan. Ex. P. Cuevas cautioned that low performers should not be chosen on the basis of a single factor. *Id.* Chief Thompson and Deputy Chief Lynch were copied on the email. *Id*. Upon hearing the allegations from Galiazzi that the Department was using an illegal quota system, Inspector Cuevas emailed Lt. Cook, Galiazzi's superior, stating "[o]bviously, this is a serious concern an accusation" and "you must determine why he believes this, if he misunderstands his role or was an improper order given to him." Ex. W. Shortly thereafter, Chief Thompson issued an email to all supervisors clarifying that directed patrols should be issued to conduct proactive police patrols in crime hot spot locations, and that "[a]ny questions with this order must be brought to my

13

attention immediately." Ex. Y. On April of 2009, after being informed that certain officers did not understand the policy, Chief Thompson issued a general order clarifying the policy. Ex. CC. In May of 2009, Chief Thompson issued another general order clarifying the difference between a field inquiry and an investigative detention. Ex. DD. Deputy Chief Lynch followed up by instructing all commanders that they were <u>not</u> to tell their officers that a certain number of directed patrols were required per shift and that low performers were to be evaluated on the totality of the circumstances. Ex. K at 34:15-19; 37:10-20.

The undisputed facts show, far from being indifferent to the mistaken beliefs of certain officers, the command staff of the Department attempted numerous times to clarify the policy and make sure that officers understood that there was no quota, and that low performers were to be evaluated on the totality of the circumstances. The plaintiffs' assertion that "no action was taken" could not be farther from the truth. The plaintiffs have failed to identify a single statement, order, or other communication from Chief Thompson endorsing or acquiescing to anyone's rights being violated.

Because there was no unlawful custom in the Department, and because Chief Thompson cannot be shown to be responsible for certain individual officers' mistaken beliefs about the directed patrol program, summary judgment should be granted on the plaintiffs' *Monell* claims, and the City, Inspector Cuevas and Chief Thompson should be dismissed from the matter.

**V.      The Plaintiffs' Requests for Declaratory Judgment, Injunctive Relief, and Front Pay are Moot**

In their opposition brief, Plaintiffs do not even attempt to articulate a claim for front pay. Therefore, this reply will address only Plaintiffs' requests for declaratory judgment and injunctive relief.

14

"It is axiomatic that the federal courts may not decide an issue unless it presents a live case or controversy." *Abdul-Akbar v. Watson*, 4 F.3d 195, 206 (3d Cir. 1993). In *Watson*, the plaintiff brought a § 1983 action challenging the adequacy of the legal services provided to inmates at the prison in which he was incarcerated. *Id*. at 196. The District Court issued an injunction requiring that the defendant prison formulate a new Legal Access Plan. *Id.* at 197. However, it was discovered that the plaintiff had been released from prison prior to trial, and prior to the injunctive order. *Ibid*. The Third Circuit held that the injunction had been issued in the absence of a live case or controversy, and vacated the injunction. *Ibid. See also Bracey v. Pennsylvania Dept. of Corrections*, 456 Fed.Appx. 76, 77 (3d Cir. 2012) (noting that the *Watson* holding applies equally to declaratory relief, and dismissing as frivolous a similar appeal).

Plaintiffs' arguments regarding mootness are contrary to the established law. The City of Camden exercises no control over the operations of the Camden County Police Department. Ex. MM at ¶ 5. Therefore, much like in *Watson*, the plaintiffs' requests for declaratory and injunctive relief are moot. Plaintiffs admit that the court cannot issue an injunction with is binding to Camden County, and that Camden County is currently providing all police services in the City of Camden. Plaintiffs' argument that the City is merely attempting to escape liability is unfounded, as several claims remain, aside from the claims for injunctive relief, declaratory relief, and front pay. Because there is no case or controversy regarding those requests, Plaintiffs claims for injunctive relief, declaratory relief, and front pay should be dismissed as moot.

## CONCLUSION

For the reasons stated above, summary judgment should be granted on all claims.

|  |  |  |
|---|---|---|
| Dated: October 22, 2014 | by: | WEIR & PARTNERS LLP<br>  /s/Wesley Fenza<br>Wesley Fenza, Esq. (WF9011)<br>Weir & Partners, LLP<br>*A Pennsylvania Limited Liability Partnership* |

15

# Exhibit OO



# Camden Police Department Memorandum

### Special Operations

**To:** Lt. Cook
**From:** Sgt. A. Moffa
**Date:** February 16, 2009
**Re:** Work Performance M. McCausland

Sir I have reviewed Officer M. McCausland #1274 stats from week seven (7). I compared those stats with his weekly stats from week two (2). I have noticed some improvement in the areas of Directed Patrols, Summonses Issued, Field Contact Cards, and Pedestrian Stops. His number of Directed Patrols has more than doubled. The other stats have gone up except for the area of arrest. I did notice that he is engaging more people. His numbers went from a 0 to 9 in the area of Pedestrian Stops. I believe that as long as he is engaging pedestrians the number of arrest should go up. I will continue to monitor Officer M. McCausland on a daily basis. I have attached a copy of week 2 and week 7 stats for your review.

CC: File

ZLF FOP 0154