# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

FRATERNAL ORDER OF POLICE,
LODGE 1, JOHN WILLIAMSON,
ANTHONY GALIAZZI, and CHARLES        CIVIL NO. 10-1502 (NLH)(AMD)
J. HOLLAND,

  Plaintiffs,                                        **OPINION**

     v.

CITY OF CAMDEN, SCOTT
THOMSON, ORLANDO CUEVAS, and
LIEUTENANT JOSEPH WYSOCKI,

  Defendants.

---

**Appearances:**

GREGG L. ZEFF
JENNIFER L. PRIOR
ZEFF LAW FIRM, LLC
100 CENTURY PARKWAY
SUITE 305
MT. LAUREL, NJ 08054

    On behalf of plaintiffs

JOHN C. EASTLACK, JR.
WESLEY L. FENZA
WEIR & PARTNERS LLP
THE LIBERTY VIEW BUILDING
457 HADDONFIELD ROAD, SUITE 310
CHERRY HILL, NJ 08002

    On behalf of defendants

**HILLMAN, District Judge**

    Plaintiffs, Fraternal Order of Police, Lodge 1, and John

Williamson, Anthony Galiazzi, and Charles J. Holland, Camden Police

Officers, filed a complaint against defendants, the City of Camden, Scott Thomson, City of Camden Police Chief, Orlando Cuevas, City of Camden Police Inspector, and Joseph Wysocki, City of Camden Police Lieutenant, claiming that defendants imposed, and continue to impose, an unlawful quota policy on Camden City police officers,[1] Plaintiffs further contend that the implementation of that policy, as well as the ramifications of plaintiffs' expression of their disagreement with the policy, constitute violations of N.J.S.A. 40A:14-181.2 (Quotas for arrests or citations prohibited; use of numbers in law enforcement officer evaluations),[2] N.J.S.A. 34:19-1,

---

[1] Plaintiffs' claims are asserted against the City of Camden, which is the proper defendant in a claim asserted against the former Camden City Police Department. Boneberger v. Plymouth Township, 132 F.3d 20, 25 n.4 (3d Cir. 1997) (a municipality and its police department are a single entity for the purposes of § 1983 liability). Plaintiffs' claims against the individual defendants are in their individual and official capacities, and the official capacity claims are actually claims against the City of Camden. See Monell v. New York City Dept. of Social Services, 436 U.S. 658, 690 n.55 (1978) (official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent"). Previously, the Court raised the issue of the effect of the May 1, 2013 Camden County takeover of the City of Camden's policing duties on plaintiffs' claims, particularly with regard to their request for injunctive and declaratory relief. Because the Court has found that none of plaintiffs' claims are viable, the issue of the Camden Police Department becoming defunct is now moot.

[2] It appears that the FOP's only claims relate to N.J.S.A. 40A:14-181.2.

et seq. (Conscientious Employee Protection Act), and their First Amendment rights under the federal and New Jersey constitutions.[3] Plaintiff Holland has also asserted a claim for a violation of his rights under the federal and New Jersey Family Medical Leave Acts. Defendants have moved for summary judgment on all of plaintiffs' claims.  Plaintiffs have opposed the motion.  For the reasons expressed below, defendants' motion will be granted.

<u>**BACKGROUND**</u>

The policy that is the central issue in this case is the Camden City Police Department's policy regarding "directed patrols."[4]  This Court recently addressed another Camden police officer's suit against the City of Camden regarding the directed patrol policy, and that officer's claims that he was retaliated against because he spoke out against the policy.  See <u>Davila v. City of Camden</u>, --- F. Supp. 3d ---, 2014 WL 7011159 (D.N.J. Dec. 11, 2014) (Civil Action 11-554 NLH/AMD).[5]  In <u>Davila</u>, the Court

---

[3] Plaintiffs have withdrawn their claims for violations of their Due Process rights.

[4] It is unclear whether the directed patrol policy is still in effect.

[5] The plaintiff in <u>Davila</u> was a Camden police sergeant who thought that the directed patrol policy was generally a good one but was nonetheless concerned that the police department would be subjected to lawsuits by Camden citizens because of the collection and retention of personal information.  <u>Davila v. City of Camden</u>, --- F. Supp. 3d ---, 2014 WL 7011159, *4 (D.N.J.

3

summarized the directed patrol policy:

> [D]irected patrols were a police investigative tactic
> which required police officers to patrol targeted crime "hot
> spots" in an effort to concentrate police presence in areas
> of the city that were known high-crime areas.  The policy
> required officers to "engage" members of the public who were
> not suspected of committing any offense in an attempt to
> obtain information about the community and make the police
> presence known in the community.  The policy required
> officers to approach citizens in the neighborhoods and
> attempt to obtain information about criminal activity in the
> neighborhood, and also obtain personal identifying
> information from individuals if they agreed to provide it,
> such as the person's name, date of birth, residence, and
> social security number.

Davila, 2014 WL 7011159, *1.

The Court further noted:

> It appears that "directed patrols" fall into two
> categories.  One type of police contact with an individual
> constitutes a constitutionally protected encounter, where an
> officer has reasonable suspicion to stop an individual
> suspected of committing a crime.  In that type of encounter,
> an individual is not free to walk away and is required to
> provide identifying information.  The other type of police
> contact with an individual – called a "mere inquiry" – does
> not implicate any constitutional rights, and a party is free
> to refuse to provide personal information and can walk away
> from the officer.

---

Dec. 11, 2014).  The plaintiff voiced his objection to the
policy at a roll call meeting, and he was disciplined for
insubordination.  Id.  The Court granted summary judgment to the
defendants on the plaintiff's First Amendment and NJ CEPA
claims, finding that the plaintiff did not offer sufficient
evidence to demonstrate that his discipline was in retaliation
for protected speech or a whistleblower activity, and was not an
effort to promote workplace efficiency and avoiding workplace
disruption.  Id. at *5, *6.

Id. at *1 n.2.[6]

---

[6] The Court also pointed out in Davila that police officers are required to understand the parameters of detaining and speaking to citizens. See, e.g., Ashcroft v. al-Kidd, --- U.S. ----, 131 S. Ct. 2074, 2083 (2011) ("A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."). The law on police encounters with citizens is clearly established:

> Even a brief detention can constitute a seizure. Terry v. Ohio, 392 U.S. 1, 16 (1968). However, "[t]he police do not violate the fourth amendment by 'merely approaching an individual on the street or in another public place, by asking him [or her] if he [or she] is willing to answer some questions....' " Davis, 104 N.J. at 497, 517 A.2d 859 (quoting Florida v. Royer, 460 U.S. 491, 497 (1983)). On the other hand, "mere field interrogation" is constitutional "so long as the officer does not deny the individual the right to move." State v. Sheffield, 62 N.J. 441, 447, 303 A.2d 68, cert. denied, 414 U.S. 876 (1973). A police officer may conduct an investigatory stop if, based on the totality of the circumstances, the officer had a reasonable and particularized suspicion to believe that an individual has just engaged in, or was about to engage in, criminal activity. Terry, 392 U.S. at 21. This Court has upheld the constitutionality of a temporary street detention based on less than probable cause.

State v. Stovall, 788 A.2d 746, 752 (N.J. 2002); Florida v. Royer, 460 U.S. 491, 497-98 (U.S. 1983) ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way.").

In this case, plaintiffs claim that the directed patrol policy constituted an impermissible "quota" system, and that they were retaliated against for not fulfilling the policy and for speaking out against the policy.  When the directed patrol policy was implemented, officers on supplemental patrol were required to conduct a minimum of 27 directed patrols, and officers on regular patrol were required to perform a minimum of 18 directed patrols.  Two of the plaintiffs, Holland and Galiazzi, were considered "low performers" on their directed patrol requirements, and they claim that they were transferred to other positions solely because of their low directed patrol numbers, which is a violation of the New Jersey quota law.

When Holland and Galiazzi were counseled for being low performers, they both objected to the directed patrol policy, calling it an illegal quota system.  Williamson, the FOP president, filed grievances on behalf of officers placed on the low performers list, he led a rally against the directed patrol policy, and he filed a state court complaint on behalf of the FOP seeking to declare the policy as invalid.[7]  These plaintiffs claim that they were retaliated against by being transferred to

_____

[7] The resolution of the state court declaratory judgment action is unclear.

lesser positions in the department and by being investigated by internal affairs because of the expression of their views on an illegal policy.  Holland also claims that his FMLA rights were violated during this time period as well because he was cited for excessive absences despite receiving approval to take intermittent leave to care for his mother who was suffering from breast cancer.

## **DISCUSSION**

### A.   **Subject matter jurisdiction**

Plaintiffs have brought their claims pursuant to 42 U.S.C. § 1983, as well as pursuant to the New Jersey constitution and New Jersey state law.  This Court has jurisdiction over plaintiffs' federal claims under 28 U.S.C. § 1331, and supplemental jurisdiction over plaintiffs' state law claims under 28 U.S.C. § 1367.

### B.   **Standard for Summary Judgment**

Summary judgment is appropriate where the Court is satisfied that the materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, or interrogatory answers, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 330

(1986); Fed. R. Civ. P. 56(a).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor."  Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v.

8

Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

**C.   Analysis**

**1.   New Jersey Quota Law**

Plaintiffs claim that the directed patrol policy violates the New Jersey statute that prohibits the imposition of quotas on police officers.  N.J.S.A. 40A:14-181.2, entitled "Quotas for arrests or citations prohibited; use of numbers in law enforcement officer evaluations," provides:

> a. A State, county or municipal police department or force engaged in the enforcement of Title 39 of the Revised Statutes or any local ordinance adopted pursuant to this title shall not establish any quota for arrests or citations. The department or force may, however, collect, analyze and apply information concerning the number of arrests and citations in order to ensure that a particular officer or group of officers does not violate any applicable legal obligation.

> b. The department or force shall not use the number of arrests or citations issued by a law enforcement officer as the sole criterion for promotion, demotion, dismissal, or the earning of any benefit provided by the department or force. Any such arrests or citations, and their ultimate dispositions, may be considered in evaluating the overall performance of a law enforcement officer.

Setting aside the issue of whether plaintiffs can maintain a private cause of action for violations of this provision, plaintiffs have not demonstrated that the directed patrol policy falls under this statutory provision.  The language of the statute is clear that a police department cannot implement quotas for "arrests or citations."  By reference to a companion provision,

the statute expressly defines "citation" to mean "any summons, ticket, or other official document issued by a police officer for a traffic violation, containing an order which requires the motorist to respond."  N.J.S.A. 40A:14-181.1 (providing that "Citation" means a citation as defined in section 4 of P.L.1983, c. 46 (C.39:5F-4)).[8]  The term "arrest" is defined in the common law as "the taking of a person into the custody of the law in order that he may be held to answer for a criminal offense or be prevented from committing one."  State v. Evans, 438 A.2d 340, 342 (N.J. Super. App. Div. 1981) (citations omitted).

As presented by the plaintiffs in this case, the directed patrol policy required police officers to engage citizens and record any information provided, and it required that officers perform 18 to 27 inquiries during a shift in order for the policy to be effective.  The policy did not require 18 to 27 arrests to be performed or 18 to 27 citations to be issued.  Thus, as a matter of law, N.J.S.A. 40A:14-181.2 is inapplicable to the directed patrol policy, and it cannot form a basis to support any

---

[8] The statute also defines "quota" to mean "any requirement, in writing or otherwise, regarding the number of arrests made or the number of citations issued within a defined period of time by a law enforcement officer, or regarding the proportion of the arrests made and citations issued by the law enforcement officer relative to the arrests made and citations issued by another law enforcement officer or group of officers."  N.J.S.A. 40A:14-181.1.

of their claims.

### 2.   NJ CEPA claims

The New Jersey Legislature enacted CEPA to "protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." Abbamont v. Piscataway Township Bd. of Educ., 650 A.2d 958, 971 (N.J. 1994).  In furtherance of that goal, the statute provides, in relevant part: An employer shall not take any retaliatory action against an employee because the employee does any of the following: . . . c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes: (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . .; (2) is fraudulent or criminal; or (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.  N.J.S.A. 34:19-3(c).

A plaintiff who brings a cause of action pursuant to N.J.S.A. 34:19-3(c) must demonstrate that: (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3(c); (3) an adverse employment action was taken against him or her; and (4) a causal

connection exists between the whistle-blowing activity and the adverse employment action.  Kolb v. Burns, 727 A.2d 525, 530 (N.J. Super. Ct. App. Div. 1999) (citation omitted).

Plaintiffs' claims are deficient on at least two of the required elements.  First, plaintiffs maintain that they reasonably believed that the directed patrols constituted impermissible quotas, and that they suffered demotions and investigations as a result of their expression of their views. While the Court accepts plaintiffs' contention that they subjectively believed the directed patrol policy established improper quotas on police officers, that believe was not objectively reasonable.

Any officer who reads the clear and plain language of the statute would immediately understand that it only applies to "arrest" and "citations," as those basic terms are understood under the common law and defined by the statute itself, and that the directed patrol policy does not encompass arrests or citations.  Nevertheless, the Court will accept for present purposes the reasonableness of their belief.  The Court also accepts that Holland and Galiazzi were transferred because they did not fulfill the "quotas" of directed patrols, and that Williamson was placed under investigation for the first time in his thirteen year career.  The Court also accepts that plaintiffs'

superiors knew they objected to the directed patrol policy.  The missing fundamental element of plaintiffs' NJ CEPA claims is the causal connection between their "whistle-blowing" and their adverse employment actions.

> ### a.   Holland and Galiazzi

In the case of Holland and Galiazzi, it is undisputed that they did not comply with the directed patrol policy by fulfilling the number of inquiries required for their shifts.  Between January 2009 and February 2009, they were verbally counselled and then given written warnings.  These plaintiffs claim that despite their improving statistics, they were transferred to lesser positions.  The reason for their transfer, plaintiffs claim, is that they objected to the directed patrol policy, which is evidenced by the fact that a fellow low performing officer who did not object to the policy was not transferred.[9]

The evidence in the record does not support a causal connection between their objections to the policy and their adverse employment actions.  On January 28, 2009, Holland and Galiazzi, and non-party McCausland, were counseled for not only

---

[9] Galiazzi and Holland state in their depositions that they were told by other officers that they were transferred and investigated because of what they wrote on their counseling forms with regard to the quota system.  The Court cannot consider this inadmissible hearsay, and no affidavits or testimony from these officers is provided as part of the record.

low performance on their directed patrols, but also for marginal performance in pedestrian/vehicle stops, moving violations, and quality of life enforcement.  (Docket No. 144-10 at 41, Memo from Lieutenant Cook to Inspector Cuevas, Feb. 2, 2009.)  Their supervisor informed them that their December statistics were low, and reminded them "that they are assigned to a unit which requires self-motivation and personnel must perform at levels higher than other units."  (Id.)  Their supervisor noted that "all three officers acknowledge our finding and have committed to improving [their] performance."  (Id.)

On February 3, 2009, Holland and Galiazzi received written warnings about their performance, and at that time Holland and Galiazzi voiced their objection to the directed patrols.  They also questioned the use of statistics to evaluate their overall performance in all areas.  (Docket No. 144-10 at 45, 50, Counseling forms.)

On February 16, 2009, plaintiffs' sergeant informed their lieutenant that their directed patrols doubled, and their other performance parameters had gone up.  (Docket No. 124-15 at 2, 4.) That same day, however, the lieutenant sent a memo to Inspector Cuevas, attaching the sergeant's report of plaintiffs' most recent statistics, and stated, "Although there has been some improvement I can only measure the effort as being less than favorable,

14

therefore I am recommending their transfer out of the unit."
(Docket No. 144-10 at 52.)

The record does not reveal the exact statistics of plaintiffs'
performance from December 2008 through February 2009.  Even though
their sergeant reports that their directed patrols doubled, it is
unclear whether they increased from 0 to 2 or 10 to 20.
Nonetheless, it is clear that plaintiffs remained deficient for
several months on the 18 to 27 directed patrols required as part
of their duties.  Moreover, even accepting that plaintiffs'
failure to comply with the directed patrol policy was due to their
objection to the policy, plaintiffs were evaluated on other areas
of performance.  Those areas remained deficient even after their
counseling.

Although plaintiffs attempt to evidence the causal connection
between their reassignment and their objection to the directed
patrol policy with the fact that fellow low-performer McCausland
was not reassigned because he did not object to the policy, the
record does not support that conclusion.  On his counseling form,
McCausland did not explain his objection to his low-performer
warning in writing like Holland and Galiazzi, but he did circle
that he did not concur with his counseling session.  (Docket No.
144-10 at 48.)  Moreover, the record contains the sergeant's
February 16, 2009 follow-up memo as to McCausland's performance,

15

which indicates that it had improved over Holland's and Galiazzi's.

As stated above, a police department is prohibited from establishing any quota for arrests or citations. A police department is also prohibited from using the number of arrests or citations issued by an officer as the sole criterion for promotion, demotion, or dismissal. N.J.S.A. 40A:14-181.2. A police department is not prohibited, however, by the very same statute from collecting, analyzing and applying information concerning the number of arrests and citations in order to ensure that a particular officer or group of officers does not violate any applicable legal obligation, or from being considered in evaluating the overall performance of a law enforcement officer. Id. Thus, the fact that the Camden police department evaluated Holland and Galiazzi's performance based on statistics in various areas, including directed patrols, and transferred them to different positions as a result of that evaluation is permissible and not evidence of retaliatory animus.

In addition to Holland and Galiazzi's reassignments, they claim other incidents of retaliation. Holland claims that in April 2009, his request to be put on bike patrol was denied; in June 2009, he was told that he would be placed in the "chronic sick" category; in August 2009, he was told that he would be

marked AWOL from a shooting; in October 2009, he was visited at home by a supervisor to confirm that he was not abusing sick leave time; in November 2009, he received a preliminary notice of disciplinary charges for failure to report, but the charges were never resolved because he asked to be transferred to the Brooklawn police department due to enormous stress.

Galiazzi claims that in March 2009 he was placed on an "abuse of sick time" list despite using his accumulated 20 days of sick time to care for his son who had broken his arm; in March 2009, he was transferred to a different squad, which had the same hours and compensation, but changed the days worked, requiring him to adjust his childcare obligations; in August 2009, his vacation was ordered to be cancelled due to manpower shortage, but instead of reporting to work, he went out on sick leave due to work-related stress, and an internal affairs officer visited him at home to confirm he was there.

These additional allegations of retaliation are either too attenuated from their objections to the directed patrol policy, or they do not amount to adverse employment actions. <u>Klein v. University of Medicine and Dentistry of New Jersey</u>, 871 A.2d 681, 691-92 (N.J. Super. Ct. App. Div. 2005) (explaining that the Legislature has defined a "retaliatory action" under the CEPA statute as "the discharge, suspension or demotion of an employee,

or other adverse employment action taken against an employee in the terms and conditions of employment," N.J.S.A. 34:19-2e, and the courts have interpreted this provision as requiring an employer's action to have either impacted on the employee's "compensation or rank" or be "virtually equivalent to discharge" in order to give rise to the level of a retaliatory action required for a CEPA claim); Hancock v. Borough of Oaklyn, 790 A.2d 186, 193 (N.J. Super. Ct. App. Div. 2002) (explaining that the imposition of a minor sanction is insufficient to constitute a retaliatory action under the statute).

Consequently, defendants are entitled to summary judgment on Holland's and Galiazzi's NJ CEPA claims.

###    b.    Williamson

Williamson's claims are different from Holland's and Galiazzi's.  Williamson contends that in his role of FOP President and his involvement in filing a state court lawsuit regarding the directed patrol policy, he was retaliated in four ways: (1) in August 2009, Williamson received a written reprimand for an incident that occurred in April 2009 at a hospital where an officer was being treated for a shooting and a nurse had claimed Williamson was verbally engaged in a loud confrontation with her and physically touched her; (2) in May 2009, Williamson was charged with a disciplinary action for not reporting that an

18

attorney had a thumb drive containing information about the Camden police department, but the charges were dropped; (3) during an FOP meeting on October 6, 2009, two women got into an argument and Williamson states that he was investigated as a result, but he does not know the result of the investigation; and (4) Williamson was told in December 2009 that he was being investigated for procedural violations that occurred on November 21, 2009.

These four alleged claims of retaliation do not support a NJ CEPA violation because they appear to be unrelated incidents, not causally connected to Williamson's stance on the directed patrol policy, and because they do not constitute adverse employment actions.  See N.J.S.A. 34:19-2e ("retaliatory action" under the CEPA is defined as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment"); cf. Espinosa v. County of Union, 212 F. App'x 146, 153 (3d Cir. 2007) (citing Kachmar v. SunGard Data Systems, Inc., 109 F.3d 173, 177 (3d Cir. 1997) (citation omitted) (explaining that employees can demonstrate a causal link between protected activity and adverse employment action using circumstantial evidence.  For example, the temporal proximity between the employee's expression and the adverse employment action or a "pattern of antagonism" on the part of the employer following the protected expression can raise the

inference of causation).[10]   Therefore, defendants are entitled to summary judgment on Williamson's NJ CEPA claim.

### 3.   First Amendment claims

Plaintiffs also claim that their First Amendment rights were violated with regard to their expression of their disagreement with the directed patrol policy.  It is well-established that a governmental entity "'may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech.'"  Dougherty v. School Dist. of Philadelphia, 772 F.3d 979, 986 (3d Cir. 2014) (quoting Rankin v. McPherson, 483 U.S. 378, 383 (1987)).  To establish a First Amendment retaliation claim, a public employee must show that (1) his speech is protected by the First Amendment and (2) the speech was a substantial or motivating factor in the alleged retaliatory action, which, if both are proved, shifts the burden to the employer to prove that (3) the same action would have been taken even if the speech had not occurred.  Id. (citation omitted).[11]

---

[10] To the extent that Williamson contends that he was retaliated against because he led protests against the policy in March 2009 and filed the state court action in April 2009, Williamson has not provided the requisite temporal proximity or other causal connection between those activities and his alleged adverse employment actions, even if they could be considered as such.

[11] For plaintiff's claims against the individual defendants acting in their personal capacity, the qualified immunity doctrine governs the analysis of those claims.  "Qualified immunity shields

The Third Circuit recently noted that "the Supreme Court has reiterated time and time again, [that] 'free and unhindered debate on matters of public importance'" is "'the core value of the Free Speech Clause of the First Amendment.'"  Id. (quoting Pickering v. Board of Education, 391 U.S. 563, 573 (1968)).  Accordingly, "public employees do not surrender all their First Amendment rights by reason of their employment."  Id. (quoting Garcetti v. Ceballos, 547 U.S. 563, 417 (2006)).  "At the same time, the Supreme Court also aptly recognizes the government's countervailing interest - as an employer - in maintaining control over their employees' words and actions for the proper performance of the workplace.  Thus, so long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively."  Id. (citation and quotation omitted).

---

government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Reichle v. Howards, --- U.S. ----, ----, 132 S. Ct. 2088, 2093 (2012).  The qualified immunity analysis is a two-step process, where a court must first decide whether the facts, taken in the light most favorable to plaintiff, establish that defendants' conduct "violated a constitutional right," and, second, whether that right was "clearly established" at the time of the challenged conduct.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Because the Court finds that plaintiffs cannot support their claims that defendants violated their constitutional rights, the qualified immunity analysis ends there.

Under this backdrop, a court must conduct a three-step inquiry to determine whether a public employee's speech is protected: (1) the employee must speak as a citizen, not as an employee, under the test established in Garcetti and recently reiterated by the Supreme Court in Lane v. Franks, --- U.S. ----, ----, 134 S. Ct. 2369, 2378-802 (2014); (2) the speech must involve a matter of public concern; and (3) the government must lack an "adequate justification" for treating the employee differently than the general public based on its needs as an employer under the Pickering balancing test.  Id.

In this case, even accepting that plaintiffs' opposition to the directed patrol policy was a matter of public concern, plaintiffs cannot meet the other two elements of their First Amendment violation claims.  For the same reasons explained above with regard to their NJ CEPA claims, plaintiffs have not provided sufficient evidence to go to a jury that their speech was a substantial or motivating factor in the alleged retaliatory actions, or that the Camden Police Department would not have taken the same action even if the speech had not occurred.[12]

---

[12] For the same reasons, plaintiff's First Amendment violation claim under the New Jersey constitution is also unavailing.  See E & J Equities, LLC v. Board of Adjustment of Tp. of Franklin, 100 A.3d 539, 549 n.5 (N.J. Super. App. Div. 2014) (explaining "[b]ecause we ordinarily interpret our State Constitution's free speech clause, N.J. Const. art. I, ¶ 6, to be no more restrictive

Consequently, defendants are entitled to summary judgment on plaintiffs' First Amendment violation claims.[13]

### 4.   Holland's FMLA claims

Holland claims that defendants interfered with this right under the Family Medical Leave Act.[14]  The Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, et seq., was enacted to provide leave for workers whose personal or medical circumstances necessitate leave in excess of what their employers are willing or able to provide.  Victorelli v. Shadyside Hosp., 128 F.3d 184, 186 (3d Cir. 1997) (citing 29 C.F.R. § 825.101).  The FMLA is both intended and expected to benefit employers as well as their employees in order to balance the demands of the workplace with the needs of families.  29 C.F.R. § 825.101(b),(c).

_____

than the First Amendment to the United States Constitution, we rely on federal constitutional principles in interpreting the free speech clause of the New Jersey Constitution," but noting that two exceptions to the general rule are political expression at privately-owned-and-operated shopping malls).

[13] Because plaintiffs cannot sustain their First Amendment claims, their claims against the City of Camden also fail.  See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978) (explaining that state a claim for municipal liability under § 1983, a plaintiff must establish a violation of a constitutional right, and that such violation was committed or caused by a policy or custom of the municipality).

[14] Holland has also advanced an FMLA interference claim pursuant to New Jersey's FMLA.  N.J.S.A. 34:11B-9.  The analysis of Holland's claims is the same for both the federal and state FMLA.

23

The FMLA affords eligible employees "a total of 12 workweeks of leave during any 12-month period" in order "to care for the spouse . . . of the employee, if such spouse . . . has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). Following FMLA leave, an employee is entitled to be reinstated to the former position or an alternate one with equivalent pay, benefits and working conditions. See id. § 2614(a)(1).

The FMLA provides relief for interference with these FMLA rights.[15] The FMLA declares it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" in the FMLA. 29 U.S.C. § 2615(a)(1). Such a claim is typically referred to as an "interference" claim. Sommer v. The Vanguard Group, 461 F.3d 397, 398-99 (3d Cir. 2006). To assert an interference claim, "the employee only needs to show that he was entitled to benefits under the FMLA and that he was denied them." Sommer, 461 F.3d at 399 (citation omitted). "An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements

_____

[15] The FMLA also provides relief for retaliation for an employee's exercise of his FMLA rights. The "retaliation theory protects employees from suffering discrimination because they have exercised their rights under the FMLA." Santosuosso v. Novacare Rehab., 462 F. Supp. 2d 590, 596 (D.N.J. 2006) (internal citation and quotes omitted). Holland has not asserted a retaliation claim.

guaranteed by the FMLA." Id. (citation omitted).

Holland claims that defendants interfered with his FMLA rights by being visited at home on one occasion, being told he was using too much sick time, and by being placed on the "chronic sick" category for his use of his intermittent FMLA leave to care for his mother who was suffering from cancer. Holland has not shown, however, that he was denied FMLA time, precluded from using his FMLA time, or otherwise prejudiced by defendants' actions. Thus, Holland's FMLA interference claim is unsupportable. See Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89 (2002) ("To prevail [on an FMLA interference claim], an employee must prove, as a threshold matter, that the employer violated § 2615 by interfering with, restraining, or denying his or her exercise of FMLA rights. Even then, § 2617 provides no relief unless the employee has been prejudiced by the violation.").

## CONCLUSION

For the reasons expressed above, defendants are entitled to summary judgment on all of plaintiffs' claims against them. An appropriate Order will be entered.


Date: March 31, 2015                    s/ Noel L. Hillman
At Camden, New Jersey              NOEL L. HILLMAN, U.S.D.J.